31

Oberlander-direct/Moore

1  No.

2  Q.   Not specifically did they say they had --

3  A.   Mr. Elzufon, who is an attorney representing one of the

4  defendants, Alex Solomon, told me that he contacted Alex

5  Solomon's insurance carrier, CNA, to advise them of what was

6  going on.  So, I suppose one could presume he sent some or all

7  up there.  I really don't know.  I never asked.  It is not

8  unreasonable to assume he might have.

9          May I add something, your Honor?

10         THE COURT:  Sure.

11         THE WITNESS:  I believe it was on the 13th that Judge

12  Buchwald directed me to forward to several people who received

13  the complaint with the attachments an order advising them they

14  were not to disseminate it.  So, presumably whatever would

15  have happened by the 13th.  Nobody has spoken to me since then

16  about any of this.

17  Q.   Did you follow Judge Buchwald's order and contact

18  everyone to whom you had sent it?

19  A.   Indeed I did.

20  Q.   Besides providing the actual documents, the ones referred

21  to as the sealed and confidential documents, did you discuss

22  the information contained in any of those documents with

23  anyone?

24  A.   Yes.

25  Q.   With whom did you discuss the information contained in

Oberlander-direct/Moore

1  those documents?

2          MR. LERNER:   Objection.   This is beyond the scope of

3  the order to show cause.

4          THE COURT:   Sustained.

5  Q.   Who drafted the SDNY complaint?

6  A.   I did.

7          MR. LERNER:   Objection, that's also beyond the

8  scope.

9          THE COURT:   It is in the record.   It is part of the

10 evidence in this case.

11 Q.   Are you aware of who has reviewed that complaint?

12 A.   Would you be more precise about the phrase reviewed?

13 Q.   Read it.

14 A.   Mr. Kriss read it.

15         THE COURT:   There are several Mr. Krisses.

16         THE WITNESS:   Referring to my client Jody Kriss.   I

17 apologize.

18 A.   My client read it, I read it and I need to request

19 clarification -- actually, no, I will answer it directly.   I

20 have been told by my lawyers at Wilson Elser that two of them

21 have read it and beyond that nobody told me that they read it

22 and furthermore whether they read it -- whether they read part

23 of it, it is unclear from your question what you're asking.

24 Q.   Did you know at the time you filed the complaint in the

25 Southern District of New York Mr. Doe's entire criminal case

M. BRYMER, RPR, OCR

33

                    Oberlander-direct/Moore

1   was under seal in the Eastern District of New York?

2              MR. LERNER:    Objection.

3              THE COURT:   I will allow that.

4   A.    Truthfully, I don't know it now.  By that I don't mean to

5   contradict what the Court said.  I certainly respect the

6   Court.  And last week, if I'm not mistaken, the Court said and

7   I'll get the quote later on, I apologize to your Honor, that

8   there is no order.  At the beginning of the matter I had

9   everything filed in the case sealed.  Whatever the Court's

10  exact words were, certainly I was there, I heard that, I

11  assume it is true, and if that's knowledge, that's the first

12  time I ever had such knowledge.

13  Q.    That's the very first time you had knowledge?

14  A.    That's the very first knowledge -- first time, if it is

15  knowledge, that is the first time I had knowledge that the

16  entire record was sealed.

17  Q.    How about the exhibits that were attached to the SDNY

18  complaint, did you know that some of them were sealed?

19  A.    I still don't know that because when the Court said -- I

20  believe what the Court said last week in further comment was

21  that his Honor checked the computer files, found that the

22  general files, if I'm not mistaken, was marked sealed and his

23  Honor said that there were six documents listed without

24  description that were under seal and that he didn't look to

25  see what they were, but could if he wanted to.  My point being

34

Oberlander-direct/Moore

1    that I actually have no knowledge that they're sealed.

2    Q.    Well, paragraph 96 of that complaint says because his

3    guilty plea to the criminal RICO proffer and cooperation

4    agreement were sealed.  When you drafted that portion, did you

5    know that they were sealed?

6    A.    I drafted more words after that.  You're moving them out

7    of context to distort the meaning.

8    Q.    Because his guilty plea to criminal RICO proffer and

9    cooperation agreement were sealed, as he was aiding the

10   prosecution of his Mafia and Russian organized crime

11   confederates, does that change your understanding of the

12   documents were sealed?

13   A.    Well, I know what I wrote.  Since it is not -- wait a

14   second.  I can check.  Can you hang on while I go look at

15   paragraph 96?

16   Q.    Absolutely.

17   A.    Please, since I'm confused, what is exactly your question

18   here?

