UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

UNITED STATES OF AMERICA,              :

                  Plaintiff,         :      98 CR 1101(ILG)

                          :

        -against-                 :     **FILED UNDER SEAL**

                          :

FELIX SATER,                     :

                          :

               Defendant.       :

-------------------------------------------------------------------- X


**FELIX SATER'S**
**MEMORANDUM OF LAW IN SUPPORT OF ORDER DIRECTING RETURN OF**
**SEALED AND CONFIDENTIAL MATERIALS**


MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, New York 10178
Tel: 212.309.6000

Attorneys for Felix Sater

Felix Sater, by and through his attorneys, Morgan, Lewis & Bockius LLP, hereby submits this memorandum of law in support of his request for:

(i) An Order directing Jody Kriss, Michael Ejekam and Fred Oberlander to immediately return to Mr. Sater certain confidential information and materials sealed by this Court which they have inexplicably acquired and improperly disseminated;

(ii) A hearing to determine how Messrs. Kriss, Ejekam and Oberlander acquired the materials and to whom they were disseminated; and

(iii) An order directing any persons who, as a result of the dissemination described above, obtained such materials, to return such materials to Mr. Sater.

## STATEMENT OF FACTS

### Background

Mr. Sater was the subject of criminal proceedings before this Court, which concluded in October 23, 2009, index number 98 CR 1101 (ILG) (the "Criminal Proceedings"). This Court sealed the docket and filings in the Criminal Proceedings including the following:

- a Cooperation Agreement dated December 10, 1998

- A United States Department of Justice Financial Statement dated December 10, 1998; and

- a Pre-sentence Investigation Report dated June 18, 2004 (the "2004 PSR")

(together, the "Sealed Materials"). In addition, Mr. Sater and the United States Attorney's Office entered into a confidential Proffer Agreement dated October 2, 1998 (together with the Sealed Materials, the "Sealed and Confidential Materials"). (Declaration of Kelly Moore dated May 18, 2010 at ¶¶ 3-6; hereinafter referred to as "Moore Decl. ¶ ___").

1

## The Improper Dissemination of Sealed and Confidential Information

Sometime on or before May 12, 2010, Mr. Oberlander prepared a new complaint on

behalf of Mr. Kriss and another former Bayrock employee to file against Mr. Sater and others in

the United States District Court for the Southern District of New York.  The new complaint (the

"SDNY Complaint") largely replicated the recently dismissed complaint in the Delaware

Action.[1]  This time, however, Mr. Kriss and Mr. Oberlander attached as exhibits and referenced

in the SDNY Complaint the Sealed and Confidential Materials. (In addition, the SDNY

Complaint quotes numerous privileged communications between Bayrock and its counsel.)

(Moore Decl. ¶¶22-25).

On Wednesday, May 12, 2010, Mr. Oberlander emailed to Ronald Kriss -- a partner at

the law firm Akerman Senterfitt and father of Jody Kriss -- a copy of the SDNY Complaint and

the exhibits.  The cover email acknowledged that the SDNY Complaint contained confidential

information and, in essence, threatened to make the information public unless the dispute could

be settled.  Mr. Oberlander's email read as follows:

> **From:** fred55@aol.com [mailto:fred55@aol.com]
> **Sent:** Wednesday, May 12, 2010 12:33 PM
> **To:** Kriss, Ronald (Sh-Mia); Kriss, Ronald (Sh-Mia)
> **Subject:** Fwd: complaint, sdny, salomon, weinrich, & salomon & co.
> Ron –
>
> I recommend you forward this to Julius with the comment from me that
> there are three alternatives here:
>
> (a) I file publicly today.
>
> (b) I file under seal today.
>
> (c) He arrange a tolling agreement with EVERY defendant but nixon peabody.

---

[1] The SDNY Complaint violates the Delaware court's order because Kriss has not yet brought his claims before an arbitrator, and no court of competent jurisdiction has decided that the claims are not arbitrable.

> I don't care how many people he has to get on the phone and how fast
> he has to work. He had years to give back the money and now it's over.
> He can get Brian Halberg to help him.
>
> I believe it's possible to get this in under seal if Bayrock joins in a joint motion
> in part 1 to seal the complaint pending a redaction agreement with the
> assigned judge but there are never any guarantees.
>
> Thanks,
>
> FMO

Ronald Kriss forwarded these materials to an executive at Bayrock and a copy was subsequently

forwarded to Mr. Sater. (Moore Decl. ¶¶ 26-28 and Ex. 3).

On Thursday, May 13, 2010, Mr. Oberlander filed the SDNY Complaint in the Southern

District of New York, and the matter was assigned to the Hon. Naomi Reice Buchwald. The

SDNY Complaint was subsequently made available to the public for download through a paid

online news service, "Courthouse News." (Moore Decl. ¶¶ 29-30).

Later that day, upon learning of the filing, Mr. Sater's attorneys called Mr. Oberlander to

demand that the Sealed and Confidential Materials be withdrawn and returned. Mr. Oberlander

stated that he had retained his own counsel, David Lewis, to address his disclosure of the Sealed

and Confidential Materials. Mr. Lewis refused to disclose how his client, Mr. Oberlander, had

obtained the Sealed and Confidential Materials and refused to return the Sealed and Confidential

Materials. (Moore Decl. ¶¶ 31-33).

