**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| UNITED STATES OF AMERICA | 98 CR 1101 (ILG) |
| Plaintiffs, | |
| v. | |
| FELIX SATER aka FELIX SATTER, | RECEIVED |
| Defendant, | 7/19/10 |
| | Chambers of |
| | I. Leo Glasser |
| | U.S.D.J. |

---

FREDERICK M. OBERLANDER, ESQ. et al.

Non-Party Respondents

---

## Declaration of Richard E. Lerner in Opposition
## to All Relief Sought in OTSC

I, Richard E. Lerner, an attorney duly admitted to practice before this court, declare under penalty of perjury as follows:

1.      I am a member of the firm of Wilson, Elser, Moskowitz, Edelman & Dicker, attorneys for non-party respondent Frederick M. Oberlander. For the reasons stated in the accompanying declaration of Mr. Oberlander, it is most respectfully submitted that this court must dismiss this proceeding forthwith, as it constitutes an illegal and unconstitutional infringement of Mr. Oberlander's First Amendment rights.

2.      I cite the following legal authority for the proposition that this court must dismiss this proceeding forthwith, as it violates Mr. Oberlander's First Amendment rights: *New York Times Co. v. United States*, 403 U.S. 713 (1971); *Bartnicki v. Vopper*, 532 U.S. 514 (2001); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986); *Hartford Courant v.*

*Pellegrino*, 380 F.3d 83 (2004); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995);

*Procter & Gamble v. Bankers Trust*, 78 F.3d 219 (6th Cir. 1996); *Huminski v. Corsones*,

396 F.3d 53 (2d Cir. 2004); *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004); *United*

*States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995); *Roman Catholic Diocese of Lexington v.*

*Noble*, 92 S.W.3d 740 (Ky. 2002).

      3.     I hereby incorporate by reference all of the arguments set forth in our

letters to the court, copies of which are included as exhibits hereto.

      4.     I will also note that the *Zyprexa* case, which is relied upon so heavily by

the movant, is sub judice before the Second Circuit.

      WHEREFORE, it is respectfully requested that these proceedings be terminated

forthwith. It is further requested that should the court reach any of the issues presented, it

must declare that Mr. Oberlander has an absolute right under the First Amendment to use

and discuss the documents at issue, and the information contained therein.

Dated:   New York, New York
        July 16, 2010

                                Respectfully submitted,

                          WILSON, ELSER, MOSKOWITZ,
                          EDELMAN & DICKER LLP

                    By: _____

                          Richard E. Lerner
                          Attorneys for non-party respondent
                          Frederick M. Oberlander
                          150 East 42nd Street
                          New York, New York 10017
                          (212) 490-3000

To:    Morgan, Lewis & Bockius LLP (via email and overnight mail)
       101 Park Avenue
       New York, NY 10178-0060
       212-309-6000
       Attn:  Kelly Moore, Esq.

       Stamoulis & Winblatt, LLC (via email and overnight mail)
       Two Fox Point Centre
       6 Denny Road, Suite 307
       Wilmington, DE 19809
       302-999-1540
       Attn:  Stamatios Stamoulis, Esq.

       United States Attorney's Office (via email and overnight mail)
       Eastern District of New York
       Criminal Division
       271 Cadman Plaza East
       Brooklyn, New York 11201
       Attn:  Marshall Miller, Esq.
              Todd Kaminsky, Esq.

       Joshua Bernstein (via email only)
       Arnold Bernstein (via email only)

*Pellegrino*, 380 F.3d 83 (2004); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995);

*Procter & Gamble v. Bankers Trust*, 78 F.3d 219 (6th Cir. 1996); *Huminski v. Corsones*,

396 F.3d 53 (2d Cir. 2004); *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004); *United*

*States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995); *Roman Catholic Diocese of Lexington v.*

*Noble*, 92 S.W.3d 740 (Ky. 2002).

      3.     I hereby incorporate by reference all of the arguments set forth in our

letters to the court, copies of which are included as exhibits hereto.

      4.     I will also note that the *Zyprexa* case, which is relied upon so heavily by

the movant, is sub judice before the Second Circuit.

      WHEREFORE, it is respectfully requested that these proceedings be terminated

forthwith. It is further requested that should the court reach any of the issues presented, it

must declare that Mr. Oberlander has an absolute right under the First Amendment to use

and discuss the documents at issue, and the information contained therein.

Dated:     New York, New York
           July 16, 2010

                                 Respectfully submitted,

                                 WILSON, ELSER, MOSKOWITZ,
                                 EDELMAN & DICKER LLP

                     By: _____
                                  Richard E. Lerner
                           Attorneys for non-party respondent
                           Frederick M. Oberlander
                           150 East 42nd Street
                           New York, New York 10017
                           (212) 490-3000

To:    Morgan, Lewis & Bockius LLP (via email and overnight mail)
101 Park Avenue
New York, NY 10178-0060
212-309-6000
Attn:  Kelly Moore, Esq.

Stamoulis & Winblatt, LLC (via email and overnight mail)
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
302-999-1540
Attn:  Stamatios Stamoulis, Esq.

United States Attorney's Office (via email and overnight mail)
Eastern District of New York
Criminal Division
271 Cadman Plaza East
Brooklyn, New York 11201
Attn:  Marshall Miller, Esq.
       Todd Kaminsky, Esq.

Joshua Bernstein (via email only)
Arnold Bernstein (via email only)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA | 98 CR 1101 (ILG) |
| Plaintiffs, | |
| v. | |
| FELIX SATER aka FELIX SATTER, | |
| Defendant, | |

FREDERICK M. OBERLANDER, ESQ. et al.

Non-Party Respondents

### Declaration of Frederick M. Oberlander

I, Frederick M. Oberlander, declare under penalty of perjury, pursuant to 28 U.S.C. 1746, that the factual statements set forth herein are true, based upon my personal knowledge, and my knowledge derived from my review of the materials maintained by me for the prosecution of the matter of Kriss v. Bayrock, and the defense of myself in this proceeding as to which I am a non-party respondent.

### Introduction

1.      On May 18, 2010, in response to movant's *ex parte* petition, Exh. A, without notice and a hearing, this court, sitting as a star chamber, issued, undocketed and under seal, a patently unconstitutional prior restraint TRO against me and the co-respondents, enjoining us from disseminating truthful information, lawfully obtained, of public concern, *viz.* documents evidencing movant's federal racketeering conviction, plea

4062160.1

bargain and sentencing, portions of which respondents included in a civil racketeering complaint they filed against movant *et al.* on May 10, 2010 in the Southern District of New York.

     2.    If this were the court's only transgression, I might have charitably considered it to be constitutional amnesia, and reacted with measured restraint.

     3.    But this gag order was the least of it. I have discovered, and the documents reveal, that – despite thirty years of binding precedent – for over a decade this court has covertly maintained movant's criminal docket as a "super sealed" case, which is patently unconstitutional, and the court is unconstitutionally concealing the docket and surreptitiously dispensing whatever justice, or lack thereof, as the court sees fit.

     4.    Since it was accompanied by the implied threat of criminal prosecution, I believe the gag order was meant to chill me into silence. I will not be silenced. The court has concocted a system of private justice without public accountability. This is not just constitutional amnesia. This is a constitutional crisis.

     5.    With no evidentiary hearings, no on-the-record findings, no due process of any kind whatsoever, this court maintains that, somehow, revealing even one word contained in any one of these documents would be a clear and present danger to national security, basing this on facts that the court alone claims to know from extra-judicial sources, which facts it apparently refuses to share with the respondents.

4062160.1

6.     Interestingly, twelve years ago in November 1998, shortly after this court sealed the file on this action, *Business Week* got hold of the complaint – a plain vanilla criminal complaint charging the movant and co-defendant Gennady Klotsman with RICO violations, etc., and wrote about it, Exh. B. Notwithstanding that I stand in the same position as *Business Week*, and the article remains on its website, this court has not brought *Business Week* into these proceedings. Perhaps the court does not wish to pick a fight with someone who buys ink by the gallon. The *Business Week* article states that the criminal complaint came from a court file. So what is the court going to do about it? Nothing – because obviously there is nothing, constitutionally, that the court can do. And there is nothing that the court can do to me.