19   Q.    When you wrote because the guilty plea to criminal RICO,

20   proffer and cooperation agreement were sealed, did you know

21   that those documents were sealed?

22   A.    I've already testified that I never have and still don't

23   know that they're sealed.

24   Q.    So, what is the meaning of that sentence when you say

25   were sealed?

M. BRYMER, RPR, OCR

35

Oberlander-direct/Moore

1   A.   It means I'm alleging on behalf of my clients that we can

2   prove, should there be any fact at all, an ultimate fact that

3   they were sealed, that doesn't mean I know it to be true nor

4   are those my words.   I wrote them on behalf of my clients.

5   Q.   When you wrote that it is your testimony you were not

6   under the belief the documents were sealed?

7   A.   I already testified what I believe to be the state of the

8   world with respect to how I represent them and what I chose to

9   aver on their behalf as work product.   This complaint is

10   Mr. Kriss' statement that he believes the following to be true

11   by the requisite level of pleading confidence.   If I'm not

12   mistaken, is it Rule 11?   Whatever it is in Federal Court.   It

13   is not an ultimate fact.   Nothing in the complaint depends on

14   it.   It is not judicial admission, and, even if it were, it

15   isn't mine.

16   Q.   It is your client's?

17   A.   I said it is not judicial admission and, but, even if it

18   were, it is not mine.

19   Q.   You disagree with the statement that the criminal

20   complaint, the proffer and cooperation were sealed?

21   A.   I couldn't very well do that because that would require

22   my knowledge of whether they are sealed and I still don't know

23   whether they are sealed.

24   Q.   Mr. Oberlander, did you yourself ever make any attempt to

25   obtain any portion of the criminal file from the courthouse

                    Oberlander-direct/Moore

1    here in the Eastern District of New York?

2    A.    Through my agent?

3    Q.    Through anyone.

4    A.    Yes.

5    Q.    And did you try to obtain any aspect of the criminal file

6    relating to my client in the document?

7    A.    I think it was the 10th was the date of the first hearing

8    here.

9    Q.    I'm sorry.

10   A.    It was the date of the first hearing here.  I believe

11   that is May 10th.

12         MR. LERNER:    June 11th.

13         THE WITNESS:  Oh, June 11th.  The date of the first

14   hearing.

15   Q.    But prior to filing the SDNY complaint, it is your

16   testimony you made no effort to actually obtain any portion of

17   the criminal case?

18   A.    That's correct.

19   Q.    Are you familiar with PACER?

20   A.    Oh, you mean the computer system?

21   Q.    Yes.

22   A.    I am.

23   Q.    Have you used it?

24   A.    Ever?

25   Q.    Yes.

37

Oberlander-direct/Moore

1  A.    Yes.

2  Q.    Did you attempt to use it to obtain information related

3  to the criminal case against my client in the Eastern District

4  of New York?

5         MR. LERNER:   Objection.   The question is too broad.

6  If you're asking the attempted use to find out any information

7  about the case --

8         MS. MOORE:   I am.

9         MR. LERNER:   Are you able to answer that?

10        THE WITNESS:   Yes.

11        MR. LERNER:   Okay.

12  A.   Yes, I did.

13  Q.   And when did you do that?

14        THE COURT:   Is that when or why?

15        MS. MOORE:   When.

16  A.   I would have to check.   My guess would be around the

17  20th, 25th of May.   I really can't be certain.   It is

18  certainly easy enough to check.   It would be sometime after

19  filing the complaint.

20  Q.   You're certain you never checked prior to filing the

21  complaint?

22  A.   Virtually certain because my credit card that I gave

23  PACER to bill long ago changed the number and I never updated

24  it.   I have no recollection of logging onto PACER.   I have no

25  recollection of logging onto PACER for anything prior to that

M. BRYMER, RPR, OCR

Oberlander-direct/Moore

1   time since 2008.

2   Q.   When you logged onto PACER in late May, what you pulled

3   up was a screen that says this case is under seal; is that

4   correct?

5   A.   Something like that, yes.

6   Q.   But as you sit here today it is still your testimony you

7   have no knowledge this case is under seal?

8   A.   I never testified to that.

9   Q.   What is the state of your knowledge as to whether or not

10  this case is under seal?

11  A.   That the Court said from the first date of the case, the

12  criminal matter, that he had all documents filed under seal

13  and I further testified that I have no knowledge that these

14  particular documents were filed under seal and I don't know

15  what the whole case under seal means, but I certainly respect

16  what the Court said a week ago and that's the sum total of my

17  knowledge.  I have absolutely no knowledge of what documents

18  are in fact filed under seal other than that I heard the Court

19  say there are six listed.  His Honor didn't know what they

20  were.