Mr. Lewis also stated that Mr. Oberlander had made an unsuccessful application to have

the Materials filed under seal in the Southern District, and that he was amenable to a joint

application to Judge Buchwald. Mr. Lewis and Mr. Sater's counsel subsequently spoke with

Judge Buchwald on May 13, and Judge Buchwald immediately issued an order preventing

further dissemination of the SDNY Complaint, the exhibits thereto and the information therein

(the "First Order"). (Moore Decl. ¶¶ 34-35 and Exhibit 4). Judge Buchwald indicated during the

telephone conference that any application for return of the Sealed and Confidential Materials or inquiry into the disclosure should be directed to this Court. (Moore Decl. ¶36).

On May 14, 2010, Judge Buchwald issued a second order sealing the SDNY Complaint in its entirety pending further order of the Court. Judge Buchwald further ordered that a redacted version of the original complaint, redacting any sealed documents or references to sealed documents, be filed by May 19, 2010. (Moore Decl. ¶38 and Exhibit 5).

Also on May 14, 2010, at the request of Morgan Lewis, Courthouse News removed the SDNY Complaint from its website and sent a copy of the First Order to each person who had downloaded the SDNY Complaint. On May 17, 2010, Courthouse News ran a news story disclosing information from the SDNY Complaint. At the request of Morgan Lewis, the story was taken down, but it is unknown how many people read the story while it was still posted. (Moore Decl. ¶¶ 39).

## ARGUMENT

### I.    THE SEALED AND CONFIDENTIAL MATERIALS SHOULD BE IMMEDIATELY RETURNED

The Sealed and Confidential Materials contain the utmost sensitive and personal information including detailed information about Mr. Sater's cooperation with authorities and personal financial information.

These Materials, and in particular the Sealed Materials, were protected from disclosure under this Court's order sealing the criminal docket and under Rule 32(e)(2) of the Federal Rules of Criminal Procedure, which specifically limits disclosure of pre-sentencing and other probationary reports only to defendants, their counsel, and prosecuting attorneys.

In *United States v. Charmer Indus., Inc.*, 711 F.2d 1164 (2d. Cir. 1983), the Second

Circuit specifically addressed disclosure of pre-sentence reports. It recognized that the documents are immune from disclosure under the Freedom of Information Act (*Id.* at 1170, FN6); and contain highly confidential information concerning finances, medical information, and law enforcement cooperation. *Id.* at 1171. Thus, the courts have held that such materials should be kept confidential and that disclosure may adversely affect the sentencing court's ability to obtain data on a confidential basis from the accused and other sources for use in sentencing. *Id.* Indeed, confidentiality cannot be lifted without order of the Court and only where it is required to meet the ends of justice. *Id.* at 1175. Courts routinely deny requests for records similar to the Sealed Materials because they are created in confidence, and disclosure could jeopardize fulsome cooperation by a witness. *United States Dep't of Justice v. Julian*, 486 U.S. 1 (1998) (*citing Charmer* 711 F.2d 1173-76).

Notwithstanding the confidential nature of these Materials, Mr. Oberlander and his clients distributed the Sealed and Confidential Materials and referred to them in the SDNY Complaint which was later posted on the internet and subsequently the subject of press coverage. While it is impossible to put the cat fully back in the bag, the only way to protect Mr. Sater's privacy against further intrusion is to order that all copies of the Sealed and Confidential Materials and the SDNY Complaint are immediately returned.

## II.     THE COURT SHOULD ALSO INQUIRE AS TO HOW THE SEALED AND CONFIDENTIAL MATERIALS WERE ACQUIRED AND TO WHOM THEY WERE DISSEMINATED

In this matter, the confidential nature of the Sealed and Confidential Materials is plain. For example, the Pre-Sentence Investigation Report dated June 18, 2004 states: "It is the policy of the federal judiciary and the Department of Justice that further redisclosure of the pre-sentence report is prohibited without the consent of the sentencing judge." In addition, there is ample

6

evidence that Mr. Oberlander and/or his clients were aware that the Sealed and Confidential Materials should not be disclosed including:

- Mr. Oberlander's pre-filing, threatening email indicating that the materials should be sealed;

- Mr. Oberlander's post-filing effort to have the materials sealed; and

- Mr. Oberlander's retention of personal counsel to represent him in connection with his dissemination of the SDNY Complaint and the exhibits.

Mr. Oberlander refuses to state how he and his clients in various proceedings – one of whom maintained an office adjacent next to Mr. Sater's and the other of whom has admitted to taking thousands of documents and emails when he left Bayrock – acquired the Sealed and Confidential Materials. As a result, Mr. Sater has no way to know who has copies of these Materials, or the full extent to which they were disseminated. It is therefore imperative that the Court find out how the Materials were obtained and who now possesses copies of the Materials so that the Court may fashion full relief.

The Hon. Richard Owen of the Southern District of New York recently conducted a similar inquiry in *In re Biovail Corp. Sec. Litigation*, No. 03-CV-0917. In that action, Judge Owen learned that documents obtained by Biovail Corporation in discovery in a matter before him pursuant to a protective order were subsequently used by Biovail to start a separate litigation in a different jurisdiction. Judge Owen conducted a multi-day hearing of Biovail and its counsel to determine how and why his protective order had been undermined and whether sanctions should be imposed. A copy of a news article describing the proceedings is attached. A similar hearing would be appropriate here.

Finally, Mr. Sater requests that Messrs. Kriss, Ejekam and Oberlander be ordered to pay

7

all costs and attorneys fees associated with efforts by Mr. Sater to address the improper

disclosure.

## CONCLUSION

For the reasons stated above, this Court should grant the relief sought and issue such

other and further relief as the Court deems just and appropriate under the circumstances.