7.     Notwithstanding the court's feelings about national security, the *Business Week* article remains on the website – and has been there for years, apparently – and our Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible.

8.     Many other persons, law firms, insurance companies, etc. – for example McGraw Hill, Akerman Senterfitt, Wilson Elser, Morgan Lewis, *Courthouse News*, Nixon Peabody, Roberts & Holland, Duval & Stachenfeld, Salomon & Company, the Bayrock Organization, Zurich, and CIGNA – have had access to some or all of these documents. Yet the Union stands as she stood, rock-bottomed and copper-sheathed, one and indivisible. If disclosure of these documents are such a clear and present danger, why aren't we all dead yet?  More to the point, why hasn't the court held hearings 24x7,

3

4062160.1

haling all these persons before it; why out of all these persons are only these respondents singled out to be gagged? Surely if these documents contained hydrogen bomb secrets, the FBI would be all over this; why not now in this case?

9.   The answer is obvious. There is no threat to national security. The only threat is that the court feels that there has been an affront to its honor and the integrity of the process – yet the only threat is that this proceeding will reveal that the court has maintained a constitutionally illegal super-sealed docket system of private justice. Regrettably, this court's sense of super-patriotism may explain why it has allowed itself to be used by the movant as an instrument of, and shield against liability for, his past and ongoing crimes.

10.   The scope of the TRO is breathtaking, globally gagging everyone in the world, everywhere, who ever received these documents. But the TRO was undocketed and issued under seal, and only the respondents have been served. The court has ignored that others are within its scope, yet have not been placed on actual notice of these proceedings – viz., *Business Week,* and the defendants and their insurers in the *Kriss v. Bayrock* action – so that they could know that while they went to sleep in America, they woke up in Amerika, secretly gagged.

11.   The signers of the Declaration of Independence mutually pledged to each other their lives, their fortunes, and their sacred honor. They proclaimed this publicly. This court, however, hides what it does, and no one can doubt the reason is pusillanimous

4

fear. The court knows if it tries to gag *Business Week* or a law firm, they will respond not with measured restraint but with righteous constitutional outrage. The court perhaps did not expect that I would respond with indignation, or that I would sign a declaration such as this. Nor did the court expect that in seeking to gag me, I would reveal that the court has selected who may speak the truth, and who may not, based on which speaker it thinks can't, or won't, fight back. This court would dole out First Amendment protection only to a favored speakers it fears are too big to gag. Well, your honor, I will not be gagged.

12. Two hundred years ago in *Marbury v. Madison*, Justice Marshall said it is emphatically the province and duty of the judiciary to say what the law is. Today, this court would extend that to include the right to say who may speak about it and who may not. To this, I object.

13. Similarly, two hundred years earlier, in *Dr. Bonham's Case*, Justice Coke invalidated a statute of Parliament enabling the London College of Physicians to levy fines against anyone who violated their rules, finding that their statutory powers violated "common right or reason" because "no person should be a judge in his own case." I agree.

14. *This court has made this case its own.* No court may do that. Men have understood this not just for two hundred years, but for two thousand, from when Roman praetor Ulpian wrote,

5

Iudex tunc litem suam facere intellegitur, *cum dolo malo* in *fraudem* legis *sentientiam* dixerit dolo malo autem videtur hoc facere, si evidens arguatur eius vel inimicitia vel etiam sordes.

A judge makes the case his own when with wrongful intent, whether the bias be due to friendship, hatred, or corruption, he gives a fraudulent judgment.

15.    Times change. Technology changes. The evils that men do, do not. I well believe this court has departed from its duty to judge impartially and issued *fraudes sentientiae* – that is, judgments tainted or cheated of honest and impartial deliberation, *cum dolo malo.*

16.    This court must deem itself disqualified, because it is a witness to what it purportedly sealed and what its order stated, but will not reveal that order to me. Or this court will have to recuse itself, when I move on July 19th to unseal this case and all of the unconstitutionally sealed cases in this courthouse. This unconstitutional sealing process in this case, with no hearings, findings, or notice, from its inception, is and has been not just a stain on the constitution and the judiciary, but invalid *ab initio*, and thus each and every item in the secret docket must be not only re-docketed in public, but released to the world immediately and in its entirety, with all deliberate speed.

17.    My application will be far broader than just seeking the unsealing of this one case. Under Second Circuit precedent, I may demand – and I will demand – the unsealing of every secretly sealed docket in this court house. Based upon representations by this court, I believe the court has admitted that this courthouse maintains a dual docket of "super sealed" cases, surreptitiously dispensing hidden process to favored defendants,

6

and so on July 19th I will move for the immediate release to the world of the nature and description of each and every such case, and the immediate reconstruction of public docket sheets in each and every such case, and their release as well.

18.     There is no possibility that this court can, let alone appear to, impartially sit in judgment of itself and its years of constitutional transgressions, and so it will have to recuse itself immediately.

19.     Moreover, by refusing to share its extra-judicial, non-evidentiary knowledge of what, if any, documents were ever sealed and not just unlawfully vaulted away out of sight, and in accordance with what orders or decrees, if any, and upon what constitutionally required hearings and findings, if any, and what corresponding decretory language exists, if any, all of which are matters of materially disputed fact, this court has disqualified itself.

20.     Finally, I would ask of this court one question: *You have done enough. Have you no sense of decency sir, at long last? Have you left no sense of decency?* For the only threat to our Union is that a judicial system that would self-justify and rationalize how it could ever dare operate in secret.

### Summary

21.     The movant's motion, brought by TRO did not seek, as requested relief, a **permanent** injunction against dissemination of the information contained in the documents at issue. It sought a **temporary** restraining order against the dissemination of purportedly sealed and confidential materials. The **permanent** relief sought was an order

7

4062160.1

directing the respondents to testify as to whom they got the documents from and who they gave them to. The TRO was itself an illegal prior restraint, in violation of the First Amendment. Nonetheless, I have testified as to how I got the documents, and to whom I gave them. So this entire star-chamber proceeding should now be ended. Case over.

22.     But somehow, this matter has been converted into a motion to restrain my free speech rights, via a request for a return of the purportedly sealed documents that were given to me, and a permanent injunction against my using any information that I obtained from them. Since it appears that the court wishes to go down this road, I will respond zealously, as it is my absolute right to do. My zeal will include, as noted above, a motion to unseal[1].

---

[1] Make no mistake, this is a case of prior restraint. In *Procter & Gamble v. Bankers Trust*, 78 F.3d 219 (6th Cir. 1996), the court held an injunction prohibiting a news magazine from publishing *civil* litigation filings was an impermissible infringement on First Amendment rights. *A fortiori*, in this case, where the Documents are litigation filings or other judicial documents or played a significant role in the performance of Article III functions in a *criminal* case (see *Amodeo*, *infra* at fn.13), an injunction prohibiting Respondents from publishing them would be unthinkable prior restraint. Movant's reliance on *Zyprexa* is thus misplaced, as *Zyprexa* involved an injunction against commercial documents passed between the parties in discovery and which played no role in the performance of Article III functions (*Amodeo*). Furthermore, although irrelevant to this case, the Zyprexa court noted that the non-judicial commercial documents in that case had been properly sealed and that the sealing order itself had been violated; in this case no documents have been properly sealed, because the entire sealing process was constitutionally corrupt, there having been no requisite hearings or findings, apparently everything simply shoveled into the vault without even a formal sealing order, assuming anything at all, including any of these documents, was actually sealed to begin with, since the Court refuses access to those records and thus there is no record evidence anything was ever sealed, and Respondents deny anything was sealed (and maintain that if

8

## The Documents

23.     The evidence has shown that in March 2010, I received unsolicited from Joshua Bernstein, then a client, five documents[2]: (i) a proffer; (ii) a cooperation agreement; (iii) a presentencing investigation report (PSR); (iv) a criminal complaint; and (v) a draft information (collectively, the "Documents"). I was given (i), (ii), and (iii) in both printed and electronic form, and (iv) and (v) in electronic form only.