21  Q.   So, prior to filing the SDNY complaint you made no effort

22  whatsoever to verify the statement in the complaint that they

23  were under seal?

24  A.   I didn't say that.

25  Q.   Okay.

39

Oberlander-direct/Moore

1          Did you make any attempt prior to filing the

2   complaint to verify whether the documents you were attaching

3   them to or any part of Mr. Doe's criminal case was under seal?

4   A.    The basis for the allegation in the complaint are

5   contemporaneous press accounts from 2007 and which reputable

6   reporters list some parts as being under seal.  I believe the

7   exact phrase, for example, from an article I think December

8   17th, 2000, in the New York Times, within a day or two of that

9   said that a federal complaint remains under seal.  Based on

10  that and press coverage of Mr. Doe, it was eminently

11  reasonable to allege that at the time Mr. Kriss was hired in

12  2003 those documents were under seal, but, as I said, that's

13  an averment or allegation on behalf of Mr. Kriss, who

14  presumably had come to that conclusion from his verification

15  of the complaint and it is a reasonable complaint he had.  I

16  have not testified as to mine.

17  Q.    My question, Mr. Oberlander, was prior to filing this

18  complaint did you make any effort to verify whether or not the

19  documents you were attaching thereto or any other part of my

20  client's criminal file were under seal?

21          MR. LERNER:  Objection, asked and answered.

22          THE COURT:  Answer it again, you can answer it.

23  A.    I referenced the press accounts.  That's how I verified

24  it.

25  Q.    Anything besides press accounts that you went to to

M. BRYMER, RPR, OCR

40

Oberlander-direct/Moore

1   attempt to verify whether the documents you were attaching or

2   any part of the criminal case were under seal?

3   A.    Anything else I did, I don't recall specifically, no.

4   Q.    You just referenced a New York Times article which

5   specifically states a federal complaint brought against him,

6   meaning my client, in a 1998 money laundering stock

7   manipulation case was filed in secret and remains under seal;

8   is that right?

9   A.    The question is whether I referenced that article?  Yes,

10  I just did.

11  Q.    Did you read that article?

12  A.    Many times.

13  Q.    Did you read it with utmost care before filing the

14  complaint in the Southern District?

15        MR. LERNER:   Objection.

16        THE COURT:   Sustained.

17  Q.    Did you read it before filing the complaint in the

18  Southern District?

19  A.    I read it in 2007, when it first came out.  That was

20  before filing the complaint.

21  Q.    So, you knew certainly that as of December 2007, when

22  that article was written, the complaint was still under seal;

23  is that right?

24  A.    No.  I must have testified at least six times, I still

25  don't know that and anybody that would believe necessarily

41

Oberlander-direct/Moore

1  anything they would read in the newspaper like that I'm not

2  among the set of.  I continually told you that I do not know

3  what documents are under seal, never have known what documents

4  are under seal and the fact that the New York Times says that

5  one document is under seal is sufficient for purposes of the

6  well pled complaint, but does not make me know anything is the

7  case.

8         THE COURT:  May I for purposes of clarification?  You

9  testified that at some point you accessed or attempted to

10  access the file in this case via PACER.

11        THE WITNESS:  That's correct.

12        THE COURT:  I don't recall hearing and if it was

13  mentioned I missed it, what date was that?

14        THE WITNESS:  Sometime in the last few days of May,

15  May 20 or 25.  It may -- sometime between May 20 and June

16  10th.  I would have to check.  It was after filing the

17  complaint.  It was after the order to show cause was served.

18        THE COURT:  Thank you very much.

19  Q.   The criminal complaint referenced in the New York Times

20  article as being under seal, you made no independent effort to

21  obtain that; is that right?

22  A.   Independent of what?

23  Q.   Independent of receiving it from Joshua Bernstein.

24  A.   I testified that my attorneys attempted to access the

25  court file on June 11th, so presumably the answer is I did on

M. BRYMER, RPR, OCR

                                                                    42
                        Oberlander-direct/Moore

1  June 11th.

2  Q.   Any time prior to that?

3  A.   No.

4  Q.   You --

5  A.   Excuse me.  I went onto PACER.  Theoretically, if it had

6  been there and available, I guess that would be a constructive

7  attempt.  I'm not going to mislead.  Since nothing shows up

8  other than sealed --

9  Q.   You quote extensively from that complaint in your SDNY

10 complaint; is that right?

11          THE COURT:  Extensively from what?

12          MS. MOORE:   The criminal complaint.

13          MR. LERNER:   Objection.  This goes beyond the

14 scope.