Dated: New York, New York
May 18, 2010

MORGAN, LEWIS & BOCKIUS LLP

By _____
Kelly Moore (KM 4839)
Brian A. Herman (BH 0731)

101 Park Avenue
New York, New York 10178-0060
Phone: 212-309-6000
Fax: 212-309-6001

*Attorneys for Felix Sater*

8

MAY-18-2010 TUE 12:49 PM                                          FAX NO.                                          P. 22
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 9 of 16 PageID #: 101
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers                    Page 1 of 7

# LAW.COM

Select 'Print' in your browser menu to print this document.

**Copyright 2010. ALM Media Properties, LLC. All rights reserved.**

Page printed from: http://www.law.com

Back to Article

---

### Racketeering Lawsuit by Biovail Backfires
### Against Company and Lawyers

Andrew Longstreth

09-13-2007

This wasn't how it was supposed to go for Biovail Corp., Canada's largest publicly traded drugmaker. Biovail was supposed to be the victim, the ill-used dupe of powerful hedge funds, analysts and bankers, whose short-selling scheme to spread false information about the company led to a plunge in its share price in 2003. And Biovail's lawyers, respected litigators from Howrey and Kasowitz, Benson, Torres & Friedman, were supposed to be the ones to help the company prove it.

Mark Wegener, co-chair of Howrey's global litigation practice, had been hired to defend Biovail in a shareholder class action in federal district court in New York. His job was to shift blame for the company's disastrous market fall away from Biovail and its executives, including Chairman Eugene Melnyk. The company's other lead outside counsel, Marc Kasowitz, played offense. After more than a year of investigation -- which included shoe-leather sleuthing by his firm's in-house detective agency -- he had filed a 90-page racketeering suit in New Jersey state court. It was a document as detailed as it was audacious, lobbing charges against some of the most powerful financial figures on Wall Street.

And as Melnyk had hoped, the racketeering suit proved a public relations masterstroke. Kasowitz, a smooth talker with striking silver hair, was a compelling supporting player in Biovail's PR attack, appearing on CNBC's "Squawk Box" and a Canadian business channel to discuss the allegations in the complaint. He also testified about the dark side of short-selling at a 2006 Senate committee hearing. That March, Melnyk himself starred in a "60 Minutes" piece on Biovail's case against the hedge funds. During the segment, Melnyk, then still Biovail's chairman, told reporter Lesley Stahl, "We don't sue just for the purpose of suing somebody. This is something that was carefully thought through, was very well researched, was extremely well lawyered. I can't wait for our day in court."

Biovail has had to wait longer than Melnyk had hoped -- a lot longer. To use the terminology of a hockey fan like Melnyk, the company has been stuck in the penalty box for the past seven months. Last winter Biovail's "extremely well-lawyered" strategy blew up in the faces of Melnyk and his counsel, bringing the racketeering case to a halt and diverting attention away from the supposed short-sellers' conspiracy. Instead, scrutiny has focused on Biovail and its lawyers. This spring and summer, in an extraordinary set of hearings before federal District Court Judge Richard Owen in Manhattan, Biovail's litigation tactics have been exposed in minute detail -- and the spectacle hasn't been pretty. Lawyers involved in the case privately say they've never seen anything like the parade of eminent firms and lawyers, all represented by their own criminal defense counsel, answering questions before an irritated and deeply skeptical judge.

Over nine days of hearings that included testimony from 13 witnesses, the lawyers who were to have been Biovail's saviors have pointed the finger everywhere except at themselves. The Kasowitz firm, to defend itself against suggestions that it knowingly violated a protective order, has laid bare discussions with its client and co-counsel, citing an exception to the rules of attorney-client privilege that permits the firm to counter allegations of misconduct. Kasowitz lawyers have placed blame for the Biovail blowup on Howrey, which has been presented with evidence that it should have warned Kasowitz Benson about the protective order. Howrey, meanwhile, asserts that ultimate responsibility lies with the Kasowitz firm, which was lead counsel in the case in which the protected documents were used.

The Biovail story is far from over. Eugene Melnyk resigned as chairman in June, but he remains the company's biggest shareholder -- and by all accounts is determined to revive the New Jersey RICO suit. And even though Biovail fired Kasowitz Benson in March, in the midst of the hearings before Judge Owen, a brief that the company filed in early August indicates that Biovail and Kasowitz may not be done with each other. But whatever happens next in this

MAY-18-2010 TUE 12:50 PM                                                              FAX NO.                    P. 23
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 10 of 16 PageID #: 102
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers          Page 2 of 7

strange, embarrassing debacle, a remark made on the last day of hearings by Biovail's counsel in the Owen proceedings, Peter Fleming Jr., of Curtis, Mallet-Prevost, Colt & Mosle, will be hard to forget. "It would be nice to do things all over again," Fleming said. "But [that] can't be."

Not long ago, Howrey's Wegener was claiming credit for giving Kasowitz the controversial documents that would later cause Biovail so much trouble, at least according to the account that a Kasowitz partner offered in Owen's courtroom. On Dec. 9, 2005 -- two years after the company's precipitous stock drop -- Biovail held a regularly scheduled board meeting in Toronto. On hand at Melnyk's request were the company's outside counsel, some of them flown in on Biovail's corporate jet, to brief the board on Biovail's sprawling docket.