24.     I received them passively and so for First Amendment purposes  lawfully[3].

---

anything was, it was sealed unconstitutionally, corruptly, and illegally), and in any event even if this Court had decided to uphold the Constitution and properly sealed any of the Documents, that sealing order would have never been violated because Respondents obtained the documents without involvement of the Court files or Court process [*Roman Catholic Diocese of Lexington v. Noble*, 92 S.W.3d 740 (Ky. 2002), refusing to hold newspaper in contempt for publishing documents which were sealed; sealing order merely restricts access to the documents in the custody of the court through the court or its process, not access to copies of the documents or the same information obtained other than through the Court: "An order sealing a record or part thereof should not be read as creating a prior restraint on publication of the contents of the sealed material, unless the order expressly says so."]. And movant never claimed the proffer was never sealed at all. And of course *Zyprexa* is not authority to begin with. To the extent the *Zyprexa* court felt entitled to enjoin individuals but not the media on the implicit basis that individuals' rights of free speech are less than those of the media, the court was in error, for that is not the law here or anywhere else in this country. *Huminski v. Corsones*, 396 F.3d 53 (2nd Cir. 2004). Some or all of these same points are true of movants other misrelied-on cases FRCP 26 commercial discovery cases, and this Court may disregard them as well.

[2] In the form I received them from Bernstein, the cooperation agreement had appended to it a Department of Justice financial statement. So from my perspective there are five documents at issue, whereas from the movant's perspective there are six, since the movant considers the financial statement to be a separate document.

[3] *Bartnicki v. Vopper*, 532 U.S. 514 (2001), holding that where a person is a passive recipient of information of public concern his dissemination thereof is protected against

9

25.    The documents are judicial documents related to or part of the federal charge, adjudication, and disposition of criminal racketeering charges brought against the movant in 1998, the adjudication occurring before this same court and with this same case number, 98-CR-1101.

### The Return of the Documents

26.    Insofar as the "return" of those documents means the return of the original, printed versions that I was given, I have no objection to delivering them to the court to do with as the court sees fit. However, insofar as the "return" of those documents means the destruction of all copies thereof, physical or electronic, in my possession, I object on the grounds that such a "return" is a *de facto* prior restraint, as discussed immediately next.

### The Injunction

27.    A permanent injunction would continue the patently unconstitutional prior restraint under which this court placed the respondents on May 18, 2010. I object.

### There is a Presumptive Right of Access to Most Criminal Documents

28.    In this and the immediately following section, "Right of Access" refers only to the right of a person to obtain access from the court itself (or as the case may be, the executive branch).

---

penalty by the First Amendment regardless whether the person giving it to him acquired it illegally and regardless whether, if such were the case, he knew or should have known.

4062160.1

29.     Respondents, and everyone else, enjoy presumptive First Amendment and common-law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court and the Second Circuit Court of Appeals. It is well understood that the reason for these presumptive rights are the protection of society's interest in having its citizens able to see or learn for themselves what goes on in their courts and engage in the marketplace of ideas by discussion of what they have seen or learned (and in the case of criminal proceedings to protect the defendant's rights to an open trial so he may feel safe that the court or prosecutors will not trample on his constitutional rights in secret).

30.     Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.

31.     In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[4]

---

[4] By contrast, in civil proceedings, in the case of garden-variety commercial documents exchanged during discovery, there is a common-law right of access, but it is less

11

Within this category of criminal proceedings or documents, the presumptive First Amendment and common-law rights of access are ranked according to the proceeding or document to which access is requested.

32.     In this circuit, the most open documents in criminal proceedings (that is, the documents to which the presumption of access is most protected and most strong) are docket sheets, for the obvious reason that without access to those docket sheets no one could know what other documents he might want to access. **This circuit has found an almost overwhelming First Amendment right of access to criminal dockets** (and, though not relevant to this case, has found the same right of access to civil dockets as well).

33.     Almost, if not as, subject to this presumptive right of access are those documents known as "judicial documents," which in this circuit means those documents which played a role in the adjudicative decision itself.

**There is no Presumptive Right of Access to Presentence Investigation Reports**

34.     Pursuant ot F.R.Crim.P 6, there is no presumptive right of access to grand jury minutes, while maintained under secrecy; however, even this secrecy is not absolute, and upon sufficient showing of need the public may be allowed access.

---

protected and thus more readily overcome by a showing of need to keep the documents from public view.

12

35.     Presentence investigation reports have also been historically not open from ready access, but the source of that protection is not statutory, as is the case with grand jury minutes, but by judicial common law, and again their secrecy is not absolute. Although not definitive or clear in its application, this court has said in dictum that it considers such reports to be similar in this sense to grand jury minutes.

## There Is a Presumptive Right of Access[5] to Most Criminal Judicial Records

36.     Respondents, like everyone else, enjoy presumptive First Amendment and common law rights of access to court procedures and documents. The authority for this includes decisions of the United States Supreme Court[6] and the Second Circuit Court of Appeals.[7]

37.     It is well understood that the *raison d'etre* of these presumptive rights is the protection of society's interest in having its citizens able to see or learn for themselves what goes on in their courts and to be able engage in the marketplace of ideas by discussion of what they have seen or learned [8] (and in the case of criminal proceedings

---

[5] In this and the immediately following section concerning PSRs, "Right of Access" refers only to the right of a person to obtain access from the court itself (or as the case may be, the executive branch) when either is in possession "in the normal course", and not to any other right of access from any person other than the court or executive branch.

[6] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[7] *Hartford Courant v. Pellegrino*, 380 F.3d83 (2004); *United States v. Amodeo*, 44 F.3d 141 (2d Cir. 1995).

[8] *Huminski v. Corsones*, 396 F.3d 53 (2d Cir. 2004).

13

also to protect the defendant's rights to an open trial so he may be safe that the court or prosecutors will not trample on his rights in secrecy).

38.     The right of access of an individual citizen, and his right to engage in that marketplace of ideas, is as strong, and as strongly protected, as is the right of access of the largest media outlet.[9]

39.     Yes, these presumptive rights of access are qualified, but that only means that they are not absolute and at times when a person seeks access to a court process or documents, the court may engage in a balancing test, weighing these rights of access and society's interest in protecting them against the countervailing interest asserted by the person objecting to that access.[10]

39.     In particular, when the court proceedings or documents in question are criminal in nature, the right of access is founded both in the First Amendment (and Sixth) and common law, and is of paramount societal importance, such that only a showing of a compelling interest can justify restricting it, and then only to the degree necessary.[11] (By contrast, in civil proceedings, in the case of garden variety commercial documents exchanged during discovery, there is a common law right of access, but it is less

---

[9] *Id.* ("Rights accorded by the First Amendment provide quintessential protection for the individual.")

[10] *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980); *Press-Enterprise Co. v. Superior Court of California* 464 U.S. 501 (1984); *Press-Enterprise Co. v. Superior Court of California*, 478 U.S. 1 (1986).

[11] *Id.*

14

protected and thus more readily overcome by a showing of need to keep the documents from public view).

40.     Within this category of criminal proceedings or documents, the presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

41.     In this circuit, the most open documents in criminal proceedings (that is, the documents to which the presumption of access is most protected and most strong) are docket sheets, for the obvious reason that without access to those docket sheets no one could know what other documents he might want to access. This circuit has found an almost overwhelming First Amendment right of access to criminal dockets (and, though not relevant to this case, has found the same right of access to civil dockets as well), which may be restricted only upon a due process finding of compelling interest. [12] Almost, if not equally, open to access are those documents generally referred to for this purpose as "judicial records," which in this circuit means those documents which played a role in the adjudicative decision itself.[13]

### The Proffer, Cooperation, Complaint, and Information Are Criminal Judicial Records; They and the Information in Them Are Matters of Public Concern

42.     Within this category of criminal proceedings or documents, the

---

[12] *Hartford Courant v. Pellegrino*, 380 F.3d 83 (2004).