15          THE COURT:  Mr. Lerner, that document is in

16 evidence.

17          MR. LERNER:   I understand, your Honor.

18          THE COURT:  If it is in evidence, it is in evidence

19 as to what it says and it is in evidence as to what it is that

20 may have been quoted.  It is part of the record.  It is a

21 rhetorical question.  It is a rhetorical one if it has been

22 quoted.  It is Mr. Oberlander's complaint.  I think the

23 assumption is a correct one, he quoted it, he signed the

24 complaint.

25 Q.   Mr. Oberlander, can you please turn to page 40 of that

Oberlander-direct/Moore

1    complaint, paragraph 207.

2    A.    Yes.

3    Q.    The quote contained in paragraph 107 that is indeed from

4    the criminal complaint I have been referring to; is that

5    right?

6    A.    The complaint says it is.  I certainly wouldn't knowingly

7    misrepresent it.  Without the complaint in front of me, I have

8    to rely on what this says is right.  I wrote it; I assume it

9    is true.

10   Q.    Did you obtain that from the actual complaint, the

11   criminal complaint?

12   A.    I must have.  I mean if you're asking me do I recall

13   writing that paragraph 207, what day and time, no, but I must

14   have if this is in fact from the complaint.  If you don't show

15   me the complaint, I have to assume it speaks for itself.  If

16   you show me the complaint, then I will be able to tell you

17   whether I copied it.

18   Q.    Did you obtain the complaint from which you quoted from

19   Mr. Bernstein on March 3rd via email?

20   A.    Yes.  This must now mean what I assume was true is in

21   fact true.  It is one of the documents attached to the March

22   3rd email.

23   Q.    You did not attach that complaint as one of your exhibits

24   to the SDNY complaint.  Why not?

25   A.    Work product.

                                                              44
                    Oberlander-direct/Moore

1           MR. LERNER:    Objection.

2    Q.    Was it because you knew it was under seal?

3           MR. LERNER:    Objection.

4           THE COURT:   I will allow it.

5    A.    No.

6    Q.    Was it because you knew it was stolen?

7           THE COURT:   Sustained.

8    Q.    Exhibit C to Movant's Exhibit 1 is a presentence report.

9    Did you read the entire presentence report before filing the

10   SDNY complaint?

11   A.    Yes.

12   Q.    Did you read the sentence on page two that reads, "It is

13   the policy of the federal judiciary and the Department of

14   Justice that further re-disclosure of the presentence

15   investigation report is prohibited without consent of the

16   sentencing judge"?

17   A.    I did.

18   Q.    What did you understand it to mean?

19   A.    That further disclosure by employees of the Bureau of

20   Prisons is against the policy of the judiciary and the Justice

21   Department without the consent of the sentencing judge.

22   Q.    So, you did not think that that sentence applied to your

23   disclosure of the PSR; is that your testimony?

24   A.    That's correct.

25   Q.    Did you make any attempt to obtain permission from the

45

Oberlander-direct/Moore

1   sentencing judge before filing the SDNY complaint?

2           MR. LERNER:   Objection.  He just answered.  It was

3   unnecessary.

4           THE COURT:   I think I can take judicial notice of the

5   fact, Ms. Moore, that no request was made of me by anybody

6   other than the Probation Department regarding this presentence

7   report.

8   Q.   Now, Mr. Oberlander, you cite an email to Ron Kriss on

9   May 12; is that correct?

10  A.   I may have sent more than one.

11  Q.   Let me show you what's been marked Movant's Exhibit 2.

12          MR. LERNER:   Your Honor, may I bring my client a cup

13  of water?

14          THE WITNESS:   Apparently I'm thirsty.

15          MR. LERNER:   Can we have the last question read

16  back?

17          MS. MOORE:   I think I just handed the witness an

18  exhibit.

19  Q.   Can you take a moment to review that exhibit, please?

20  A.   I did.

21  Q.   Is that in fact the email you sent to Ron Kriss on May

22  12?

23  A.   It looks like it.  I don't recall every word and how I

24  wrote it.

25          MR. LERNER:   Your Honor, I object.

46

Oberlander-direct/Moore

1      THE COURT:  I don't know what it is.  Have you seen

2 the email?  Do you know what is being referred to?

3      MR. LERNER:   Yes.

4      THE COURT:  What is the objection?

5      MR. LERNER:   Objection is it has nothing to do with

6 to whom Mr. Oberlander forward the documents or how he

7 received them.  It is beyond the scope.

8      THE COURT:  May I see the email?

9      MS. MOORE:   I'm sorry, your Honor.  I thought I

10 handed it up.  It is Exhibit 2.