Michael Bowe, a young Kasowitz partner, was to show board members what his firm had uncovered in its investigation of the short-selling conspiracy Melnyk suspected. Melnyk had asked him to present his evidence as if he were arguing to a jury, Bowe later testified, but with only a few days to prepare, the Kasowitz partner didn't have time for that. Instead, he showed the board a PowerPoint slide show entitled "The 2003 Short Attack." Among the highlights were e-mails from David Maris, an analyst for Banc of America Securities LLC (BAS). In the Kasowitz firm's view, the e-mails showed Maris conspiring with hedge fund operators to depress Biovail's stock price. Bowe told the board at the conclusion of the PowerPoint that Kasowitz lawyers believed they'd found sufficient evidence for Biovail to bring claims against several hedge funds and analysts in New Jersey state court -- home to Biovail's U.S. subsidiary and some of the defendants -- under the state's Racketeer Influenced and Corrupt Organizations Act.

Melnyk couldn't contain his excitement. He told the board that Bowe's presentation was only the "tip of the iceberg," according to Bowe. And once Kasowitz's firm had the "voice mail blasts" -- the equivalent of mass e-mails -- that Maris had sent investors, Melnyk said, they'd really know what BAS had been up to.

At the conclusion of Bowe's presentation, one board member asked Bowe how the Kasowitz firm had obtained its evidence. Bowe launched into a discussion about all the efforts Kasowitz had made to investigate the conspiracy. He was beginning specifically to address the origin of the BAS e-mails when Wegener, according to Bowe, interrupted him: Kasowitz only had the damning documents, Wegener told Biovail's directors, because Howrey had given them to him.

"I remember that because I was taken aback," Bowe testified before Owen. "I felt like [Wegener] had his nose sort of out of joint because I hadn't given him credit for providing these documents and I was trying to steal his thunder, and he seemed annoyed."

Wegener testified that he didn't recall any such conversation. More importantly, he also said that he didn't know the Banc of America documents that had gotten Melnyk so excited were under a protective order. They'd been produced in the shareholder class action that Howrey was defending for Biovail -- but under a nine-page agreement that limited their use to that case and that case alone.

At the time of the Biovail board meeting, Melnyk was counting on the proposed RICO suit against short-sellers to redeem not only his company's reputation, but also a large chunk of his personal fortune. The son of Ukrainian immigrants, Melnyk had spent more than two decades developing a record as a shrewd businessman. In the late 1980s he sold his publishing company, which issued clinical research summaries. Then he became the head of Biovail, a company that specializes in developing improved versions of existing drugs.

By the summer of 2003, Melnyk was a billionaire and the owner of the Ottawa Senators, a National Hockey League team. With more than 27 million Biovail shares, he was the largest holder of Biovail stock, and he had good reason to be bullish about his investment. As Biovail's stock neared $50 in the first half of 2003, the value of Melnyk's holding in the company swelled to more than $1 billion.

But in June the share price began to drop steadily. By the end of 2003, Biovail stock was trading below $25.

The drop could be explained, at least in part, by Biovail's poor performance. In October 2003 the company issued an announcement of disappointing third-quarter results, which sent the stock downward. But Melnyk suspected that there was something else going on. As Biovail's share price continued to languish through 2004, he came to believe that short-sellers were waging a campaign of disinformation to make sure the share price never recovered. He had been receiving odd calls from major investors questioning the company's accounting, he claimed in a March 2006 *New York Times* article. And when Gradient Analytics Inc., an independent equity research firm, and Banc of America analyst Maris both issued harsh Biovail reports that largely mirrored each other, Melnyk was convinced there was a conspiracy against him and his company.

In late 2004 Biovail hired Marc Kasowitz and his firm to investigate Melnyk's hunch. (In addition, Melnyk asked Kasowitz to represent him personally in a related dispute with former Banc of America analyst Jerry Treppel, who had sued Melnyk, Biovail, and others for allegedly executing a "smear campaign" against him after he published a research

MAY-18-2010 TUE 12:51 PM FAX NO. P. 24
Case 1:98-cr-01101-ILG Document 51 Filed 05/18/10 Page 11 of 16 PageID #: 103
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers Page 3 of 7

report that was critical of Biovail.) The Kasowitz firm, founded in 1993, was well prepared to handle the sort of investigation Melnyk wanted. It had distinguished itself for tough, aggressive lawyering that inspired intense loyalty from such clients as Celanese Corp. and the Liggett Vector Brands Inc. It also had a three-year-old investigative affiliate -- KBTF Group LLC -- headed by James Holohan, a former New York Police Department captain who supervised detectives assigned to the Manhattan district attorney's office.

The Kasowitz investigation was wide-ranging. One of the biggest finds came in 2005, when Holohan and Bowe interviewed Darryl Smith, a former salesman with Camelback Research Alliance Inc. (now known as Gradient). Smith told Holohan and Bowe that the hedge fund S.A.C. Capital Management had approached his company in 2003 with the idea of issuing a negative report on Biovail. According to Smith's story, which was later recounted in Biovail's RICO complaint, Camelback agreed, producing a report tailored to S.A.C.'s needs.

Kasowitz attorneys, meanwhile, were also working to collect information from Biovail cases that were already under way. In Melnyk's dispute with Treppel, for example, the firm issued subpoenas to at least two companies that would end up being named as defendants in the New Jersey RICO action. The magistrate judge in the Treppel case initially quashed both of them, remarking that they appeared to be "designed to elicit information about a purported conspiracy." More successful, at least at first, were the firm's efforts to find evidence of the short-selling scheme -- including the controversial BAS documents -- in the shareholder class action before Owen.

That had been Mark Wegener's case since the spring of 2005, when Howrey took it over from DLA Piper. (DLA had discovered a conflict with an existing client.) On May 11, 2005, Wegener and his partner Edward Han met with DLA's Joseph Finnerty III to discuss the transition. Finnerty briefed the Howrey partners on the status of the litigation and on discovery issues. According to Wegener's testimony, Finnerty told him that because DLA had a conflict with Banc of America -- which was a third party in the shareholder case -- Biovail had hired the New York litigation boutique of Schindler Cohen & Hochman to handle discovery from Banc of America. Finnerty suggested that Wegener visit Steven Schindler to review what the bank had produced.