[13] *United States v. Amodeo*, 44 F.3d 141 (2nd Cir. 1995). Respondents cite this case solely for the definition of judicial records, and not for any relevance to the issue(s) of prior restraint.

15

4062160.1

presumptive First Amendment and common law rights of access are ranked according to the proceeding or document to which access is requested.

--   **Per Se**

43.   Given the abundant decisional law establishing the existence of First Amendment and common-law rights of access to these documents because of the fundamental, bedrock policy of allowing citizens to disseminate them throughout the marketplace of ideas, it is axiomatic that they are matters of public concern per se, given that their public concern is what creates these rights of access in the first place.


--   **In the Specific Facts of This Case**

44.   The record reflects that the movant is a violent recidivist felon with prior convictions for assault with a deadly weapon and for violation of federal racketeering law. On that basis alone the facts of his criminal racketeering adjudication in this court are matters of public concern. This isn't a parking ticket.

45.   Apparently, in spite of the massive racketeering scheme for which he was convicted in this court, the movant received no prison term and no order of restitution, even though he and his co-criminals, including Mafia and Mafiya mobsters, stole over $40,000,000. On that basis, these documents are matters of public concern, as sentencing dispositions always are.

46.   Even while awaiting sentencing, the movant began racketeering crimes at

16

4062160.1

Bayrock, some of which relate back horizontally to the sentencing process itself. Specifically, movant began skimming almost $1,000,000 a year, year after year, unreported, from Bayrock in 2003. On that basis, these documents are matters of public concern.



48.     Finally, in hearings before this court on June 21, 2010, in an episode not likely to wind up in her career highlights tape, counsel for the movant allowed him to take the stand. One can imagine how excited she, and movant, must have been to imagine how he would make a big splash. One can also imagine how he felt when he jumped off

17

the high board only to realize moments later that the respondents had drained the water out of the pool. For movant perjured himself when he testified that he was a member (owner) of Bayrock, and then backtracked and said he was not ███████████████ ████████████████████████ He not only committed another predicate crime, which the respondents will supplement to their SDNY RICO complaint, but did so within 10 years of the first such lie, and thus is now subject to racketeering liability for operating an enterprise (courtroom 8B, EDNY) through a pattern of racketeering (perjury and obstruction of justice). On that basis, these documents are matters of public concern.

### -- There Is a Non-Presumptive Right of Access to Presentence Investigation Reports

49.    Pursuant to Fed. R. Crim. P. 6, there is no presumptive right of access to grand jury minutes, while maintained under secrecy; however, even this secrecy is not absolute, and upon sufficient showing of need the public may be allowed access, as *Charmer* states. Presentence investigation reports have also been historically not open to ready access, though the source of that protection is not statutory, with grand jury minutes, but rather is decisional law, and again their secrecy is not absolute, and upon sufficient showing of need the public may be allowed access, as *Charmer* states. Although not definitive or clear in its application, this court has said in dictum that it considers such reports to be similar in this sense to grand jury minutes.

50.    However, the fact that grand jury minutes and PSRs are not readily

18

4062160.1

accessible does not make them not matters of public concern. In this case, the PSR is a matter of public concern for the reasons cited above; viz. it is the evidence that the movant lied to the Probation Officer, a predicate racketeering crime, and that the Probation Officer failed to detect it, both of which are matters of public concern.

51.     *Charmer* never addressed First Amendment issues of free speech or prior restraint. There is however federal authority on that point, and therefore the respondents end this argument by citing appellate authority that, read with *New York Times* and *Bartnicki*, allows them to disseminate not only the four judicial records, but the PSR as well.

52.     In *United States v. Smith*, 123 F.3d 140 (3rd Cir. 1997), the court was addressed the question whether it could impose a prior restraint on a newspaper which had lawfully come into possession of a sentencing memorandum which contained grand jury material (it had been leaked by the executive branch). The court sealed the sentencing memorandum after the leak had been detected, on the ground that F.R.Crim.P 6(e) material was implicated, and ordered briefing on the extent to which the sentencing memorandum was sourced in secret grand jury material. The court held that the newspapers, which already had the sentencing memorandum and wanted access to those briefs and an associated hearing, had no First Amendment right of access to those briefs or the associated hearing, but then observed as to the sentencing memorandum they already possessed, which contained much of the same material as would the briefs and

19

the hearing:

> The order entered by the district court in this case cannot effectively bar further dissemination of any potential grand jury secrets by members of the public who possess the sentencing memorandum. Nor could the court enter an order barring parties in possession of the sentencing memorandum from passing the memorandum onto other parties. Under prior restraint law, orders prohibiting the media from publishing information already in its possession are strongly disfavored. Although the district court could not prevent the newspapers from publishing the sentencing memorandum once they came into possession of it, the court properly prevented further government disclosures of the putative grand jury secrets contained in the sentencing memorandum to additional parties. Even if the dissemination by members of the public continues, the order barring further disclosure of any secret grand jury material will at least narrow that dissemination.

53.     The court so held even though it noted that the sentencing memorandum disclosed, and would disclose, certain sensitive information that Rule 32 required probation officers to exclude from PSRs and disclosed, or would disclose PSR material in violation of Rule 32(b)(6).

54.     This is a resounding trifecta of First Amendment freedom: The court held that newspapers and members of the public already in possession of a sentencing memorandum containing not only secret grand jury material but also PSR material and even material too sensitive for a PSR could not be enjoined from disseminating it at will because they enjoyed a First Amendment right to do so and could not be made to suffer prior restraint.

55.     Neither may respondents be enjoined, from disseminating the PSR or any

20

of the other Documents. This is still the United States of America, not Soviet Russia.[14]

Dated:    Suffolk County, New York
           July 16, 2010

*[signature]*

                 Frederick M. Oberlander

---

[14] This court should note that in *United States v. Watkins*, 623 F.Supp.2d 514, SDNY, the court ruled that where a plaintiff in a civil case attempted to take a position in that case about his financial condition ten years earlier which was materially different from what he had told the Probation Officer and court at the time during his federal sentencing for a drug crime, as evidenced by the PSR, the revelation of that fraud was sufficient need under *Charmer* to justify unsealing the PSR sections that related to his financial condition and other records as well. Clearly, in this case movant is in worse position if he attempts to argue that his PSR should be protected (and this is beside the issue of prior restraint), because even if Respondents didn't already have the PSR *Watkins* would entitled them to get it on motion. Obviously, *Watkins* also confirms that the PSR in this case is a matter of public concern *for New York Times* and *Bartnicki* purposes.