11      MS. MOORE:   If I may, your Honor?

12      THE COURT:  I have it.

13      MR. LERNER:   There's nothing in this email...

14      THE COURT:  Ms. Moore.

15      MS. MOORE:   Your Honor, the document is in fact

16 forwarding the complaint with the exhibits asking that it be

17 re-forwarded.  It mentions possibilities with respect to

18 filing under seal.  I believe it is clearly relevant to

19 whether or not this witness knew that the attachments were

20 under seal to begin with.

21      THE COURT:  I will allow it.  There are some portions

22 of it which may not have any relevance to this proceeding, but

23 certainly paragraphs A, B and C attached to the first

24 paragraph are perfectly relevant to this proceeding and

25 perhaps the last paragraph is as well.  I'll receive it as

47

Oberlander-direct/Moore

1    Plaintiff's 2.  You can move on.

2          MS. MOORE:    Yes.

3    Q.   Mr. Oberlander, in this email you state there are three

4    objections I filed publicly today, I filed under seal.  I

5    arranged for an agreement with every defendant but Nixon

6    Peabody.

7          At the time you sent him the email you had already

8    filed it publicly, had you not?

9    A.   According to the court rules I had, but the -- yes.

10   According -- actually, seriously, I can't answer that only

11   because the terminology is confusing to me.  I had filed a

12   complaint already but it had not been public.

13   Q.   When you say you forwarded this to Julius, who is Julius?

14   A.   Ron Kriss would have understood that to be Julius

15   Schwartz.

16   Q.   Julius Schwartz is a principal of Bayrock?

17   A.   I have no idea what he is now, but at one time he was.

18   According to various testimony he gave title as executive vice

19   president, general counsel and considered himself de facto

20   chief executive officer of the company.

21   Q.   And he's a former law partner of Ron Kriss; is that

22   right?

23   A.   I think they called them shareholders, but, yes.

24   Q.   At the firm of Ackerman?

25   A.   Ackerman Senterfitt.

48

Oberlander-direct/Moore

1   Q.   And in this email you basically say there's three options

2   or pay the money back now; is that right?

3   A.   No.

4   Q.   Give the money back and now it is over.  What is the

5   meaning of that?

6   A.   It means Julius Schwartz personally in conspiracy with

7   other people, including Mr. Doe, stole in cash equivalent

8   about eight million dollars from my clients in terms of the

9   value of the partnership interest, they converted about

10  $30 million, probably tens of millions of dollars, depending

11  on the analysis from the Treasuries of New York State, New

12  Jersey and the United States, and I don't know how many

13  millions from people they defrauded when they were buying

14  condominiums and that they had plenty of time to rectify their

15  theft, embezzlement, larceny, fraud and tax evasion.

16  Q.   If in response to this email they agreed to pay back

17  millions of dollars you said were owed, would you have not

18  filed the complaint?

19  A.   I believe I testified I already had.

20  Q.   Would you have not served it?  Would you have retracted

21  it?

22  A.   If all defendants settled?  I don't know who they is.

23  You said if they had paid.  Who is the they in your question?

24  Q.   Julius.

25  A.   What about it?

49

Oberlander-direct/Moore

1  Q.   Well, the way I read this email, Mr. Oberlander, correct

2  me if I'm wrong, is that you're giving him three options in --

3  or demand for money.  You're saying I'll do this, this or this

4  unless you pay me the money back.

5           Am I reading that wrong?

6  A.   You are.

7  Q.   It was not your intent to make it a demand for money in

8  exchange for not filing it publicly?

9  A.   Of course it wasn't.

10 Q.   Explain to me the last paragraph.  I believe it is

11 possible to get this in under seal if Bayrock joins a joint

12 motion in Part One to seal the complaint pending redaction

13 agreement with the assignment judge.

14          What did you mean by that?

15 A.   What I meant by that is that this email was following up

16 on a telephone conversation I had with Mr. Kriss approximately

17 30 minutes earlier and during the course of that conversation

18 I informed Mr. Kriss that the best practices dictated that I

19 attempted to file the SDNY complaint under seal, which I had

20 attempted to do ex parte, and that I followed the procedures

21 to that and that the Part One Judge I was given to whom I

22 submitted a motion along with a brief in support of a motion

23 requesting a seal -- that would be Judge Kimball Wood --

24 declined without reason to seal it and because of the time it

25 took for her law clerks to go through everything and for her

50

Oberlander-direct/Moore

1   to then decline to seal it, it ran past the closing date for

2   the time for the cashier which I had to come back and file in

3   the morning and drop off the copy and within 24 hours upload

4   it to PACER.