Finnerty also, according to his testimony before Owen, informed Wegener and Han of the protective order that he and Biovail general counsel Kenneth Cancellara had recently negotiated with plaintiffs lawyers. (Wegener and Han both testified that they remembered the meeting, but didn't specifically recall any mention of the protective order.) The protective order, negotiated at Biovail's request, had been signed by Owen on April 29, 2005; an electronic notice of it was sent to both DLA and Schindler Cohen. (In court papers, Schindler Cohen later stated it was not aware that DLA had negotiated a protective order and was not provided with any drafts of the agreement.) The nine-page order, 22 paragraphs in all, focused on the use of each party's confidential documents. But the seventh paragraph governed a wider set of material. "Documents, testimony, or information obtained through discovery in this action," it stated, "including but not limited to confidential information, may be used or disclosed solely for the prosecution or defense of this action."

By July 2005, Finnerty had sent all the key documents in the shareholder class action -- including the protective order -- to Howrey. Throughout the next seven months, evidence from the Owen hearings shows, Howrey litigators were well aware of the protective order, invoking it in at least 25 letters to plaintiffs lawyers. On June 17, 2005, for instance, Howrey partner Han wrote a cover letter attached to discovery materials provided to plaintiffs counsel at Bernstein Litowitz Berger & Grossmann. Production was made, Han wrote, "pursuant to the protective order."

Melnyk, not a lawyer and not particularly concerned with such niceties as protective orders, later testified that he wasn't told of any restrictions on discovery in the class action, even though his general counsel had helped negotiate the protective order. In fact, Melnyk was urging the Kasowitz lawyers to get their hands on discovery from Banc of America Securities. In March 2005, when DLA was still lead counsel in the shareholder case, lawyers at the Kasowitz firm had even provided input on a subpoena to BAS, a detailed request that produced thousands of documents. In the fall of 2005, Melnyk called Kasowitz partner Bowe to inquire what the bank had turned over in response to the subpoena in the shareholder case. When Bowe told Melnyk that he had received only a handful of those documents, Melnyk was "unhappy," according to Bowe.

Bowe asked a Kasowitz associate, Rodney Villazor, to follow up with Schindler Cohen. On Oct. 25, 2005, Villazor e-mailed Steven Schindler: "Steven, just following up on the status," wrote Villazor. "The client is getting anxious about starting our affirmative discovery and the [BAS] records would be very helpful."

Schindler, whose firm was now acting as Howrey's local counsel in the class action, didn't send anything. A week passed, and an anxious Melnyk once again asked Bowe about the BAS documents. When Bowe said he was still empty-handed, Melnyk arranged a conference call for himself, Bowe and Wegener. According to Bowe's testimony, Melnyk told Wegener he wasn't happy that the Kasowitz firm didn't have the BAS documents. Why, he asked, hadn't they been sent? Wegener said he didn't know, Bowe testified, but would call Schindler and make sure the Kasowitz lawyers got them immediately. (Wegener testified that he didn't remember Melnyk's request.)

The Kasowitz firm received the bank's records from Schindler Cohen soon after the conference call. (In court papers, Schindler Cohen stated that its lawyers were unaware that the Kasowitz firm was working on a New Jersey RICO complaint until a day before it was filed.) No one told lawyers at Kasowitz that the BAS documents, which were not

MAY-18-2010 TUE 12:51 PM                                          FAX NO.                    P. 25
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 12 of 16 PageID #: 104
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers          Page 4 of 7

marked confidential, were under a protective order that prohibited their use in any case other than the shareholder class action.

By the late fall of 2005, Bowe was sending BAS documents to Melnyk's apartment in New York. Melnyk apparently liked what he saw and asked Bowe to make certain BAS documents a central part of his presentation at the company's December board meeting -- the meeting at which Bowe would recommend to the board that Biovail not simply use evidence of the short-selling conspiracy to defend the shareholder class action, but that the company strike back with a suit of its own, the New Jersey RICO case.

Bowe left that Friday board meeting in Toronto with two tasks: to locate the BAS voice mail blasts that Melnyk had mentioned to board members; and to begin drafting a complaint. He wasted no time. On Monday he e-mailed Wegener: "Let me know whether we should work this through the other firm that issued the subpoena (for the volcemail blasts) or whether you want to deal with them," Bowe wrote, copying Melnyk on the message. Wegener appeared all too eager to please his client: "Please work through Schindler, but keep me in the loop to make sure you get all you need." (Wegener later testified that he still didn't know about the protective order at this point, even though it had been mentioned in letters written by other Howrey lawyers.)

At Bowe's request, Kasowitz associate Courtney DeCristofaro followed up on the voice mail blasts with Schindler partner Rebecca Fine. According to a memo that DeCristofaro filed to herself after the conversation, Fine told DeCristofaro that there was "no confidentiality agreement in place regarding the [BAS] docments."

The Kasowitz firm finished a first draft of the RICO complaint shortly after the board meeting in December. Though BAS was not named as a defendant, the complaint included more than 200 references to Banc of America and analyst David Maris. Bowe circulated the draft complaint to Wegener, who analyzed it in a January 25, 2006, memo. The memo outlined several questions, such as whether a RICO claim was appropriate and how Melnyk should be mentioned in the complaint. But Wegener made no mention of any restriction on the BAS documents that Schindler Cohen had provided to Kasowitz -- the documents that formed the foundation of the RICO case. In the last line of the memo he wrote: "I look forward to reviewing the evidence we have gathered in support of these allegations." (Wegener testified that when he reviewed the complaint, he did not know that Kasowitz Benson had used Banc of America documents subpoenaed in the New York class action.)