21

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------- X
UNITED STATES OF AMERICA,                    :
                              Plaintiff,     :
                                             :    98 CR 1101 (ILG)
                                             :
              -against-                      :    **FILED UNDER SEAL**
                                             :
                                             :
FELIX SATER,                                 :
                                             :
                              Defendant.     :
------------------------------------------------------- X

**ORDER TO SHOW CAUSE FOR**
**PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**

Defendant Felix Sater, by his attorneys Morgan, Lewis & Bockius LLP, having moved this Court for relief hereinafter described,

**NOW** upon the accompanying Declaration of Kelly Moore, Esq., executed on May 18, 2010, and Defendant's Memorandum of Law, and on all the pleadings and proceedings had herein, it is hereby

**ORDERED**, that Jody Kriss, Michael Ejekam and Fred Oberlander show cause before a motion term of this Court, Room *26*, United States Courthouse, 225 Cadman Plaza East, Brooklyn, New York 11201 on *May 28, 2010* at *12:* o'clock in the noon thereof, or as soon thereafter as counsel may be heard, why an order should not be issued requiring Jody Kriss, Michael Ejekam and Fred Oberlander and any other persons who have acquired the Sealed and Confidential Materials to immediately return the Sealed and Confidential Materials to Mr. Sater;

**ORDERED**, that pending said hearing, Messrs. Kriss, Ejekam and Oberlander and their representatives, employees and agents, and all other persons acting in concert with them and all other persons who have obtained the Sealed and Confidential Materials, are restrained and enjoined from disseminating the Sealed and Confidential Materials or information therein further;

**ORDERED**, that Messrs. Kriss, Ejekam and Oberlander appear at said hearing and give evidence as to how they obtained the Sealed and Confidential Materials and to whom said materials have been disseminated;

**ORDERED**, that personal service of a copy of this order and annexed affidavits upon Messrs. Kriss, Ejekam and Oberlander or their counsel on or before May 19th, 2010 shall be deemed good and sufficient service thereof;

**ORDERED**, that Messrs. Kriss, Ejekam and Oberlander's papers in opposition to Mr. Sater's motion, if any, shall be served by hand on Morgan, Lewis & Bockius LLP, counsel for Mr. Sater, on or before May 25th, 2010 at 5:00 p.m. (with a courtesy copy hand delivered to the Court in Chambers), and that Mr. Sater's reply papers, if any, shall be served by hand on counsel for Messrs. Kriss, Ejekam and Oberlander by no later than 5:00 p.m. (with a copy for Chambers) the day before the return date provided by this order;

**ORDERED**, that all papers related to the instant motion are hereby sealed;

**ORDERED**, that a copy of all papers shall be served on Marshall Miller and Todd Kaminsky of the United States Attorney's Office for the Eastern District of New York.

Dated: New York, New York
     May 18, 2010   at
        2:00 p.m

                                            _____
                                            United States District Judge

2

BUSINESSWEEK: NOVEMBER 9, 1998

FINANCE: INVESTIGATIONS

# THE CASE OF THE GYM BAG THAT SQUEALED

**An accidental find in New York tips the Feds to a stock scam**

It was the kind of oversight that is, usually, pretty harmless. A "Marina Shap" failed to pay the rent on her cubicle at Manhattan Mini-Storage in the SoHo section of New York. When the manager opened the bin last January, however, he found an intriguing assortment of knickknacks: Two 9-millimeter pistols, a 12-gauge shotgun, and, the FBI asserts in a court filing, "various documents in a box and gym bag."

The fluke discovery of the guns was hardly earth-shattering in gun-happy New York. But the documents drew the attention of the FBI's Russian organized crime squad. According to a sealed criminal complaint filed with the U.S. District Court in Brooklyn and obtained by BUSINESS WEEK, the FBI maintains that the mini-storage document trove sets forth a tale of stock manipulation and money laundering. Allegedly involved are more than 30 foreign shell companies and bank accounts that, the complaint maintains, were used to launder the proceeds from illegal stock sales during 1994 and 1995.

**MONEY LAUNDERING.** The feds are charging that the stock scheme involves two individuals--Gennady "Gene" Klotsman and Felix Sater--who they say ran a now-defunct micro-cap brokerage, White Rock Partners & Co., which later changed its name to State Street Capital Markets. Both are charged with stock manipulation and money laundering. The lawyer listed in the court docket as Klotsman's attorney, Michael W. Kahn, did not respond to a request for comment. Klotsman was arrested in September and is in custody. Efforts to reach Sater were unsuccessful.

The stock targeted in the complaint was a Bala Cynwyd (Penn.) company called Holly Products Inc. The company makes electronic components for casino equipment, among other things, and was the subject of a public offering by White Rock in late 1994. Its share price was elevated through 1995 but swiftly plummeted, down 96% over the past year to a recent price of 3 cents. The feds do not charge any involvement by officials of Holly, whose most recent phone listing is inactive. According to the FBI, Sater and Klotsman manipulated Holly and other shares in a "pump and dump" scheme, and then laundered the proceeds.

According to the complaint, the scheme began when Klotsman and Sater secretly acquired large blocks of stock for offshore corporations they controlled. The FBI maintains that the two men inflated share prices by under-the-table payoffs to brokers at White Rock and other firms, pegged to sales volume. The two men's profits, $10 million according to the complaint, then went through a trans-national money laundry.

According to the feds, the money that came in from hapless
investors was sent on a round-the-world tour--to the Netherlands
Antilles and Switzerland, and then to Israel, Luxembourg, the
Netherlands, Ireland, the Channel Islands, and the U.S. The feds
say that Sater and Klotsman sometimes used phony names--and
sometimes did not--which evidently made the FBI's job easier.

The prosecution of Klotsman and Sater bears strong similarities to
the prosecution of New York jeweler Aleks Paul--who is not
charged in this case (BW--Aug. 10). Paul was arrested in July and
charged with engaging in a money-laundering scheme for White
Rock. Paul pleaded not guilty, and his lawyer says he is vigorously
fighting the charges.

One issue raised by the Klotsman/Sater complaint is the possibility
that the FBI may be probing ties to Russian organized crime--
which has long been believed to be enmeshed in the world of
shady micro-cap brokers. The FBI agent handling the
Klotsman/Sater case, Leo Taddeo, belongs to the FBI's Russian
organized crime squad. Sources familiar with the Paul case say
the FBI is also probing possible Russian and Italian mob links in
the Paul investigation. Paul's lawyer, Benjamin Brafman, denies
knowledge of any mob probe.

If indeed the feds are pursuing mob ties, they need more than
lucky breaks like unpaid mini-storage bills. They need confidential
informants familiar with the operations of these firms. And the
complaints in both cases indicate that they've got several. Perhaps
one of them, someday, will answer this question: Who owned
those two 9-millimeter pistols and that 12-gauge shotgun? And
what was he or she planning to do with them?

By Gary Weiss in New York

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x

UNITED STATES OF AMERICA,            :     98 CR 1101 (ILG)

            Plaintiff,            **FILED UNDER SEAL**

   - against -                         :

FELIX SATER,                         :     **Declaration of Thomas W. Hyland in**
                                           **Support of Cross-Motion and in**
            Defendant.            **Opposition to Main Motion**

-------------------------------------------------------- x

FREDERICK M. OBERLANDER, ESQ.,

          Non-Party Respondent.

-------------------------------------------------------- x

      I, Thomas W. Hyland, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as

follows:

      1.     I am a member of the firm of Wilson, Elser, Moskowitz, Edelman & Dicker LLP,

counsel for attorney Frederick M. Oberlander, Esq. This declaration and the exhibits hereto are

filed under seal. I make this declaration based upon my review of the file maintained for the

defense of Oberlander. However, my file does not include the documents at issue on this motion.

Pending a ruling on this order to show cause, I have directed Oberlander to maintain the status

quo, and show the documents to no one, not even me or anyone in my law firm.

      2.     I submit this declaration in opposition to order to show cause brought by

defendant Felix Sater. Sater seeks the following relief:

      a)     As per the OTSC, the immediate return of certain purportedly protected materials.

      b)     As per the OTSC, an inquiry into how certain persons acquired the purportedly
             protected materials, and to whom they were distributed.

      c)     As per the OTSC, a temporary restraining order against further dissemination.

      d)     Apart from the relief sought in the OTSC, defendant Sater's memorandum seeks
             costs and attorney's fees.

3.      I also submit this declaration in support of the affirmative relief sought by cross-motion, by which Oberlander requests leave of the court to contact the client who gave him the documents at issue, who – it is expected – would avow by affidavit how he obtained the documents and from whom, and that they were not obtained from a sealed court file.

4.      The following exhibits are submitted herewith:

Exhibit "A"          Declaration of Frederick M. Oberlander, Esq.

Exhibit "B"          Complaint in matter of *Kriss v. Bayrock.*

Exhibit "C"          Excerpts of deposition of Joshua Bernstein, dated March 8,
                     2010 (Bernstein v. Bayrock Group, LLC, Supreme Court,
                     Westchester County, Index No. 02579/09).