5          So, I told Mr. Kriss that since best practices

6   covering me as plaintiff's attorney would indicate that I

7   attempt to file the complaint under seal and since I had

8   already been turned down by a Part One Judge that had not got

9   a spun wheel yet and an assigned judge, it was my belief that

10  if at least one defendant, ideally more than one, would join

11  with me in a stipulated motion to file under seal it would

12  then be reasonable to go to a new Part One Judge without judge

13  shopping and say, your Honor, we would like this filed under

14  seal by stipulated agreement.

15         So, my purpose in contacting Ron Kriss was the same

16  purpose I had in contacting John Elzufon an hour earlier, at

17  10:30, I think, that morning, which was to say to them that I

18  wanted to file the complaint under seal for reasons listed in

19  the sealing motion and that I was turned down, but that I

20  believed if someone stood next to me from the defendant's side

21  with a stipulated request to file under seal that perhaps that

22  would work.

23  Q.   Mr. Oberlander, why did best practices dictate that you

24  file a civil RICO complaint under seal?

25  A.   For one thing these companies of Bayrock are a

51
Oberlander-direct/Moore

1    partnership and the -- for tax purposes and the crux of the

2    complaint is that Mr. Doe, Julius Schwartz with the conspiracy

3    of professionals ran Bayrock through a pattern of rampant tax

4    evasion, tax fraud, money laundering, and when you play games

5    like that in a tax partnership you are propagating

6    consequences to every single one of the partners, including

7    the innocent minority partners, and it was my interpretation

8    that given the financial information that was in the complaint

9    even though nominally it would appear to be related to

10   Bayrock, it had sufficient impact on the tax partners of

11   Bayrock that it triggered, I think it's 21F, I'm not sure, of

12   the ECF filing that says while you don't have to file under

13   seal information, complaint or documents that contain the

14   following, you probably should, and, if I'm not mistaken, on

15   the list of those things that the court recommends attempted

16   to be filed under seal are documents containing personal

17   financial information.  That was one reason.

18   Q.   Were there any other reasons?

19   A.   Yes, there were.  There are emails in the complaint and

20   while I am certain that they are properly used and not subject

21   to objection and the reasons for that are stated in the moving

22   papers for filing under seal, I believe that best practices

23   requires in a case of this gravity that the opposing side in

24   the interest of justice be given a chance to examine the

25   complaint and see if they had, for example, privilege

52
Oberlander-direct/Moore

1  objections, in which case there could be a period of maybe a

2  week or two while the complaint stayed under seal pending a

3  redaction agreement.  That's what I was explaining to

4  Mr. Kriss, that's what I was explaining to Mr. Elzufon and

5  that's what is in my moving papers to put it under seal and in

6  fact that's what Morris and Cohen, representing Mr. Schwartz,

7  and I believe although it should be impossible conflict, also

8  representing Bayrock Group, specifically requested of me

9  within days of filing if I would agree to redaction.  So,

10  apparently they have the same view of it as I do.

11          The third reason for wanting to file under seal is

12  because this is a derivative action and while there are about

13  five or six known equity class members that are represented by

14  Mr. Kriss since Bayrock must be assuming even a fraction of

15  these complaints, claims in the complaint are true.  Since

16  Bayrock must be and must have been for sometime insolvent,

17  there are a staggering number of creditors who have quasi

18  equity standing to participate in a derivative action as

19  beneficiaries and to the extent that filing the complaint

20  prior to giving a chance for redaction would destroy what was

21  left of the company based on public reaction to it the

22  interest of my own derivative, albeit unknown clients, the

23  better part of the -- it was to attempt to redact and preserve

24  value of the company so that people out in the world reading

25  this wouldn't shoot against it.

53

Oberlander-direct/Moore

1  Q.    Were there any other reasons you made a motion to file it

2  under seal?

3  A.    Those were the three motions.

4  Q.    Does that motion exist in writing?

5  A.    Of course it does.

6  Q.    Do you still have a copy?

7  A.    Yes, I do.

8  Q.    Does that motion in any way contain any references to the

9  fact that there are sealed documents related to a criminal

10  case attached to the SDNY complaint?

11  A.    I'm virtually certain that it doesn't because 21F, in

12  fact, when you read it and it lists the documents -- rather,

13  the information which might give a reasonable attorney pause

14  to think about attempting to seal.  I believe the very last

15  one is if your document contains information about a

16  cooperation agreement with the government.  I presume from

17  reading that mine was not the only document ever filed that

18  contained a cooperation agreement that the government had.