Later that month, Wegener and Biovail's CEO, Douglas Squires, met in Bowe's office to review the RICO complaint. Again, there was no mention of the protective order. On Feb. 22, 2006, Biovail filed its ill-fated racketeering suit in New Jersey.

At 4:21 p.m. on March 7, 2006, a few weeks after Biovail filed the New Jersey suit, a letter that came through Schindler Cohen's fax machine startled partner Rebecca Fine. It was from a paralegal at Banc of America who was objecting to a subpoena that Fine's firm had issued in February, requesting more discovery materials in the class action before Judge Owen. Banc of America wanted assurances, the paralegal wrote, that Biovail would comply with the protective order and not use the documents subpoenaed in the New York class action for the New Jersey case.

Protective order? Fine later testified that at the time, she wasn't aware of one. She immediately told an associate to get a copy of the document. A couple days later, with the order in hand, she called Howrey partner Andrew Lazerow and Kasowitz associate Villazor to alert them of it. (It's not clear from testimony at the Owen hearings what was said in the conversation.) Fine also told her partner Steven Schindler, who sent an e-mail on March 13, 2006, to Howrey partners Wegener, Han and Lazerow. "In connection with the subpoenas we recently served, we want to call to your attention [to] the attached stipulation and confidentiality order which prohibits the use of documents produced in this case in other cases. (See paragraph 7)," Schindler wrote. "We have called this paragraph to the Kasowitz's firm's attention. Since we are getting objections based on the supposition that these will be used in New Jersey, we need to address this. If Kasowitz will want to share these documents, we will have to make a modification to the order."

The urgency of the matter didn't seem to get through to Biovail's lawyers, though. On March 21, 2006, Kasowitz associate Villazor sent an e-mail to Fine, asking for more BAS documents. Fine responded by attaching the protective order and giving her interpretation of its key passage: "Our reading of paragraph 7 is that we cannot provide these documents to you. I appreciate that this is an inconvenience, but we are bound by the terms of the protective order." That evening, Villazor (who is now an associate at Hughes & Luce) notified Kasowitz lawyers Bowe, Albert Mishaan and David Shapiro of Fine's e-mail.

Banc of America's lawyers stepped up the pressure in April. The bank had been named as a defendant in a securities class action in New Jersey federal district court that seemed to be a copycat suit to Biovail's RICO case; the class action complaint cited the same internal BAS e-mails as the RICO case. The bank's outside counsel, O'Melveny & Myers partner Bradley Butwin and counsel Gary Svirsky, wanted to know how those e-mails had ended up being quoted in the New Jersey shareholder case. Butwin and Svirsky, along with the Morrison & Foerster lawyers who represented BAS analyst Maris, sent a pair of letters to Schindler Cohen, the firm that had issued the subpoenas to the bank in the first class action. In those letters, O'Melveny clearly suggested that Biovail had violated the protective order signed by Owen.

MAY-18-2010 TUE 12:52 PM                                FAX NO.                           P. 26
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 13 of 16 PageID #: 105
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers          Page 5 of 7

Biovail and its lawyers had a problem. A big problem. The company's racketeering suit was attracting international media attention. For months, the case had been at the forefront of Melnyk's mind. He'd been obsessed with the Banc of America evidence. But now his lawyers were on notice that much of the RICO evidence was material that Banc of America claimed Biovail wasn't entitled to use.

The gravity of the protective order situation finally made an impression on attorneys at Howrey, Schindler Cohen, and Kasowitz Benson. Yet as they exchanged e-mails and phone calls, debating what to do about Banc of America's objections to the use of its e-mails in the RICO complaint, no one wanted to take responsibility for the mistake. Not the lawyers at Schindler Cohen, the firm that was originally charged with handling discovery from BAS. Though the firm had been sent electronic notice of the protective order when Owen signed it, Schindler Cohen didn't retrieve a copy of the actual document until months later. Schindler argued in an April 4, 2006, e-mail to Wegener that his firm wasn't to blame: "Since we are not counsel in the case where it is alleged these documents were used, and we were not consulted about their use, we cannot really answer the questions posed other than [by saying that] if the order was violated, we -- this firm -- did not violate it."

Howrey wasn't ready to admit fault either, even though it was lead counsel in the shareholder class action in which the documents had been produced -- and even though Howrey attorneys had repeatedly acknowledged the protective order in litigating that case. According to Kasowitz partner Bowe, Wegener told him in the spring of 2006 that the whole issue was DLA Piper's fault, because DLA never provided Howrey with a copy of the protective order during the transition. (DLA had, in fact, included the protective order in the materials it sent Howrey, as Howrey later confirmed.) Wegener, who testified that he didn't recall the conversation with Bowe about DLA, later said he was angry at Schindler Cohen for failing to pay attention to the protective order.

Nor was the Kasowitz firm about to fall on the sword. It had not been the firm of record in the class action in which BAS had produced the crucial e-mails. But the firm had participated in drafting the subpoena to Banc of America in 2005. And nearly a year later, when Kasowitz lawyers were drafting the New Jersey RICO complaint, it appears that nobody at the firm checked to see if there was a protective order in the class action. (In court papers, the firm argued that there was no protective order in place when it drafted the subpoena to Banc of America in March 2005, and that the order was never clearly identified in the class action docket.)