5.      The relief sought by Sater should be denied in all respects. However, should this court find a colorable argument in defendant Sater's favor, the issue should be resolved by United States District Judge Naomi Reice Buchwald, S.D.N.Y., in the context of the ordinary discovery process in the underlying civil RICO matter of *Jody Kriss, et al. v. Bayrock Group LLC, et al.*, S.D.N.Y. Docket No. 10-cv-3959. We respectfully submit, however, that there is absolutely no colorable argument in Sater's favor. This is so because the only thing that has been sealed is the court's own file. The documents at issue did not come from the court file. Oberlander did not obtain them improperly.

--      *Summary of the allegations in the complaint against Sater
        in Kriss v. Bayrock.*

6.      In behalf of Jody Kriss and others, Oberlander has instituted a derivative action in the United States District Court for the Southern District of New York against Sater, *et al.* The action sounds in fraud, tax evasion, money laundering, embezzlement, breach of fiduciary duty, and, importantly, substantive and conspiracy violations of RICO. Significant in the schemes and conspiracies is that Sater was – as alleged – the majority owner of the Bayrock Organization,

though he hid his ownership, *inter alia*, (a) to avoid millions of dollars of personal tax liability; (b) to launder money; and (c) to hold out to this very court that he had no income and no assets.



--     *Sater's motion must be denied, because he has failed to make a*
               *prima facie showing of entitlement to relief.*

8.     The court will note that Sater's OTSC contains no affidavit from Sater himself. He does not state that Oberlander – or indeed anyone – obtained these documents in violation of any sealing order, or for that matter that Oberlander – or indeed anyone – obtained them from the court. And in fact Oberlander did not get them from the court file.

9.     Moreover, Sater does not state that he never gave his personal copies of the documents to any third person. In fact, it appears that his counsel concedes that he kept copies of the documents at Bayrock, and since it is apparently his position that he had no ownership in the Bayrock Organization, it is not quite clear what expectation of privacy he maintained by keeping them at the Bayrock offices. In any event, since Sater failed to avow that he did not give out

copies, and since he failed to avow that he protected his copies, he has failed to eliminate the possibility that he himself released the documents into the world, without preserving their purportedly protected status.

10.    By his failure to state that Oberlander obtained the documents from the court files and by his failure to rule out these obvious scenarios – *a fortiori* by his failure to state either – Sater has failed to make a *prima facie* showing of entitlement to any relief whatsoever; thus, this court should summarily deny the order to show cause.

11.    Even if this court is not inclined to deny the motion summarily, the first inquiry must focus on Sater, not Oberlander. This is to say, before this court conducts any inquiry into how Oberlander obtained the documents, it must be established whether Sater ever gave them to anyone else (other than perhaps his own attorney) or otherwise made them – or any purportedly protected information contained in them – available. If he answers *Yes*, then the court need not go any further. See, *e.g.*, *Bradley v. C.I.R.*, 2006 WL 3780767 (2d Cir. 2006) (holding that the privilege of attorney-client communications is waived when the documents are disclosed to an accountant); *In re von Bulow*, 828 F.2d 94 (2d Cir. 1987) (holding that disclosure of attorney-client communications in an extra-judicial setting constitutes waiver of the privilege in all court proceedings). So if Sater himself disclosed or failed to protect the documents or the information in them then he has forsaken any privilege that may have attached to them and no further inquiry is warranted about how Oberlander obtained them.

12.    Conversely, further inquiry might be warranted only if Sater will avow, under penalty of perjury, that he has never given the documents or the information to anyone or allowed them to become known.

13.     There is good cause to believe that Sater failed to maintain the privilege that may

attach to his own documents. Joshua Bernstein testified in the matter of *Bernstein v. Bayrock* at

pages 194-195 that "at the direction of Felix Sater I downloaded regularly files from [the] hard

drive and the server [of the Bayrock computers]." Felix further directed Bernstein "to keep

...offsite, an archival copy [of] as much of the server as [he] could." (Excerpts of the deposition

are included as an exhibit hereto).

14.     If Sater was not an owner of the Bayrock organization, then any personal

privilege was, at least arguably, shattered **if** he put these documents on the company's computer

and when he directed that all documents, including the ones at issue, be accessed by Bernstein

and saved offsite at Bernstein's home. (Bernstein deposition, p. 219: "*Q.* Where did you keep

them? *A.* In my files. *Q.* At home? *A.* Yes.")

15.     Given this testimony, before this court proceeds any further Sater should be asked

a line of questions like this: *Q.* Did you give the documents at issue here to anyone? *Q.* If so, to

whom? *Q.* Did you put any of your own personal documents on the Bayrock computer system?

*Q.* How many copies did you leave lying around at Bayrock? *Q.* Where? *Q.* Were they always

under lock and key? *Q.* Who else had access to your files? *Q.* How many copies did you leave

lying around in other places? *Q.* Did you have any ownership interest in Bayrock? *Q.* If not, what

makes you think you didn't waive any privilege **if** you put them on the computer?

--      *If the court entertains the motion, Oberlander should be granted leave to
         contact the client who it is believed obtained the documents from Sater
         and who in turn gave them to Oberlander.*

16.     As for how Oberlander got the documents, the answer is simple: As he states in

his declaration, they were given to him without his solicitation by a client. Oberlander must be

circumspect in stating who it was that gave him the documents, however, as he is duty-bound to

4020238.2

preserve an attorney-client privilege. Oberlander states in his declaration that he did not obtain them from the court file. Rather, unsolicited, they were given to him by a client. [Again, by "client" we mean to be circumspect, as the term could refer to either a present or former client].

17.     Because this OTSC is under seal, Oberlander has not contacted this client to ask if he would submit an affidavit in opposition to this order to show cause. It is believed that if this court were to permit Oberlander to contact the client, then the client would readily submit an affidavit stating that he obtained the presentencing report, the proffer agreement, the cooperation agreement and the United States Department of Justice financial statement from Sater, either by his having been given a hard copy of the documents or an electronic copy.

--      *Oberlander did not take the documents from the court file. He obtained them lawfully.*

18.     As set forth in the Oberlander declaration, he came into possession of information showing why Sater was hiding his personal assets from a client, lawfully, not from the court.

## Argument
--      **The court's privilege has not been violated. Assuming Sater himself even had any privilege to begin with and then disclosed the documents to others, that's his problem.**

19.     While courts may not freely disseminate PSR's (or other sealed materials), the privilege is the court's. The court cannot prevent third-persons in possession of the documents from giving them to another. Since, as he states in his declaration – and this is uncontested – Oberlander did obtain the documents from someone other than the court, he did not violate any sealing order or other court privilege, Sater's motion must simply be denied.

4020238.2

20.     Contrary to what Sater's counsel asserts in his memorandum of law,[1] Criminal

Procedure Rule 32(e)(2) is not a prohibition against the disclosure of a PSR beyond the usual

participants in a criminal prosecution – *i.e.*, the court, prosecutors, defense counsel, and the

defendant. Federal Rule of Criminal Procedure, 32(e)(2) states:

> *Minimum Required Notice.* The probation officer must give the
> presentence report to the defendant, the defendant's attorney, and
> an attorney for the government at least 35 days before sentencing
> unless the defendant waives this minimum period.

21.     This is nothing more than a scheduling rule. As set forth in the margin, the history

of Rule 32 proves this.[2] The 1983 amendment[3] (which is the source of Rule 32[e][2]) is a

procedural scheduling provision. It is this amendment that Sater's counsel incorrectly

characterizes as some kind of substantive rule. Indeed, the Second Circuit's observation in

*United States v. Charmer Indus. Inc.*, 711 F.2d 1164, 1172 (2d Cir. 1983) with respect to this

1983 version of Rule 32 remains accurate still. There, the Second Circuit stated that although the

rule "sets the standards for release of presentence reports to defendants, their counsel, and the

prosecuting attorneys, it is silent as to whether and under what circumstances such reports may

be disclosed to 'third persons,' – by which we refer to persons or entities other than the courts,

---

[1] See Sater memorandum at 5 (arguing that Rule 32(e)(2)of the Federal Rules of Criminal Procedure "specifically
limits the disclosure of pre-sentencing and other probationary reports only to defendants, their counsel, and
prosecuting attorneys").