19  Q.    I'm sorry, I'm confused and not familiar with 21F.  Does

20  21F permit you to file such a document or tell you to file it

21  under seal?

22  A.    Neither.  Actually, it simply says there's no restriction

23  whatsoever against filing it under seal, but you might want to

24  think about it.

25          THE COURT:  Excuse me.  What is 21F?

Oberlander-direct/Moore

1          THE WITNESS:  I apologize, your Honor.  There are ECF

2    rules published by EDNY and SDNY, jointly electronic filing

3    rules, and they refer to filing of all documents, not merely

4    complaints, and I'm pretty certain, it is funny -- again I

5    apologize, but there are two sets of rules, two so I'm

6    assuming it is 21E and -- whatever they are they are back to

7    back.

8          One says if your document contains any of the

9    documents you may not file it electronically or I guess

10   without court order or court permission.  So, that would be

11   according to Ms. Moore's questions you are prohibited from in

12   the absence of extenuation filing.  Following that I think is

13   21F, which contains a list of items which if your document

14   contains them you are perfectly free to file under seal, but

15   if I can paraphrase you probably ought to think about it

16   before you do that and consider attempting getting it sealed.

17         THE COURT:  Among the documents listed are

18   cooperation agreements?

19         THE WITNESS:  Indeed.

20         THE COURT:  Yes?

21         THE WITNESS:  Honestly, yes.

22         THE COURT:  Presentence reports?

23         THE WITNESS:  No.

24         THE COURT:  Cooperation agreements?

25         THE WITNESS:  Two-word phrase cooperation agreement,

Oberlander-direct/Moore

1  if it doesn't say that, it says something like -- evidence in

2  cooperation with the government.  May say cooperation

3  agreement.  Yes, it is very clear what it refers to.  It

4  does.

5          THE COURT:  Does it also refer to proffer agreements,

6  which are essentially almost synonymous with cooperation

7  agreements?

8          THE WITNESS:  No, it does not, no.

9          THE COURT:  You indicated earlier I believe you had

10 no idea, if I'm paraphrasing correctly, what a sealed case is,

11 what sealing encompasses and so on.  Do you recall that?

12         THE WITNESS:  No, I apologize.

13         THE COURT:  You never said anything like that?

14         THE WITNESS:  No, no.  The words are similar to what

15 I said, that I certainly would never have said more than I

16 mean to say, that I don't know what it means when a case is

17 put under seal.  Of course, I know what it means when a case

18 is put under seal.  I believe Ms. Moore was asking me what

19 documents I knew to be part of the sealed -- whatever you want

20 to call it.  There is a sealed, what is it, envelope?  However

21 your Honor wishes to refer to it.  Assume in an average case

22 there are some documents that are sealed and some that are

23 not.  In this case it may be all documents.

24         Ms. Moore has generally been asking me or in fact

25 entirely been asking me did you know this document was sealed,

M. BRYMER, RPR, OCR

56
Oberlander-direct/Moore

1  did you know that one and I said no, but if you're asking me

2  do I know what it means when a court orders a case sealed,

3  yes, of course I do and I apologize for any confusion.

4          THE COURT:  Do you understand that it means that the

5  case generically, meaning everything connected with that case,

6  is sealed?  The case is sealed, what does that mean?

7          THE WITNESS:  May I answer?  I would very much like

8  to answer that.

9          THE COURT:  By all means.

10          THE WITNESS:  All right.  In this particular case,

11  not having seen the sealing order, I certainly can't comment

12  on what any -- in general, my understanding is that when a

13  judge orders a case sealed that the order at a minimum directs

14  court personnel to remove the documents that are subject to

15  the sealing order from the publicly available file to keep

16  them sequestered somewhere, somewhere I guess in a safe of

17  some kind, to decline to release them to any member of the

18  public or anyone else asking for them who doesn't have a court

19  order and that a sealing order will typically, but not

20  necessarily, also include an order of the Court in the nature

21  of an injunction enjoining certain parties for that action

22  from disseminating some or all of the same documents.

23          That would be my generic understanding of what a

24  sealing order is.  It is not in rem, could not be in rem.  It

25  is directed to court personnel not to disclose and directed

57

Oberlander-direct/Moore

1    sometimes but not all the times the parties not to disclose.

2    It specifically is not a gag order nor could it purport to be,

3    but again for clarity I don't know what the order says.

4           If I may, there is one case with which I'm familiar

5    that says it probably more eloquently than I can.  It is from

6    the Supreme Court of Kentucky.  It is in the June 14th letter

7    and it says that a sealing order of the type I described, what

8    we call generic in this question, is not to be interpreted to

9    be a global gag order, not to be interpreted as any form of

10   court order purporting to control the ability of somebody to

11   obtain the same information outside the court process.