Over the next couple of months, the three firms dithered. There were some discussions about sending a letter to Owen, asking him to modify the protective order. A draft of the letter that circulated among the firms, which was later produced during the hearings before Owen, informed Owen that Banc of America had raised an issue with a subpoena in the class action -- but the draft letter contained no express admission that the protective order had been violated. It was never sent. There was also an effort to persuade the plaintiffs lawyers to agree to a change in the language of the protective order. In a meeting in late May 2006 to discuss a settlement of the New York class action, Kasowitz and Bowe asked plaintiffs lawyers Max Berger and Steven Singer of Bernstein Litowitz about modifying the protective order. Bowe later testified that he believed Singer would agree, but in the end, Singer told lawyers at Schindler Cohen that he would not.

In June 2006, two months after Biovail's lawyers were put on notice by Banc of America, Wegener finally filed a motion asking Owen to modify the protective order. It was too late. On June 29 Banc of America's O'Melveny lawyers filed for sanctions against Biovail, citing the company's violation of the protective order.

In granting the bank's motion in January 2007, Owen called Biovail's "belated efforts ... to modify the protective order to give it absolution ... offensively obvious."

At about 5:45 p.m. on Friday, Jan. 26, 2007, Bowe was standing in the elevator bank at his firm's midtown Manhattan office, about to head home for the weekend. His BlackBerry buzzed. It was an e-mail from Martin Cunniff, a partner at Howrey. He informed Bowe that Owen had just ordered sanctions against Biovail. Specifically, Owen found that the company had used court-protected Banc of America documents from the class action before him to support its allegations in the RICO suit in New Jersey.

Owen's ruling included several remedies. He ordered Biovail to pay the legal fees of Banc of America, which brought the sanctions motion. He also directed Biovail and its lawyers to return the Banc of America documents covered by the protective order. And although he didn't give a deadline, Owen instructed Biovail to redact from its RICO complaint all allegations based "solely" on documents that BAS had produced in his court.

Deleting the BAS references from the RICO case would have gutted, at least temporarily, some of Biovail's key racketeering claims -- delaying the progress of the case that had brought Melnyk and his company so much attention. Biovail's lawyers, however, didn't make the changes Owen ordered, at least not right away. And that turned out to be a big mistake.

Richard Owen, who was appointed in 1973 by President Richard Nixon, has long had a reputation for being prickly, for seeing the dark side of seemingly benign admissions or missteps by lawyers in his courtroom. The Howrey and Kasowitz lawyers gambled with that reputation when they decided not to redact the New Jersey RICO complaint. In his testimony, Bowe said the decision was Howrey's. Howrey had attached many of the Banc of America documents in

MAY-18-2010 TUE 12:52 PM                                    FAX NO.                              P. 27
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 14 of 16 PageID #: 106
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers              Page 6 of 7

Biovail's response to the sanctions motion filed by BAS. So Cunniff, according to Bowe, suggested an aggressive argument: Because the BAS documents were now publicly available, there was no need to redact the RICO complaint. Instead Wegener and Cunniff opted to file a motion seeking "clarification" of Owen's sanctions order. (Wegener testified that he didn't recall where the "clarification" strategy originated.)

Meanwhile, on Jan. 30, two business days after Owen issued the sanctions order, Kasowitz and its New Jersey local counsel -- Nagel Rice -- sent a subpoena to Banc of America, a third party in the RICO case. The subpoena sought much of the same material that the bank had produced in the class action -- and that Owen had found Biovail improperly used in the RICO case. The Kasowitz firm would later claim that the subpoena had been in the works for weeks before the sanctions ruling, and that key motions were approaching fast. But it's also true that there was no looming discovery deadline, and the BAS subpoena was returnable in 10 days. Was the subpoena an end run around Owen's order?

The bank's lawyers at O'Melveny & Myers thought so. They wrote a letter to Kasowitz, accusing Biovail of defying Owen's sanctions order. Kasowitz was undeterred. On February 2 the senior partner responded in a letter that the subpoena "will, as a practical matter, shortly render moot any dispute as to the extent redaction is required."

O'Melveny went right to Owen, who ordered a conference to discuss Kasowitz's failure to amend the RICO complaint. On the Feb. 16, 2007, call, Svirsky, a mild-mannered Canadian, called Biovail "unrepentant": "Rather than redact the complaint, Biovail actually has the temerity to serve a subpoena on Banc of America Securities in the New Jersey action which is designed, in Biovail's own words, to 'moot the sanctions order,' " he argued to the judge. "If the sanctions order is to have any meaning, then Biovail cannot be permitted to do exactly the opposite of what that order requires."

Owen appeared to accept Svirsky's arguments. As the call went on, the judge became more and more irritated with Kasowitz, who kept trying to defend the subpoena. "If that subpoena was issued with the slightest suggestion that this was a protective device against a breach of the protective order, then that is subject to penalties," Owen warned, "for violating a district court order ... namely, mine." The call ended with Owen hanging up on Kasowitz and ordering a hearing on both the protective order and Kasowitz's subpoena to Banc of America.

Finally, the Kasowitz firm seemed to be spooked. Before the first day of hearings in Judge Owen's courtroom last February, Kasowitz hired John Siffert of Lankler Siffert & Wohl and Paul Shechtman of Stillman, Friedman & Shechtman, both experienced criminal defense lawyers. But from day one, Siffert encountered a judge skeptical of his client. "Now, there was simply no communication to the Kasowitz Benson firm ... prior to the filing of the New Jersey complaint that a protective order exists. As hard as that may be to accept, that is the fact," Siffert tried to explain. Owen replied: "I appreciate your saying 'as hard as that is to accept' because it seems to me in common sense you are right about that."