[2] For decades, presentence reports were not disclosed to defendant or counsel. Only in 1967 did Rule 32 first permit
– but not require – the trial court to disclose the report to defendant and counsel, in the court's discretion. A 1973
amendment first required – but only on request of the defendant – disclosure to defendant and counsel. A 1983
amendment eliminated the request condition, requiring disclosure by the court to defendant and counsel, but also
requiring they return the documents.

[3] Id.

the Parole Commission, the Bureau of Prisons, and probation officers." 711 F.2d 1164, 1172 (2d Cir. 1983).[4]

-- *Sater was entitled to disclose the documents to whomever he wished. And he was entitled to vitiate whatever privilege he feels he may have had.*

22.     Rule 32 contains no restriction on disclosure of the presentence report by defendant or even by counsel. Indeed, this is the official position of the United States judiciary itself: the United States Probation and Pretrial Services System states in *The Presentence Investigation Report, Publication 107*, VI-3 (March 2006)[5] that free disclosure by defendant or counsel is the default rule. ("Rule 32 does not appear to restrict the disclosure of the presentence report by counsel or the defendant. Some courts have local rules which limit redisclosure.")[6]

23.     In support of the order to show cause, Sater has failed to demonstrate that there is any applicable rule that prohibited his or his own counsel's disclosure of the PSR. In any event, there is no authority for the notion that if a document comes into the possession of the recipient, through no intentionally unlawful conduct by the recipient, there is any basis to find fault with that recipient.

-- *The court's privilege has not been violated.*

24.     In point of fact, only court personnel are barred from disclosing sealed documents, and in particular PSR's. In addition to the default rule of free disclosure by counsel

---

[4] In 1988, the Supreme Court ruled that defendants could obtain their own PSRs through FOIA demand. *United States Dept. of Justice v. Julian*, 486 U.S. 1 (1988). A year later Rule 32 was amended to eliminate the 1983 requirement that defendants and counsel return the reports to the court, since they could always obtain – and keep – the reports through FOIA requests anyway.

[5] Available at http://www.fd.org/pdf_lib/Monograph%20107.pdf. See page ~~161~~ **108, §VI-3** of the PDF.

[6] For example, Local Rule 32(c) of the Federal District Court, District of Vermont, limits redisclosure by counsel, though not by the defendant himself.

and defendant, Federal law even requires the disclosure of the PSR's to third parties, who themselves are under no prohibition against further redistribution.[7]

> -- *The court's privilege is not absolute. Upon a showing of compelling need, the documents may be unsealed.*

25.    Moreover, the court's privilege is not absolute.[8] A court will order disclosure of a PSR to third parties "so as to ensure the accuracy and truthfulness of all information before this and other courts, and to prevent respondent from taking inconsistent, self-serving positions regarding his financial condition" in a civil lawsuit. *United States v. Watkins*, 98 CR 1142 (JSR), 2009 U.S. Dist. LEXIS 58220 at *9.[9]

> -- *The court's privilege is not absolute. Upon a showing of compelling need, the documents may be unsealed.*

26.    As noted in *Charmer*, disclosure of presentence reports to third-parties is permitted upon a showing of a compelling need for disclosure to meet the ends of justice. 711

---

[7] For example, in 2003, Congress passed the PROTECT Act, which amended 28 USC 994(w) to require courts to submit to the Sentencing Commission information regarding a defendant's sentencing, including the PSR, and requires that the commission, on request, transmit the presentence report to the House and Senate Judiciary Committees and the Attorney General. Neither the Freedom of Information Act nor the Privacy Act apply to the Sentencing Commission, or to Congress, and thus there is no law which, directly or indirectly, prohibits subsequent redisclosure of a PSR by either body.

[8] To be sure, as *Charmer* and subsequent decisions have made clear, presentence reports are generally not considered public records but "*confidential*"court documents. *United States v. Watkins*, 98 CR 1142 (JSR), 2009 U.S. Dist. LEXIS 58220 (S.D.N.Y. 2009) at *4, citing *United States v. Charmer Indus., Inc.*, 711 F.2d at 1177. I have put the word "confidential" in quotes, because the word is too often confused with "privilege." Here, a "confidence" can be ordered to be disclosed, or disclosed even if obtained wrongfully; a "privilege" is inviolate, absent very narrow and special circumstances, such as the crime-fraud exception. Here, the court document was "privileged," meaning the *court* couldn't be ordered to disclose it (again, absent special circumstances). Indeed, contrary to Sater's counsel's position, the holding of *Charmer* is exactly this: *Charmer* held that a probation service clerk – an employee of the judiciary – had no authority to release a PSR from the court file. Only the court itself could exercise that authority. The case is inapplicable to the distribution of PSR's from a defendant to a third-party, or a third-party to another third-party.

[9] Furthermore, several district court cases within the Second Circuit recognize that sentencing memoranda and letters attached to or specifically referenced in a sentencing memorandum filed with the court are generally accessible to the public. See *United States v. Sattar*, 471 F.Supp.2d 380 (S.D.N.Y. 2006); *United States v. Roeder*, 05-CR-6161L, 2009 U.S. Dist. LEXIS 11395 (W.D.N.Y. Decided Feb. 13, 2009); *United States v. Lawrence*, 167 F. Supp. 2d 504, 506 (N.D.N.Y. 2001); see also *United States v. Kushner*, 349 F. Supp. 2d 892, 902 (D.N.J. 2005). As the *Kushner* court noted, 349 F. Supp. 2d at 905, "a strong presumption of access attaches to sentencing memoranda." Also, sentencing memoranda and exhibits attached to it, may bear directly on the Court's Article III duties, "perhaps the most important of judicial duties." 349 F. Supp. 2d at 905.

F.2d at 1175; see also *United States v. Lewter*, 402 F.3d 319 (2d Cir. 2005); *United States v. Moore*, 949 F.2d 68, 72 (2d Cir. 1991). This standard likewise applies to applications for the disclosure of federal probation records. See *In re Lobel*, 03 CR 296, 2005 U.S. Dist. LEXIS 5869, at *2-3 (S.D.N.Y. April 6, 2005).

27.    In a remarkably similar situation, the *Watkins* court found compelling need existed where a civil defendant sought to estop that the plaintiff from claiming in 2008 that he had ten years earlier in 1998 purchased half ownership of a business for $600,000 while at the very same time in 1998 the very same plaintiff was lying to the court and to the Probation Department during his sentencing for a drug conviction (like Sater hiding his ownership in the business, as alleged in the *Kriss* complaint) and hiding the $600,000, claiming he had no money or assets to avoid a fine. The *Watkins* court ordered the release to the defendant of (1) the plaintiff's presentence report and (2) other statements the defendant had made to the Probation Department regarding his financial condition. See also *United States v. Harris*, 617 F. Supp. 2d 99 (E.D.N.Y. 2007) (granting Family Court presiding over mother's demand for custody of her son access to the mother's probation records in particular the results of mother's drug tests).[10]

28.    Here, there is no basis to try to put any genie back in the bottle (or cat back in the bag), because the documents at issue would inevitably be ordered to be disclosed, in accord with *Watkins.* ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

---

[10] In somewhat similar vein, in *United States v. Huckaby*, 43 F.3d 135, 140 (5th Cir. 1995), the Fifth Circuit upheld the district court's order releasing the defendant's presentence report, so as to address the defendant's claim that his prosecution and conviction for felony tax crimes (instead of a misdemeanor) was racially motivated.