12          THE COURT:  We're talking about two different things,

13   Mr. Oberlander.  If a case is declared to be a sealed case and

14   court personnel are instructed this case is to be kept under

15   seal, you understand that to mean that court personnel are

16   precluded from making any information pertaining to that case

17   available to anybody.  I don't know what the Kentucky court

18   was dealing with, nor do I particularly care, the fact of the

19   matter is that your understanding is correct, that when a case

20   is declared to be a case filed under seal it directs court

21   personnel that this case is not to be made available to

22   anybody except under court order, which means in effect that

23   it is globally unavailable to anybody unless a court orders

24   it, directs it to be unsealed.

25          So, when you went to PACER, whenever it is you did,

58

Oberlander-direct/Moore

1  you saw this was a sealed case and when Mr. Lerner went to the

2  Clerk's office and requested to see the file, he was told, as

3  he told me in a letter addressed somewhere along in this case,

4  that the Court Clerk said, "Sorry, this case is under seal and

5  we cannot disclose anything about this case to you."  That is

6  what you were told or at least you told me that in the letter.

7           MR. LERNER:   My letter said I went to the Clerk's

8  office to obtain a copy of the sealing order.  I was unable to

9  obtain a copy of the sealing order.

10          THE COURT:  You were told even that's under seal.

11  They couldn't show you that?

12          MR. LERNER:   That is correct.

13          THE COURT:  Because it is the entire envelope under

14  seal in the vault of the Court together with everything else

15  that's filed.  Now, it is true there were six documents which

16  were also specifically marked under seal, but when the court

17  is authorized, a Judge of the court would be authorized to

18  access that sealed case, there are many entries which are

19  ministerial which the Court is told a letter has been sent or

20  whatever it is, an adjournment has been granted, but there are

21  some documents which are specifically filed under seal, so

22  even the Court can't look at it unless it makes a request to

23  see what that document is and asks the clerk, Clerk of the

24  Court, to open the vault and let me see what docket number 36

25  is.

59

Oberlander-direct/Moore

1          In the course of the proceeding it may have some

2     specific value for the Court's information but it is globally

3     sealed.  It is not addressed to any particular person.  It

4     couldn't be.  The Court wouldn't know in advance who it is

5     that might want to look at this file.  The Clerk of the Court

6     is told this case is sealed and without permission of the

7     Court it shouldn't be disclosed to anybody.

8          Why don't you move on, Ms. Moore.

9     BY MS. MOORE:

10    Q.   Just to clarify, Mr. Oberlander, it is your understanding

11    when a document is under seal that doesn't happen on its own,

12    right, it is pursuant to court order?  Is it your

13    understanding the court needs to order a document to be under

14    seal?

15    A.   I would not technically -- because I believe once a court

16    orders generally documents filed it doesn't then order each

17    individual document.  You just -- as a matter of course as you

18    file it becomes sealed.  But generally at one time or another

19    somebody somewhere on behalf of the court with authority to do

20    so must have written that order directly to keep some or all

21    documents under seal in order for it to be true as a statement

22    that such and such a document is sealed.

23    Q.   It is not limited to court personnel.  Your order before

24    Judge Kimball Wood, you would understand it to mean you

25    couldn't further disseminate the document, could you, if it

M. BRYMER, RPR, OCR

60

Oberlander-direct/Moore

1   had been signed?

2   A.   You mean the proposed order?

3   Q.   Yes.

4   A.   I have to look at it.  I drafted the thing quite some

5   time ago, but, yes, the object of the court order could

6   variably be any party over whom the Court at the time of the

7   order had personal jurisdiction sufficient to justify -- we

8   don't need to go into a constitutional Rule 65 speech.  You

9   understand.  We both understand.

10  Q.   But it is your testimony that no part of your application

11  before Judge Wood related to the fact that you were attaching

12  documents that were under seal in the Eastern District of New

13  York?

14  A.   I haven't seen it in a few weeks.  I truly don't recall

15  that I did that.  If I did, it is my memory error, but

16  certainly that sealing order -- I mean it is easily -- you

17  know, I can find it when I get back to my office, but to the

18  best of my recollection I believe that the motion said --

19  actually, it doesn't -- it could read possibly like that

20  because it does refer to information that is privileged and

21  confidential.  Let's rephrase it.  I will not quote from

22  something not in front of me.

23       It would be impossible to read it that way.  I didn't

24  necessarily intend to write it that way.  I don't recall

25  specifying that there were documents in there that would be

M. BRYMER, RPR, OCR