As the hearings progressed through the spring and summer, there seemed to be more pinstripes in Owen's courtroom than at a New York Yankees home game. Joining Siffert at the back counsel table were Biovail's lawyers, Fleming and T. Barry Kingham of Curtis Mallet-Prevost, as well as lawyers from the Gregory Joseph firm. Howrey partners Thomas Engel and Martin Cunniff crowded in at the end of the table. Banc of America and David Maris had five lawyers from O'Melveny and Morrison & Foerster stationed at the front counsel table.

During his three days on the stand, Kasowitz, who wore monogrammed shirts with French cuffs, alternated between appearing bored, annoyed and defiant, prompting Owen in one session to warn Siffert that his client was not being direct in his answers. Wegener didn't fare much better. He was eager to seem forthright, but failed to remember crucial conversations and at times came off as uncomfortable. On cross-examination, Siffert asked Wegener why he didn't mention the protective order in his memo analyzing the draft complaint of the New Jersey RICO action. Wegener said his firm had received the order but that he didn't "focus" on it.

The star of the nine days of hearings was Owen himself. The white-haired judge was deeply engaged throughout, frequently interrupting testimony with his own comments and questions. In May, Melnyk testified for more than five hours. O'Melveny partner Svirsky asked if Melnyk remembered being told about the order at a board meeting. Melnyk said that he couldn't recall. (He later clarified his answer as a no.) A dubious Owen sat up in his chair and intervened.

"If there was a court order out there that put you at risk of going to the MCC for violating it, that's something that ought to be talked about, right?" asked Owen.

"I agree," said Melnyk.

It's unclear whether Melnyk understood the reference. But many lawyers in the courtroom, including several former prosecutors, took notice: The MCC is the Metropolitan Correctional Center.

At press time the judge had not yet decided what, if any, punishment to extract from Biovail and its lawyers. O'Melveny is asking that Biovail be enjoined from suing Banc of America or its employees and barred from seeking

MAY-18-2010 TUE 12:52 PM                                                FAX NO.                          P. 28
Case 1:98-cr-01101-ILG   Document 51   Filed 05/18/10   Page 15 of 16 PageID #: 107
Law.com: Racketeering Lawsuit by Biovail Backfires Against Company and Lawyers          Page 7 of 7

discovery from the bank. Svirsky and Butwin are also asking Owen to disqualify Kasowitz from advising or
representing Biovail in any capacity in the New Jersey RICO case.

That might seem an unnecessary request, since Biovail fired the Kasowitz firm last March. But there has been
evidence that the relationship between Kasowitz and Melnyk is not over. When he testified before Owen, Melnyk had
the chance to blame the Kasowitz firm for the protective order fiasco. Instead, he cited the "very good work" Kasowitz
Benson did for Biovail. It was general counsel Wendy Kelley who recommended that Kasowitz Benson be fired, Melnyk
testified -- and for him that was a difficult decision. More recently, in a Aug. 3 brief filed with Owen, Biovail argued
vigorously against disqualifying the Kasowitz firm, which was never officially replaced in the RICO case. "The Kasowitz
firm has conducted an in-depth investigation of an unlawful conspiracy between hedge funds and analysts," wrote
Biovail's lawyers at Curtis Mallet-Prevost. "Denying Biovail the benefits of that investigation will severely hamper
Biovail's efforts to ... prosecute its case." (Fleming said he argued against Kasowitz's disqualification simply because
he found it to be a violation of the Sixth Amendment. O'Melveny's Butwin declined to comment on the Biovail brief.)

Of course, if and when Biovail's RICO suit is restarted, it will hardly be the only piece of litigation the company has to
worry about. In May, while Biovail was being grilled in Owen's courtroom, the company received notice of an
investigation by the Securities and Exchange Commission of its accounting and disclosure during 2003, the same year
Biovail has alleged that it was victimized by short-sellers. The company has also acknowledged that it is under
investigation by the U.S. Attorney's office for the Eastern District of New York, which is looking at the same issues as
the SEC. And even if the Kasowitz firm comes back in the RICO case, it will face well-prepared defendants who have
seen Biovail's litigation strategy exposed in Judge Owen's courtroom.

No, this is certainly not the way it was supposed to go for Biovail.

LEWIS & FIORE
225 BROADWAY, SUITE 3300
NEW YORK, NEW YORK  10007
(212) 285-2290
(212) 964-4506 (FAX)

David L. Lewis
Charles G. Fiore

May 18, 2010

Brian Herman, Esquire
Morgan, Lewis & Bockius, LLP
101 Park Avenue
New York, New York  10178-0600

**RE:  Kriss v. Bayrock**

Dear Mr. Herman:

      In reference to the above-captioned matter, I will accept service on behalf of Mr. Oberlander.

      We also agree that on his behalf we will do nothing to disseminate this document and by this letter, I remind you, and I ask that you inform Judge Glasser that I am out of town on business until Monday, June 7, 2010, when I expect to be in the Eastern District on other matters and will be available to the court.

      We would also like an electronic copy of said document you are presenting to the court today to provide to Mr. Oberlander.  Like you, I will also have co-counsel, Joseph Calluori, working on this issue with me.

Very truly yours,

           DAVID L. LEWIS
           DAVID L. LEWIS

DLL/bf
cc:  Fred Oberlander
     Joseph Calluori, Esquire

DICTATED BUT NOT READ BY DAVID L. LEWIS