29.     The court must be aware of the distinction between "sealed" court documents, which would be generally inaccessible to the public, versus those same documents being disclosed by others, such as Sater himself. The court must also be aware of the distinction between the sealed documents, versus the information contained therein. This court can only prevent someone from obtaining the court documents; it cannot prevent anyone from learning the information from other sources. While Sater's counsel harps on the fact that the *Kriss v. Bayrock* complaint refers to the documents as "sealed," apparently to show Oberlander's *scienter*, the complaint merely alleges that certain documents were <u>at one time</u>, years ago, sealed, and Sater utterly fails to appreciate the distinctions noted above. The documents were indeed "sealed" – past tense – by the court. The documents that are in the court file, if any, may still be "sealed." However, the documents that Oberlander obtained, and certainly the information in them, are not "sealed."

30.     Upon perusal of the complaint in the *Kriss v. Bayrock* action, the court will see that it was drafted with utmost care. Sater's motion pits a convicted racketeer, tax-evader, money launderer, and fraudfeasor against a zealous advocate, but without any evidentiary basis having been shown to show that the miscreant has any basis for obtaining the relief that he seeks. Sater's counsel has not demonstrated, through an affidavit of Sater himself, that he never gave the

documents to any third person and has not demonstrated he otherwise protected them at all, assuming the existence of any protectable privilege to begin with. Therefore, the motion must be denied in all respects.

31.     In the event the court even entertains this motion, it is respectfully requested that this court grant the relief sought via cross motion – *viz.* leave to contact Oberlander's client – so that Oberlander may request that the client submit an affidavit showing how and from whom he got the documents at issue.

--     *Any relief granted should be granted only to a minimal extent.*

32.     Importantly, the RICO complaint as filed included as attachments only the proffer, the cooperation agreement, and five pages extracted from the PSR. The complaint does not include the financial statement or any of the putatively more confidential information in the PSR, and importantly does not include any of the typically "questionable" PSR provisions such as hearsay statements of co-defendants. The extracts *appear* to have been chosen with care, to include only those portions establishing the frauds on the probation service, the court, the racketeering victims, and others (including where Sater and his co-conspirators and co-defendants failed to disclose his history of criminal securities fraud, for example when they filed fraudulent condominium documents for Trump SoHo, intentionally omitting Sater's then-62% ownership of Bayrock and his criminal past) and are continuing that fraud on the buyers by concealing it from them, and from the attorney general.

33.     Any relief should be carefully tailored to these narrow aspects.

## Conclusion

34.     Sater failed to submit an affidavit indicating that he maintained the purportedly protected nature of the documents at issue here. Therefore, the relief requested must be denied. If

4020238.2

the court nonetheless opts to consider the motion, then Oberlander's cross-motion should be granted, permitting him to contact the client who gave him the documents

35.    Sater's application must be denied also because Oberlander states in his declaration that he obtained the documents from a third-person – a client – and not the court.

36.    Finally, the application must be denied because these documents would be ordered to be unsealed in any event, because – as alleged in detail in the *Kriss v. Bayrock* complaint – ███████████████████████████████████████████

███████████████████████████████████████████████████

███████. (I conclude by repeating that these are the allegations, unknown to me personally).

37.    If this court finds any colorable argument in Sater's favor, the documents at issue should be ordered turned over to Sater's counsel and held pending a determination of their discoverability in the *Kriss v. Bayrock* matter.


Dated:    New York, New York
          June 7, 2010

                    Respectfully submitted,

                    WILSON, ELSER, MOSKOWITZ,
                    EDELMAN & DICKER LLP

                    By: _____
                         Thomas W. Hyland
                         Attorneys for non-party respondent Fred M.
                         Oberlander
                         150 East 42nd Street
                         New York, New York 10017
                         (212) 490-3000


4020238.2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------

UNITED STATES OF AMERICA,

                Plaintiff,

    - against -

FELIX SATER,

              Defendant.

---------------------------------------------------------

FRED M. OBERLANDER, ESQ.,

              Non-Party Respondent.

---------------------------------------------------------

x
:
   98 CR 1101 (ILG)
:
   FILED UNDER SEAL
:
   **Declaration of Fred M.**
   **Oberlander**
x

x

I, Frederick M. Oberlander, declare under penalty of perjury, pursuant to 28 U.S.C. §
1746, as follows:

1.      I am an attorney duly admitted to practice before the courts of the State of New
York, as well as the United States District Court for the Southern District of New York. I submit
this declaration in opposition to the order to show cause that has been filed seeking the return of
certain "sealed" and "confidential" documents.

2.      In order to maintain the status quo, I have not shown the documents to anyone,
pending the hearing and determination of this motion.

3.      I obtained the documents at issue from a client. I did not solicit them from the
client.

4.      I did not obtain them from the court.

5.      I verily believe that, if I were permitted to contact the client, he would agree to submit an affidavit that would describe how he obtained the documents at issue, and that he, in turn, gave them to me, unsolicited.


Dated:      New York, New York
            June 4, 2010

                                                    /s/
                                            _____
                                                Frederick M. Oberlander

4020238.2

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 East 42nd Street, New York, NY 10017-5639
Tel: 212.490.3000   Fax: 212.490.3038

*Albany • Baltimore • Boston • Chicago • Dallas • Garden City • Houston • Las Vegas • London • Los Angeles • McLean*
*Miami • Newark • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford • Washington, DC • White Plains*
*Affiliates: Berlin • Cologne • Frankfurt • Mexico City • Munich • Paris*

———

www.wilsonelser.com

June 11, 2010

**VIA FACIMILE UNDER SEAL – (718) 613-2446**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York, 11201

|          |     |                               |
|----------|-----|-------------------------------|
| Re:      |     | **United States of America v. Felix Sater** |
|          | **Case No.** | : | **98CR1101 (ILG)** |
|          | **Our File No.** | : | **07765.00155** |

Dear Judge Glasser:

We represent non-party respondent Frederick M. Oberlander.

At today's appearance, the Court indicated that it felt that our firm's interpretation of the pending temporary restraining order was overly restrictive, and that the TRO did not bar us from contacting Mr. Oberlander's client to discuss the pending order to show cause. Given the Court's ruling that we have construed the TRO language too narrowly, we believe that the Court has now – at least implicitly – given Mr. Oberlander permission to show us the documents that are the subject of the order to show cause. If we are mistaken, we respectfully request that we be so advised immediately.

Additionally, the Court indicated that it felt that Mr. Oberlander is subject to the order that sealed the court file in this matter. After today's hearing, I went down to the office of the District Court Clerk and requested a copy of that order, as I believe Mr. Oberlander has a due-process right to at least see an order that Your Honor feels applies to him. However, I was informed by personnel in the Clerk's office that I could not even see the sealing order.

Without the ability to review the sealing order, we are unable to ascertain which terms of the order Mr. Oberlander is alleged to have violated. We respectfully request that the Court provide us with a copy of the order. At this time, we are unaware of any order that barred Mr. Sater from disclosing the records or documents to a third-person, that barred a third-person from re-disclosing them to Mr. Oberlander, or which barred Mr. Oberlander from using them to corroborate allegations in a RICO complaint. We are also currently unaware whether the sealing

4027940.1

order was some kind of global gag order, who exactly is permitted to see the order itself, and whether the order is binding upon even those who have never seen it.

At today's appearance, Your Honor stated that this case was akin to *United States v. Charmer Industries*, 711 F.2d 1164 (1983). As we have not seen the sealing order in this case, we can only point out that in *Charmer* it was the court personnel and probation service – who were subject to the sealing order, *in personam* – who unauthorizedly disclosed records to the Arizona Attorney General. Here, there is nothing to suggest that the Court's sealing order – which we have not seen – was binding upon anyone other than court personnel.

Thank you for your attention to this matter.

Respectfully yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

/S/

Richard E. Lerner

cc:   **VIA FACIMILE**
      Kelly Moore, Esq.
      Stamatios Stamoulis, Esq.
      Frederick M. Oberlander, Esq.