Case 1:98-cr-01101-ILG Document 308 SEALED Filed 12/06/10 Page 1 Page 1 of 7 PageID #: 956

# WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

150 East 42nd Street, New York, NY 10017-5639
Tel: 212.490.3000   Fax: 212.490.3038

*Albany • Baltimore • Boston • Chicago • Dallas • Garden City • Houston • Las Vegas • London • Los Angeles • Louisville • McLean
Miami • Newark • New York • Orlando • Philadelphia • San Diego • San Francisco • Stamford • Washington, DC • White Plains
Affiliates: Berlin • Cologne • Frankfurt • Mexico City • Munich • Paris*

———

www.wilsonelser.com

RECEIVED
*12/3/10*
Chambers of
I. Leo Glasser
U.S.D.J.

December 2, 2010

**Via Facsimile Under Seal – (718) 613-2446**

The Honorable I. Leo Glasser
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York, 11201

|        | Re: | **United States of America v. Felix Sater** | |
|--------|-----|----------------------------------------------|-----------------|
|        |     | **Case No.**                                 | : | **98CR1101 (ILG)** |
|        |     | **Our File No.**                             | : | **07765.00155** |

Dear Judge Glasser:

I write in response to submissions of Mr. Kaminsky of the U.S. Attorneys' office and Ms. Moore of Morgan Lewis, counsel for Felix Sater, so it cannot be said we waived any right or argument.

Please note Mr. Oberlander demands the immediate turnover of all official court records of Sater's conviction and sentencing disposition, including restitution or lack thereof, and all supporting documents, for use, inter alia, in the impeachment of Sater in the SDNY case 10-CV-3959, where Sater has waived service and is a defendant. Pursuant to FRE 609(a)(2), the plaintiffs in the SDNY action have the right to admit into evidence, for purposes of impeachment, Sater's RICO conviction. This is not subject to judicial discretion.

Also, since the shibboleth of *Charmer* and what it says – and most importantly what it does **not** say – has been a recurring theme, please note that on page 9-11, I present Supreme Court and Court of Appeals authority which overrules and otherwise renders obsolete *Charmer*. And please remember that *Charmer* never controlled to begin with, because it never addressed the ***First Amendment*** rights of a PSR recipient. No one raised a First Amendment argument in *Charmer*; hence, it is of no relevance here. Here, Mr. Oberlander and his clients assert an absolute First Amendment right to use these materials as they wish.

I organize this submission into three parts. First, since Mr. Oberlander, Mr. Kaminsky, and Ms. Moore all agree on the need to protect the integrity of the sealing process, I discuss that topic with their arguments jointly. Next, I address Mr. Kaminsky's remaining argument, which is the discredited "Nixon argument" – "If the court [president] does it, it's legal" – all glammed up with the lipstick of the All Writs Act, but still a tart underneath. Finally, I address Ms. Moore's

- 1 -

argument, that Mr. Oberlander is a felon extorting her client by having the gall to sue him and others in behalf of his clients and the nerve to tell them they might be better off settling before the adverse publicity. In other words, Ms. Moore recognizes that Mr. Oberlander is winning, so calls him a felon, forgetting that the *Kriss v. Bayrock* action may be the only civil RICO case in the country where three of the named defendants are actually convicted RICO felons: Salvatore Lauria; her client Sater; and his partner Tevfik Arif, now in a maximum security Turkish prison awaiting trial on racketeering and human trafficking for his use of Russian girls in sexual servitude on Turkish yachts and in Turkish hotels, in part funded with proceeds of the Bayrock racketeering).

* * *

For twelve years this court has maintained an illegally hidden docket of Sater's criminal prosecution, hiding his illegal plea bargain and sentence. The court may pretend that this is "sealing," but it is not. "Sealing" is a process of constitutional solemnity, a balancing, supported by record findings made in public hearings, of the public's First Amendment and common-law rights of access to information with the rarely competing interests of the defendant. What went on here is not "sealing" but "super-sealing," the intentional failure to docket, the obstruction of justice, the falsification of judicial records by deliberate concealment, in violation of 28 U.S.C. §1506. You are being urged by Ms. Moore (and to a lesser extent by Mr. Kaminsky) to rule:

(i)     That your undocumented, illegal instructions not to docket are within the power of the court by virtue of the All Writs Act (though such instructions were never put into a tangible medium of expression, and are known to no one).

(ii)    That such unwritten undocketed instructions constitute a "court order" that Mr. Oberlander violated.

(iii)   That the All Writs Act allows you to issue secret prior restraint *in rem* gag orders against the entire world for all time without notice or hearing.

(iv)    That even if your instructions to conceal docket entries are not a "court order," you can gag Mr. Oberlander from speaking truth of public concern (your concealment of Sater's conviction) that he lawfully learned.

(v)     That you can prior restrain without First Amendment findings of compelling interest and no less restrictive means.

(vi)    That you can do all this on the pretext of protecting Mr. Sater from being revealed as a cooperator, even though the government has already made that a matter public knowledge.

In short, you are being urged by Ms. Moore and Mr. Kaminsky to cover up the obstruction of justice, the Constitution be damned. But the First Amendment right of access to criminal court dockets is all largely irrelevant. For once the documents got out – and here they have gotten out to Mr. Oberlander, his clients, most of the *Kriss v. Bayrock* defendants, their counsel, their insurers, the press (don't forget, Courthouse News has all this), and others – the rules change.

Now we are not dealing with the First Amentment right of *access* to those documents, but rather the First Amendment right of their possessor to use those documents. That is an

**unqualified, paramount, inviolable** Constitutional right. Do not pretend otherwise. You cannot stop it. What is involved here is a bare naked attempt to infringe Mr. Oberlander's unqualified First Amendment right to speak of what has happened here. Mr. Kaminsky, no doubt, recognizes this, as even he acknowledges that Mr. Oberlander cannot be silenced. Nonetheless, he argues that the court can order Mr. Oberlander to destroy the evidence that would corroborate his spoken word. Consider the implications: Mr. Kaminsky has made Mr. Oberlander's case for him, since if Mr. Oberlander will not be believed without the documents, then by definition their destruction would violate the First Amendment. The right to speak without the right to prove the truth of what is said would subject the speaker, for one thing, to civil liability for defamation. Such civil exposure would be a *per se* chilling effect.

### — *In Response to Mr. Todd Kaminsky of the U.S. Attorneys' Office*

Mr. Kaminsky states, "[t]he Court should ... make clear that it will not tolerate sharp practice with respect to sealed documents and will take appropriate steps to protect the sealing process." However, it is in fact standard practice in the EDNY and the SDNY:

(i) make plea agreements with cooperators (including their identities and the details of their plea arrangement and reasons therefor) available to the public on request, even when they are not e-docketed; and

(ii) to observe the law, as set forth by the United States Supreme Court and the Second Circuit Court of Appeals, most recently in *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83 (2d Cir. 2004), wherein the Second Circuit held dual dockets and hidden dockets are facially unconstitutional, and in *U.S. v. Alcantara*, 396 F.3d 189 (2d Cir. 2005), where the Second Circuit required immediate docketing of such plea agreements except in very unusual circumstances where, even then, docketing may be delayed only BRIEFLY, and then only upon

    (1) record findings from publicly docketed open court procedures justified such; and

    (2) docketed companion orders that the docketing will be made upon the happening of a specified (BRIEF) period of time or the happening of a commensurately soon to occur event.

I have obtained transcripts of a very recent judicial conference at which Chief Judges Dearie (EDNY) and Preska (SDNY) discuss this. (See addendum 1). Of particular note is not just Judge Preska's comment that, per *Alcantara*, the public will know why "Sammy the Bull" got only five years, just sometimes not right away (as in the BRIEF delay *Alcantara* allowed).

I also note Judge Dearie's suggestion that there is way, way too much improper sealing going on, that things get sealed for often nonsensical reasons, and then stay sealed by inertia until someone raises a stink about it.

Now all this is on the subject of the plea agreements themselves, and what to do about threats to cooperators, but has nothing to do with sentencing procedures themselves, and in particular with *sentencing dispositions* (as in judicial records).

I have never heard anyone ever make any legal argument that a trial court has the inherent power to hide forever not only the entire docket with every entry and no findings to

support any of it, but the inherent power to hide *forever* an actual judgment of conviction and sentence, documents which are a matter of judicial record (more on that in a bit).

This is what Mr. Kaminsky is arguing: A trial court has the inherent power (i) to super-seal a criminal conviction and sentence; and (ii) order the return and destruction of any documents lawfully obtained that evidence that criminal conviction and sentence for the express purpose of making sure that their possessor may have the right to speak, but the court can destroy any evidence he lawfully obtained to prove his point. Or basically, that the court can issue an *in rem* injunction against a piece of paper and prevent anyone from disseminating it, notwithstanding the speaker's having obtained it legally and the information thereon a matter of public concern. And Mr. Kaminsky bases his argument on the All Writs Act of 1789.

The problem here is that the All Writs Act only gives the lower courts the power to issue writs that are necessary for it to implement a previously issued *lawful* order. No trial court can do anything in the first place that hasn't been authorized by statute (*i.e.*, an act of Congress). Now, it's true that the Act was passed in 1789, and still exists largely unchanged, but I would ask that the court now look at 1 Stat. 115, which was passed some months later in 1790. It says:

> [I]f any person shall feloniously steal, take away, alter, falsify, or otherwise avoid any record , writ, process, or other proceeding in any of the Courts of the United States, by means whereof any judgment shall be reversed, made void, or not take effect...every such person or persons on conviction thereof shall be fined not exceeding five thousand dollars, or be imprisoned...

It would be very hard to reconcile that statute, passed shortly after the All Writs Act, other than as preventing lower courts (and every other person subject to law) from obstructing justice by either falsifying or concealing judicial records. Or to put it another way, the court has the power to manage its own records, but not to mismanage them.

And yes, just like the Writs Act, this act too is also still in effect, as 18 U.S.C. 1506: *Theft or Alteration of Record or Process*:

> Whoever feloniously steals, takes away, alters, falsifies, or otherwise avoids any record, writ, process, or other proceeding, in any court of the United States, whereby any judgment is reversed, made void, or does not take effect....

Obviously, the super-sealing and concealment of Sater's conviction would make it *de facto* void, and *de facto* of no effect, insofar as pursuant to the ***Mandatory*** Victims Restitution Act, or "MVRA," at the instant of Sater's conviction he became liable to his victims for restitution. No longer is the decision whether to order restitution for certain crimes left to the discretion of the district court. See *United States v. Taylor*, 2002 WL 1166166, at 3 (10th Cir. 2002). The absolute nature of the district court's obligation is unmistakable from the very first paragraph of the act. There, Congress prescribed that: "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of [an offense covered by the Act], the court shall order . . . restitution." 18 U.S.C. §3663A(a)(1). Plainly, Congress has decided that defendants who have committed certain offenses should never be able to avoid restitution.

*A fortiori*, pursuant to the Crime Victims Restitution Act, or "CVRA," the victims became instantly vested with the right to pursue action to recover the restitution to which they are entitled, and had the standing to move to enhance, and the standing to seek mandamus. The MVRA gave them the right to obtain and record an abstract of such order and thus have a lien on Sater's assets, a lien which would have, in this case, been worth very many millions of dollars. All those rights are property rights (for Second Circuit authority on choses in action as to property rights, I refer you to *U.S. v. Porcelli*, 865 F.2d 1352 (2d Cir. 1989). All those rights vested in Sater's victims upon his conviction, and all those rights were meaningless if the victims were not informed he had them. (Otherwise, there would be, *inter alia*, an unconstitutional taking. And per the above, neither the All Writs Act nor any other act can authorize a lower court to violate the Fifth Amendment, or the First Amendment).

And as you know, § 1964 provides that there is no cause of action for civil RICO predicated on securities fraud until there has been a related conviction, so again Sater's victims became vested in a chose in action in civil RICO upon his conviction. It's another property right *de facto* taken from them without due process of law by the concealment of the conviction.

And of course this is not a case of issuing unconstitutional gag orders on persons to support an order that was illegal in the first place, as what happened here is no order at all, but rather a failure to docket. That is, there is a distinction between an order to seal for all time (which would be facially unconstitutional, but at least an order), and no order, which remains nothing more than an intentional failure to docket, which thus cannot be "implemented" by any writ to begin with but is simply a violation of § 1506 as well as the First Amendment (and common law) right of access to dockets and documents and relevant decisional law precedent.

Methinks it axiomatic that these rights are meaningless without disclosure of Sater's conviction (and his identity) to all his victims, and Congress thought so too: Hence, it mandated not only disclosure, but that the U.S. Attorneys' office, the probation department, and the trial court itself disclose, and prescribed administrative sanctions for failure to comply.

Now take a look at FRE 609. FRE 609 makes it a plenary right not subject to judicial discretion to introduce evidence of Sater's conviction *in crimen falsi* to impeach. It requires that such evidence be either from cross-examination or in the form of an official court record. So, again, it would be hard to imagine how concealment of the existence and record of such a conviction could be within the contemplation of the All Writs Act. (As a second addendum, we quote the testimony by Sater from the matter of *Bernstein v. Bayrock*, wherein he refuses to answer questions about his conviction).

Thus, arguing that your honor has the inherent right to conceal Sater's conviction and sentencing is not legally sound. Rather, Sater's victims have the First Amendment right to hear about this too, if they have the statutory right to hear about it. Therefore, attempting to silence directly or indirectly by spoliation the persons, such as Mr. Oberlander and his clients, who wish to speak and who by so doing will inform those who were wrongfully denied the right to hear of it would be a clear constitutional violation of the first order.

Citations to civil cases dealing with the All Writs Act and the inherent power of the court to enforce an FRCP 26 protective discovery order are wildly inapposite and off point. For one thing, *discovery documents are not subject to the First Amendment right of access, but criminal judicial documents, especially sentencings, sure are.* We've made this very clear in our prior

submissions to your honor. The *Zyprexa* "decision" that Mr. Kaminsky and Ms. Moore cling to is inapposite (and also intellectually dishonest) because, in addition to those documents being civil discovery documents, there was a violation of a court order, unlike here, where there has been no violation of any court order, as your honor has acknowledged). Moreover, in *Zyprexa* Judge Weinstein concealed – *i.e.* failed to cite – the most important case on point, which is not *Seattle Times*, but *Procter & Gamble*.

In *Proctor & Gamble v. Bankers Trust Co.*, 78 F.3d 219 (6th Cir. 1996), Business Week, a third-party to the civil litigation, was given documents by a party and wished to publish them. The Sixth Circuit, in slamming down the district court which enjoined Business Week, distinguished this from *Seattle Times v. Rhinehart*, 467 U.S. 20 (1984), for the obvious reason that no one violated a court order and, more importantly, the person who would be speaking did not obtain the documents from court process or breach thereof. In other words, the *Proctor & Gamble* court correctly distinguished the qualified right of a party in civil litigation to publish documents it obtained from its own disclosure from the absolute right of a non-party to publish documents given it by a party. Judge Weinstein should have distinguished it as well.

And anyway what happened in *Zyprexa* was that of the dozen or so persons who were given the documents by the attorney who violated the protective order, only one actually fought back and hired a public interest legal group, the Electronic Freedom Foundation, to assert his First Amendment right to publish them. Had Judge Weinstein recognized that, he would have had to recognize the First Amendment right of all recipients, so rather than do that, he invented a concept out of thin air. In his attempt to avoid having to admit that the First Amendment argument worked, and thus having to allow all speakers to speak, Judge Weinstein simply took the only person making a First Amendment argument, a web site, and said, "Well, there's no First Amendment right, but I can't gag a website...." By Judge Weinstein's thinking, Mr. Oberlander or his clients could maintain a website. See also *U.S. v. Carmichael*, 326 F.Supp.2d 1267 (MD Alabama 2004) (unquestionable right to place such information, the identity of informants and cooperators, on a website, and I remind your honor that PACER is a website).

But I repeat *Zyprexa* is inapplicable, as the First Amendment right to speak of and disseminate ***criminal judicial records***, as opposed to ***civil discovery documents***, obtained lawfully, and not from any court process, is absolute. Also, this is completely covered by *Cox Broadcasting*, infra.

I suggest that your honor also read the case of *Alvarado v. KOB-TV*, 493 F.3d 1210 (10th Cir. 2007), where the Tenth Circuit upheld the First Amendment right of a news station to broadcast the names and photos of undercover policemen, observing that the officers made the choice to subject themselves and their families to danger when they took the job and risked being outed. And you should read the case because it summarily takes outside and shoots the government's argument that a sealing order somehow gags the whole world from speaking of the information; such would be a global gag order would be facially unconstitutional, and thus such a sealing order could not be implemented by an extraordinary writ which itself would be thus facially unconstitutional.

Of course, what happened here makes the story and the documents their own First Amendment issue, in that by definition this is a hugely important story of super-sealing and hidden dockets and evasion of restitution and thus the right to tell of it is immensely protected, as the Supreme Court has said very many times.

Quote the District Court in *Alvarado*: "If application of the order would have imposed an unconstitutional prior restraint on KOB-TV, the KOB-TV's awareness of the order is irrelevant, since KOB-TV would not have been bound by its requirements." (This is to say, an order that constitutes an unconstitutional prior restraint need not be followed.) The court was not impressed with the argument that the disclosure endangered the officers' lives. Basically, free speech trumps such concerns.

Mr. Oberlander's rights are at least as strong as the media's rights. At least, the U.S. Supreme Court thinks so. As the Court stated in *Citizens United v. Federal Election Comm'n*, 504 U.S. 555, 130 S.Ct. 876, 890 (2010), "any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority." But Mr. Kaminsky argues that an individual has fewer First Amendment rights than organized media corporations. The Supreme Court raised holy hell with the good-government crowd, ruling that the media have the same rights as individuals. While one might facilely respond "But those are political issues," Judge Robert Bork testified to the futility of separating political speech from other speech, noting that you could turn anything into political speech by simply saying at the end of your speech, "and they ought to pass a law." In short, Mr. Oberlander claims the right to petition his elected legislators to exercise their supervisory powers, and to demonstrate to them that the MVRA and CVRA is being evaded. Or perhaps, the All Writs Act allows the court to overrule any citizen's right to petition his legislators.

***Mr. Oberlander, however, has no intention of going public.*** I remind your honor that our letter of November 23rd merely asked that these proceedings be declared moot. It is not Mr. Oberlander's intent to go public, **so long as his clients direct him not to go public**. While Mr. Oberlander believes he has a right to go public, he has a higher ethical obligation to his clients to follow their instructions so long as there is no even higher need to reveal all this, such as to defend himself against Ms. Moore's and your attacks on his ethics. I too have an obligation to follow the instructions of my client. That is why I have not moved to unseal, and that is why my client has not given the letter contained in the *U.S. v. Lauria* docket (which publicly discloses that Sater pled guilty to racketeering and is a cooperator) to the New York Times.

With respect to the U.S. Attorneys' office, I will conclude by directing the court to DOJ's own procedures, as set forth at Title 28 (*Judicial Administration*), Part 45 (*Employee Responsibilities*) § 45.10 (*Procedures to Promote Compliance with Crime Victims' Rights Obligations*). To the extent that any U.S. Attorneys could be said to have acted in a *non*-willful and *non*-wanton manner by failing to require that Sater pay restitution to his victims, such U.S. Attorneys must be sent for training on victims' rights. See § 45.10 (d). To the extent that such U.S. Attorneys acted wantonly or willfully, they must be disciplined. See § 45.10 (d). (The rule can be found at http://www.justice.gov/usao/eousa/vr/doj_procedures.html). Either the U.S. Attorneys' office knew that they could not hide Sater's conviction from his victims, or they damned well should have known.

-- *In Response to Ms. Kelly Moore of Morgan Lewis, Counsel for Sater*

Ms. Moore claims that Mr. Oberlander is engaging in unethical behavior and criminal extortion by threatening to take these proceedings public. Apparently counsel is unaware of *Sussman v. Bank of Israel*, 56 F.3d 450 (2d Cir. 1995), and *Revson v. Cinque & Cinque*, 221 F.3d

71 (2d Cir. 2000). In short, if an attorney has a proper motive, and his complaint is not devoid of all merit, then the threat of negative publicity is proper. To hold otherwise would have grave First Amendment implications. (Ironically, the attorney in *Revson* who was sanctioned by Judge Denny Chin at the district court level, and who then prevailed before the Second Circuit was Judd Burstein, who was recently and may still be Sater's own lawyer.)

Ms. Moore harps on the notion that Joshua Bernstein stole or converted the documents at issue from Sater. There is no evidence, however, that he stole anything. The court will recall that Sater equivocated when asked how he maintained the documents in his office, and whether they were maintained on the company's website. (The court will also recall that he testified that he did not own the company). Ms. Moore's argument is crushed by *Pearson v. Dodd*, 410 F.2d 701 (DC Cir. 1969), and *Harper & Row v. Nation Enterprises*, 723 F.2d 195 (2d Cir. 1983), *rev'd on other grounds* 471 U.S. 539 (1984). As the Second Circuit held, conversion requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control ***to the complete exclusion of the rightful possessor***. *Citizens Nat'l Bank v. Osetek*, 353 F.Supp. 958, 963 (S.D.N.Y. 1973); *Amf Inc. V. Algo Distributors, Ltd.*, 48 A.D.2d 352, 356, 369 N.Y.S.2d 460, 464 (2d Dep't 1975). Merely copying documents (with or without permission) cannot be considered conversion. See *Pearson v. Dodd*, 133 U.S. App. D.C. 279, 410 F.2d 701, 707 (D.C. Cir.), *Cert. Denied*, 395 U.S. 947, 23 L. Ed. 2d 465, 89 S. Ct. 2021 (1969). Sater has his own copies of the documents; ergo, Bernstein did not take such complete dominion and control, to the exclusion of Sater, that it could be said that Bernstein was a converter.

Ms. Moore acknowledges in her papers that she wishes to destroy evidence, and has contacted the other parties to request that they do so: "Counsel for Mr. Doe explained that Mr. Doe simply wanted the return ***and/or destruction*** of the sealed and confidential documents...." The documents at issue would be absolutely and conclusively probative of Sater's and Bayrock's defrauding of A.I.G. It is alleged in the complaint that Sater hid the fact that he was a convicted RICO felon when the company applied for directors & officer's insurance. Were Ms. Moore successful in her efforts to spoliate the evidence of his conviction, (a) AIG would be deprived of the right to disclaim coverage, and recover the moneys it has already spent defending Sater and Bayrock; (b) AIG would be deprived of the right to seek restitution of moneys paid in their defense; and (c) the purchasers of the units of the Trump Soho Hotel would be deprived of a right to rescission of their contracts, and to restitution of their deposits. (Your honor may not be aware that Sater's hiding of his RICO conviction constitutes a ***continuing*** material misrepresentation in the offering plan). Indeed, as there has been no on-the-record determination that national security or Sater's personal safety are threatened, we contend that these proceedings are nothing more than an effort to cover up the fact that Sater was able to evade jail and mandatory restitution, and continue to lie, cheat and steal.

Ms. Moore concedes that Mr. Oberlander did not violate any court order: "Respectfully, we submit that the question of whether the respondents violated the existing sealing order is irrelevant to the court's power and authority to issue the requested permanent injunction." By definition, if there was no wrongdoing in obtaining the documents, there is no conceivable basis to restrain Mr. Oberlander's (and his clients') First Amendment rights.

Finally, we submit that insofar as anyone knew generally that Sater was running Bayrock while concealing his conviction through pattern predicate acts, their taking but a single overt act in assisting him makes them RICO conspirators. Indeed, as Mr. Oberlander will demonstrate,

Case 1:08-cv-01101-LGD Document 8038SEAEFiled 12/06/12/2809 Page 9 of 26 PageID #: 964

since Sater was, as a matter of New York law, rendered insolvent when he pled guilty to racketeering – as he was mandatorily obligated to repay all of his victims – any money that came into his hands had to be reported to the Probation Department, and any monies diverted – for example to his wife, to Salvatore Lauria, and to Morgan Lewis itself – constitutes money laundering, 18 USC § 1957, to the extent the recipient knew of the taint, and state law fraudulent conveyance or transfer, as well. Succinctly, anyone taking substantial money, even legal fees for other than Sixth Amendment counsel, which she knows to be derived from illegal activity, has problems.

"Finally," says Ms. Moore, "Mr. Oberlander's suggestion that the seal order only governs court personnel ... is not support by a single case." Aside from that we have cited ample statutory authority and case law for the proposition that an order can only bind those to whom it is specifically directed, and who have notice thereof, a "sealing order" by itself means nothing, because an order can only mean what it says. An order to seal a document is an order directed to court personnel only. It could have embedded into it an order to third parties but if so it could only bind such parties who had actual notice thereof (and advance notice of a hearing). In this case, your honor has acknowledged that the sealing order (to the extent that it could be said that there was one) was directed to court personnel and the court acknowledged that there was no order to seal to begin with. An order to seal is a reviewable order with record findings made in a public hearing to support the order. Your honor admitted that no such order exists.

But Ms. Moore is typically wrong again as there is case law exactly on this point. First, the Supreme Court of Kentucky, where I remind your honor they have the same First Amendment as we do, in *Roman Catholic Diocese of Lexington v. Noble* (Ky. 2002), held that where a newspaper obtained documents which were duplicates of those which had been sealed, and published them even though it knew this, that there could be no violation of the sealing order because it was directed only at the court personnel. Your honor well knows that any order, in particular a gag order, must be exquisitely clear as to what it purports to prohibit, and it is beneath the court's dignity to try to assert that an admittedly non-existent order should have been "divined" to be what would have been an unconstitutional prior restraint. The Kentucky court stated very clearly that an order sealing a record or part thereof should not be read to create a prior restraint on publication of the contents of the sealed material.

Similarly, in the *Alvarado* case cited *supra*, the federal district court was asked to find the TV station publisher in contempt for airing information contained in documents that had been sealed. Again, airing information from copies of physical documents that had been sealed could not be restrained in the Tenthc Circuit, just as they couldn't be restrained in Kentucky. In the case before your honor, the publisher (Mr. Oberlander and his clients) obtained the documents at issue lawfully and not from any court source. Global gag orders that purport to enjoin the world cannot exist in the United States because of the First Amendment. This is why the *Alvarado* court stated that had the sealing order actually stated, as your honor's oral pronouncement on June 21 stated, "No one in the world may speak of this information," it would have been facially unconstitutional and could have been freely ignored by anyone having knowledge of it.

This brings us to *Charmer*. Your honor has asked repeatedly if he is misreading *Charmer*. Indeed, your honor is. *U.S. v. Charmer Industries*, 711 F.2d 1164 (2d Cir. 1983), was clearly overruled by *Florida Star v. B.J.F.*, 491 U.S. 524 (1987). As noted in previous submissions to your honor, the First Amendment was not even raised in *Charmer*, so it tells us nothing about the

First Amendment rights of a person who lawfully receives a PSR and wishes to publish it. But there are two cases that tell us very clearly what his First Amendment rights are.

Recall that in *Charmer* the out of state Attorney General had been given the PSR in question by a probation officer, who apparently should not have done so but no fault was ascribed to the Attorney General, who basically "got lucky" due to the negligence of the officer.

Well, a few years later, in Florida, the local sheriff mistakenly put a docket sheet containing the name of a rape victim in the press room, and a newspaper picked it up and published it, and then was sued under a state law making it illegal to publish the name of a rape complainant. This time, unlike in *Charmer*, the publisher, Florid Star, raised the First Amendment issue, and the U.S. Supreme Court held that, with respect to criminal proceedings, you just can't put the genie back in the bottle. The Supreme Court held that it was impermissible to punish anyone who lawfully obtained information of public concern and then published it, regardless that the information was mistakenly disclosed by the sheriff. *Charmers* is thus overruled. Anyone who obtains a PSR lawfully can publish it (or not publish it) as he pleases.

So holds *U.S. v. Smith*, 123 F.3d 140 (3d Cir. 1997), directly and on all fours. There, the court addressed the question whether it could impose a prior restraint on a newspaper which had lawfully come into possession of a sentencing memorandum which contained grand jury material (it had been leaked by the executive branch). The court sealed the sentencing memorandum after the leak had been detected, on the ground that F.R.Crim.P 6(e) material was implicated, and ordered briefing on the extent to which the sentencing memorandum was sourced in secret grand jury material. But the court then held that while the newspapers, which already had the sentencing memorandum and wanted access to those briefs and an associated hearing, had no First Amendment right of access to the briefs or the hearing, the court nonetheless observed that as to the sentencing memorandum that they already possessed, which contained much of the same material as would the briefs and the hearing:

> The order entered by the district court in this case cannot effectively bar further dissemination of any potential grand jury secrets by members of the public who possess the sentencing memorandum. Nor could the court enter an order barring parties in possession of the sentencing memorandum from passing the memorandum onto other parties. Under prior restraint law, orders prohibiting the media from publishing information already in its possession are strongly disfavored. Although the district court could not prevent the newspapers from publishing the sentencing memorandum once they came into possession of it, the court properly prevented further *government* disclosures of the putative grand jury secrets contained in the sentencing memorandum to additional parties. Even if the dissemination by members of the public continues, the order barring further disclosure of any secret grand jury material will at least narrow that dissemination.

The court so held even though it noted that the sentencing memorandum disclosed, and would disclose, certain sensitive information that Rule 32 required probation officers to exclude from PSRs and disclosed, or would disclose, PSR material. This is a resounding trifecta of First Amendment freedom: *The court held that newspapers and members of the public already in*

*possession of a sentencing memorandum containing not only secret grand jury material but also PSR material and even material too sensitive for a PSR could not be enjoined from disseminating it at will because they enjoyed a First Amendment right to do so and could not be made to suffer prior restraint.*

## Some Concluding Thoughts

The prosecution of Felix Sater was, and remains, a matter of public concern, and Mr. Oberlander and his clients have the absolute First Amendment right to upload all documents that they have obtained to the internet. They could forward them to any journalist who aspires to win the Pulitzer Prize, and they have no doubt this is Pulitzer Prize material. There is nothing that this court can do about it. So held the U.S. Supreme Court in *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469 (1975):

> Appellee has claimed in this litigation that the efforts of the press have infringed his right to privacy by broadcasting to the world the fact that his daughter was a rape victim. The commission of crime, prosecutions resulting from it, and judicial proceedings arising from the prosecutions, however, are without question events of legitimate concern to the public and consequently fall within the responsibility of the press to report the operations of government.

> The special protected nature of accurate reports of judicial proceedings has repeatedly been recognized. This Court, in an opinion written by Justice Douglas, has said:

> > **"A trial is a public event. What transpires in the court room is public property. If a transcript of the court proceedings had been published, we suppose none would claim that the judge could punish the publisher for contempt. And we can see no difference though the conduct of the attorneys, of the jury, or even of the judge himself, may have reflected on the court. *Those who see and hear what transpired can report it with impunity.* There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."** *Craig v. Harney,* 331 U.S. 367, 374 (1947) **(emphasis added).**

Just because Mr. Oberlander and his clients have the First Amendment right to do as they wish with the documents, the decision whether to go public is entirely Mr. Kriss's and Mr. Ejekam's. **So long as they feel it is in their interests to attempt to resolve the SDNY case subject to a confidentiality agreement, Mr. Oberlander is constrained to not go public with the information that he presently has,** again absent his need to defend himself from your attacks and those of Ms. Moore.

Your honor stated on the record that Mr. Oberlander was "disingenuous" in his testimony that he did not know that the documents he obtained were from a "sealed" file. I would urge your honor to consider the following statement from *Hartford Courant v. Pellegrino,* 380 F.3d 83, 93

(2d Cir. 2004): "Without open docket sheets, a reviewing court cannot ascertain whether judicial sealing orders exist." Mr. Oberlander has never seen an open docket sheet. If the Second Circuit cannot know whether a sealing order exists, if the docket is sealed, rather than simply and illegally empty because of willful failure to docket, then *a fortiori* Mr. Oberlander cannot "know." Pursuant to Second Circuit precedent, Mr. Oberlander's testimony that he did not know that the documents were "sealed" must be deemed truthful.

Your honor stated on the record that Mr. Oberlander knew from looking at Pacer that the file was sealed. Mr. Oberlander testified, however, that he did not look at Pacer until after he received the movant's order to show cause. While your honor might believe that he had some obligation to have looked at Pacer before he filed the complaint in the Southern District, he had no obligation to do so. See *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 303 (4th Cir. 2000). "No citizen is responsible, upon pain of criminal and civil sanction, for ensuring that the internal procedures designed to protect the legitimate confidences of government are respected." If your honor feels that Mr. Oberlander had some kind of moral obligation to do so – which was somehow higher than his legal obligation – perhaps you would also believe that a criminal defense lawyer has a higher obligation to society to not defend those who are actually guilty of the crime charged. As Mr. Oberlander testified at the hearing, his obligation is to Mr. Kriss and Mr. Ejekam, not to Mr. Sater. And if Mr. Oberlander did have special knowledge, it heightened, not his non-existent obligation to Mr. Sater, but his obligation (i) to his clients, to zealously represent them; and (ii) to the extent not in conflict with the previous, to justice.

If your honor does intend to comment on the believability of the witnesses, perhaps your honor would consider the fact ██████████████████████████████████████ He thereby secured from this court (aside from his freedom) an order that did not require him to pay immediate lump sum or installment restitution to any of the victims of the $40 million fraud which was the subject of the criminal proceeding. Yet he testified in this proceeding that he was a "member" of Bayrock, and then he backtracked and said that he was just a partner in deals. There are notarized documents, bearing Sater's signature, in which he indicated that he was a 62% owner of the Bayrock organization. Sater has authenticated these same documents in deposition testimony in March 2010.

Your honor made statements suggesting that, as an attorney, Mr. Oberlander had a different ethical obligation than would an ordinary citizen. However, as previously noted, the U.S. Supreme Court draws no distinction between classes of citizen entitled to First Amendment rights to receive information (*Richmond Newspapers v. Virginia*, 448 U.S. 555 [1980]) or disseminate information (*Bartnicki v. Vopper*, 532 U.S. 514, 525 n.8 ["we draw no distinction between the media respondents and Yocum."]).

Your honor's apparent assumption that it could sit in judgment of Mr. Oberlander's motives is misplaced. First, as was held by the Second Circuit in *Sussman v. Bank of Israel*, *supra*, 56 F.3d 450, 458 (2d Cir. 1995), if there is a reasonable basis for filing a complaint, then there is no basis for sanctions against the attorney, even if the motives for having filed the complaint "are not entirely pure." Second, your honor is not presiding over the *Kriss v. Bayrock* case, and has no business commenting on whether that complaint is well founded or was filed for any improper purpose. Third, the only proceeding that your honor could properly comment on is the movant's order to show cause, which Mr. Oberlander did not initiate.

For in the end, the question is not, "Mr. Oberlander as an attorney knew what those documents represented, which is proof of an illegal plea bargain and sentencing and cover-up...How could he speak of them?" Rather the question is, How could anyone not be permitted to learn what has happened hear, and speak of it as he wishes.

Very truly yours,

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

Richard E. Lerner

cc:    **Via E-Mail**
       Kelly Moore, Esq.
       Brian Herman, Esq.
       Stamatios Stamoulis, Esq.
       Todd Kaminsky, Esq. – US Attorney's Office
       Joshua Bernstein
       Arnold Bernstein, Esq.
       Frederick M. Oberlander, Esq.

## Post Scriptum

We remind your honor that the Lauria documents which reveal Sater's guilty plea and cooperation and their public dissemination by the United States Attorney himself eviscerate Mr. Kaminsky's position that the names of cooperators are never divulged, eviscerate your honor's stated justification of protecting Sater from being known as a cooperator. We do respectfully however insist that your honor make or rule on nothing which in any way presupposes or makes use of any extra-judicial knowledge, including without limitation knowledge obtained from presiding over the Sater matter itself. We respectfully have made no motion to recuse, but simply go on record as preserving our rights to object, appeal, mandamus, or otherwise move to avoid any decision of this court which is based in any way on any facts not in the record in this OSC matter itself. We similarly preserve our rights to object on the ground of the appearance of conflict or impropriety if and to the extent that your honor determines the First Amendment rights to speak and to hear of what happened here, insofar as what your honor's role in it is important.

Last, Ms. Moore has threatened Mr. Oberlander with contempt if he publishes or disseminates the transcripts of the hearings in this matter. Your honor should recall our refusal to go along with any sealing of the hearings without properly docketed advance noticed hearings and record findings supporting same, and your honor has stated on the record on the transcripts that they are unsealed and moreover that anyone in court who heard Sater's name used is free to state that the "John Doe" caption refers to Sater. In view of Ms. Moore's antics we request that your honor ensure that an order be issued that makes obvious to everyone in this country and was obvious to Justice Douglas 65 years ago in *Craig*, quoted in *Cox*, *infra*, that no power on the face of the earth, and certainly not Ms. Moore, can stop someone from publishing a transcript of an open court hearing or otherwise reporting on what he has heard therein.

**Addendum #1**

JUDICIAL CONFERENCE PRIVACY SUBCOMMITTEE: CONFERENCE ON PRIVACY
AND INTERNET ACCESS TO COURT FILES: PANEL FIVE: COOPERATION AND PLEA
AGREEMENTS--JUDGES ROUNDTABLE

**NAME:** MODERATOR Hon. Steven Merryday*; Panelists Hon. Raymond Dearie [1]
Hon. Loretta Preska [2]
Hon. K. Michael Moore [3]
Hon. Henry T. Wingate [4]
Hon. Michael Baylson [5]
Hon. Stefan Underhill [6]

**BIO:** *United States District Court Judge, Middle District of Florida.

**LEXISNEXIS SUMMARY:**
... Of course, I come from one of those districts where plea agreements are not made part of the record. ... For
example, if the transcript of the proceedings is sealed, the observer will assume cooperation. ... Although I agree
with Chief Judge Dearie and others that the Internet is neither the be-all nor the end-all, concern for safety of
cooperators was heightened by the electronic accessibility of the docketing materials. ... It is also the policy of the
United States Attorney's Office in the Southern District that, unless sealed, plea agreements, including cooperation
agreements, are public. ... So, in one sense, I think it would be ironic if electronic access, which enhances public
accessibility and ease of accessibility to public records, would be turned on its head and used as a way to limit
access by the public to the work that we do. ... To that extent, we should have an electronic docket that is at least as
publicly accessible, in terms of all the documents that heretofore had been filed in the paper docket. ... JUDGE
MERRYDAY: Do you think that the event of sentencing affects whether the qualified right of access has attached?
... If the correct findings are made, the docketing of that cooperation colloquy is also not shown on the docket sheet,
until some later date, typically sometime after sentencing. ... In sum, we like to think that our rule, although
relatively strict - because the Second Circuit rules are relatively strict - strikes a pretty good balance between
recognizing the substantial, although qualified, right of First Amendment access and balancing that right against the
right of the individuals who are cooperating and the right not to be put at risk as a result of that cooperation.

**TEXT:**
[*85]

JUDGE MERRYDAY: Thank you very much. We are now beginning the second phase of the afternoon panel on
plea agreements and cooperation agreements.

Our first speaker, from the Eastern District of New York, Chief Judge Raymond Dearie.

JUDGE DEARIE: Thank you very much. I am delighted to be with you.

I have just a couple of points, listening to the previous panel. I think one of the very positive things about this
conference is that it calls to our collective attention, in particular some of us judges, the fact that there has developed
over the years a sort of knee-jerk endorsement or acceptance of applications to seal documents. Of course, I come
from one of those districts where plea agreements are not made part of the record. But it goes beyond just plea
agreements - sentencing letters, 5K1 letters [7] in particular. There has developed a practice, I think, in part because of
some of the types [*86] of cases that have been ongoing here in New York City - gang cases, organized crime
cases for example - the courts have been very receptive to applications by the executive. Gerry [Shargel] is quite
right: it is the executive's responsibility to protect their witnesses and the integrity of their investigations, but to do
that, in part, they come to us and make applications. We have been enormously tolerant, I think - sometimes,
arguably, absurdly so. You have, for example, the sentencing letter of someone who has testified in five or six or
seven cases. It made the front page of the [New York] Daily News and the New York Post and even The New York

Times, day after day after day, and the application by the government to seal the 5K1 letter, which does nothing more than chronicle, in lawyer's terms, the same sort of stories that we read in our morning papers.

We have gotten, it seems to me, perhaps a little bit too receptive, too tolerant, about these applications. I think we have to begin again to be far more selective in the kind of relief we grant and in the cases in which we grant that relief.

The idea of uniformity throughout the United States is not a notion that I personally have endorsed with great enthusiasm. After all, jurisprudence is not developed uniformly, except by cases that we get from the Supreme Court. We develop our law within our circuits. Circuits differ. Indeed, there are characteristics peculiar to certain circuits and districts that invite different approaches. Off the top of my head, I can think of the way some districts approach gun cases, for example. Marijuana cases in some parts of the United States are treated very severely. In the way we have applied the guidelines, there are regional differences. I think there needs to be a recognition that within a given district, perhaps within a given circuit, there are characteristics that are peculiar that will inform a judge when he or she is called upon to decide whether or not sealing or some form of that relief is appropriate. So, although I think the theme ought to be generally uniformity, there are circumstances peculiar to a given case that warrant variances from an established procedure.

Not only do we have to consider whether or not we ought to seal something or remove it from the public record or redact it, I think one of the problems is a tendency to seal on a particular day, and a document remains sealed indefinitely. It stays that way long after the reasons that might justify sealing, or some similar relief, have passed. The reason for that is more often institutional inertia and general indifference. Nobody is interested. The general public is not interested. The situation only changes when, for example, the news media is suddenly interested in a case and we get an issue before us and an application.

I think we have to take seriously the idea of cataloguing these cases when we take documents out of the public record for good reason, which we must articulate, subject to review and evolving jurisprudence within our circuits and beyond. We have an obligation, it seems to me - and this is totally in concert with our First Amendment sensitivities - we must continue to ask **[*87]** the question of whether or not a document may not be filed in the public record. I think we do not do that.

A recent study by the Administrative Office [of the United States Courts] makes clear that a lot of documents are sealed on day one, for good reason, but on day 401, those reasons no longer apply. If we are serious about our First Amendment responsibilities, I think we need to be sensitive to that and guard against dispatching documents to the status of forever "private" without compelling justification.

As far as the public versus the Internet, I am a bit of a Luddite when it comes to things electronic, involving cyberspace. But I tend to think that is probably not the significant issue. If someone is intent on doing harm, the information will become available, either through the Internet or in public.

Just to sum up my little part, being sensitive to First Amendment concerns does not just mean making a given ruling in a given case at a given moment. We need to continue to ask the question of whether or not the relief secured at one time is necessary to keep in place.

JUDGE MERRYDAY: Thank you very much.

From the Southern District of New York, Judge Loretta Preska.

JUDGE PRESKA: Thank you.

Ladies and gentlemen, as we have all recognized, of course, there is a qualified First Amendment right of access to the public and the press in criminal proceedings, articulated in cases like United States v. Alcantara [8] here in the Second Circuit. These cases, of course, require that restrictions on public access to criminal proceedings and the docketing in those proceedings be accompanied by appropriate and contemporaneous findings of fact. [9]

Here in the Southern District, upon a defendant's pleading guilty to an indictment or superseding information with a cooperation agreement - and, indeed, really with any plea - several relevant documents are produced. The first is a minute entry. That is a memo from the judge's deputy clerk to the docket clerk setting out the fact that a particular defendant pleaded guilty on such-and-such a day, sentencing scheduled for another day, report on bail status, and the like. The docket clerk then converts that minute entry into a docket entry.

Although that docket entry might make no specific reference to a cooperation agreement, as we have all recognized, the experienced observer can often figure out when a cooperation agreement is in place. For example, if the transcript of the proceedings is sealed, the observer will assume cooperation. If a sentence date is not scheduled, but only a status letter, the observer will assume cooperation.

Although I agree with Chief Judge Dearie and others that the Internet is neither the be-all nor the end-all, concern for safety of cooperators was heightened by the electronic accessibility of the docketing materials. Of course, we have all read about the wonderfully named website, **[*88]** Whosarat.com, [10] which makes it its business to peruse the dockets and to inform anyone who is reading who is a cooperator, who is working undercover, often providing mug shots of those individuals.

Adam Liptak in The New York Times quoted a Justice Department official saying, "We are witnessing the rise of a new cottage industry engaged in republishing court filings about cooperators ... for the clear purpose of witness intimidation, retaliation and harassment ... . The posting of sensitive witness information creates a grave risk of harm to cooperating witnesses and defendants." [11]

Obviously, that mission is made easier by the electronic accessibility, rather than schlepping down to the courthouse and going through paper records.

I note parenthetically that electronic availability of this information is not the only way information about cooperators gets out. I have recently been informed that the United States Attorney's Office in the Southern District of New York noticed lawyers perusing the lawyer sign-in sheet at the U.S. Attorney's Office to see who had gone in ahead of him or her. Needless to say, the multi-line sign-in sheets have been discontinued.

In the Southern District, decisions about accessibility of cooperation agreements are made on a case-by-case basis. In the most ordinary case, where the Executive Branch has concern for a cooperator's safety, the assistant will ask that the minute entry and the transcript of the plea proceedings be sealed, usually until the cooperator testifies or is sentenced. The docket entry will not indicate the identity of the defendant. The docket merely reads, "Sealed document placed in vault." When the Executive Branch voices more concern over the safety of a cooperator, a judge might determine that the delay of any docket entry is necessary. In those instances, the United States Attorney's Office generally makes a written application setting out the reasons for the necessity of delaying docketing, and, if that application is granted, with, of course, the requisite findings of fact, all of the documents associated with that plea are put together in a sealing envelope and that sealed envelope is retained in chambers. No docket entry at all is made.

The Court of Appeals has specifically endorsed the delaying of docketing in the Alcantara case provided that the interval of delay ends on a specified date or the occurrence within a reasonable time of a specified event. [12] I think this goes to Chief Judge Dearie's point that there is often not an end to it. We have been urged in our court, on the basis of Alcantara, to set either a date or an event certain for the unsealing of the document and the docket entries. Again, generally, the court will provide for unsealing either at sentencing or when the cooperator testifies.

**[*89]** Thus, in almost all instances, the public will know why, for example, Sammy the Bull [13] got five years after admitting to nineteen murders. The public just might not know it on the day the individual pleads.

Finally, there are also some circumstances in our district where a case is commenced as United States v. John Doe. For example, if the government is building a case against an organization - let us say a Mexican drug cartel, or even a corporation - and if the government signs up a cooperator as the first step in the investigation, disclosure of that individual's name might well undermine the investigation or put the individual at risk. In these instances, again on application of the Executive Branch, the court will permit, upon findings, the proceeding under the United States v.

Doe name and then will seal the proceedings. Sometimes they are sealed cases, again upon adequate findings.

It is also the general practice in the Southern District of New York not to docket any plea agreement, whether a cooperation agreement or otherwise. Most judges do not mark the plea agreements as exhibits to the plea proceedings. Generally, the court will review the agreement, allocute the defendant, and then return it to the United States Attorney's Office. This return is consistent with Local Rule 39.1, [14] which provides that lawyers retain the originals of any exhibits they proffer. This is a general rule; it does not just apply to plea situations.

It is also the policy of the United States Attorney's Office in the Southern District that, unless sealed, plea agreements, including cooperation agreements, are public. They are not generally on the docket, but if requested, they will be provided.

Eventually, as you can hear, most of these cooperation agreements are unsealed and the related docket entries made, indicating when the docket entry was made and when the original event reflected in the docket entry took place. That way, the public can see what the government is doing.

Thus, we in the Southern District feel that this approach is a good balance between the safety of the cooperators and their families, on one hand, and the need for transparency in our work, on the other. I suggest to the [Judicial Conference] Privacy Subcommittee that such an approach allows judges to do what judges do - that is, to consider the competing interests and then to fashion a fact-specific remedy on a case-by-case basis. Thus, I commend that approach to the committee.

Thank you.

JUDGE MERRYDAY: Thank you.

From the district just to the south of the Middle District of Florida, my friend Mike Moore.

JUDGE MOORE: Thank you.

From the remarks that I have heard, there does seem to be some coalescing of practice around the various districts. This comes following [*90] the sort of district-by-district experimentation, with the advent of electronic access.

But just from a judicial perspective, and to give some context to our district practices before we get into how we got to where we are, I see one of the roles of a judicial officer as to promote public confidence in the judiciary as an institution. One of the ways in which we do that is to increase public access to our public records and public access generally to what we do. So, in one sense, I think it would be ironic if electronic access, which enhances public accessibility and ease of accessibility to public records, would be turned on its head and used as a way to limit access by the public to the work that we do.

I think that is just a frame of reference of where our court came from as we began dealing with the issue that arose out of the Whosarat website. [15]

When we were confronted with it, we did pilot it, so to speak, with this dual docket of a paper docket and an electronic docket, where we were withholding the plea and cooperation agreements from electronic filing. We did that for about a year and revisited the issue. I think there was some sentiment that it was somewhat unseemly to maintain a dual docket, a paper docket and an electronic docket, and that our electronic docket should mirror to the maximum extent, if not fully, what was being filed in our paper docket, with the idea that at some point in the future our electronic docket is our sole docket. That is where the future is taking us. To that extent, we should have an electronic docket that is at least as publicly accessible, in terms of all the documents that heretofore had been filed in the paper docket.

Having said that, we recognize the concern of the litigants. Certainly the U.S. Attorney's Office had a continuing concern in all of its cases. But if you are a defense attorney, you may have a concern at one point not to have cooperation agreements or plea agreements filed in the record, and at other times you may want to have somebody

else's documents made publicly available.

But we looked at it, without trying to get into the fray and pick winners and losers on this for the parties, and found that there was an alternative. The alternative, I think, has been touched on. It has been adopted in other districts around the country. That was, at least in our minds, that there is no rule, substantive or procedural, in the federal criminal context that requires the filing of a plea agreement, much less a cooperation agreement. It has been a practice in many districts around the country, but it is just that. It has been a practice. There is no compelling reason why a lawyer has to file a plea agreement or a cooperation agreement.

Now, to the extent that a party seeks to do that and the concern is the cooperation aspect of an agreement, that can be parsed or made a separate agreement. If the lawyers want to file a plea agreement, they are welcome to do so. It becomes their choice, their decision. If they do not want to file [*91] the cooperation agreement because of concerns for the safety of witnesses, there is no obligation for them to do it, so they can elect not to do so.

But where does that leave us? When we go to a plea colloquy, it is incumbent upon the judge to ask the standard question: Are there any inducements for the entry of the plea of guilty? That is where it is made a matter of public record that the individual has entered into a cooperation agreement with the government. The judge is free to look at the agreement. As Judge Preska has mentioned, it can become an exhibit. It can be returned to the parties. But the fact of cooperation is now in the public domain, through the transcript, and unless somebody finds it necessary to go to the public record and request a transcript of that proceeding, it is really of no interest to anyone else at that point and is not made a part of any electronic record.

I think it is a viable solution or a practical solution that does not undermine the court's otherwise obligation to promote transparency and public accessibility to our records.

That is the way we have handled it.

JUDGE MERRYDAY: Thank you, Mike.

The Chief Judge of the Southern District of Mississippi, Henry Wingate.

JUDGE WINGATE: Thank you. Thank you so much for inviting me here to share my few comments with you on this matter.

The people in my district have addressed this matter almost ad nauseam in trying to come up with what we thought to be the best approach. Mississippi has two districts, the Northern District and the Southern District. When I came on the bench many, many years ago, we were separate in almost everything. The Northern District had its rules and the Southern District had its rules. When I was a practicing attorney, I actually carried around rulebooks for the Northern District and for the Southern District. I had so much stuff in my trunk on the different rules that I had no place for my clothes or my tire.

But after I came on the bench, we all got together and decided that perhaps we ought to have one set of rules for the entire state. So now we have uniform rules for the Northern District and for the Southern District combined. [16]

When this thorny issue arose, the first thing that I did was to talk to my opposite number up in the Northern District to determine how we might address this issue. We conferred with the U.S. attorneys, the public defenders, the U.S. probation officers. They all were on the same page that we ought to do something. Then we referred it to our local Criminal Rules Advisory Committee, attorneys appointed by chief judges from both the Northern and the Southern Districts, and had them study the issue. They canvassed the country on possible solutions, and they came up with what they thought would be the best approach, which I will discuss with you in just a moment. They then published their suggested approach for [*92] comments in the local newspapers, to allow attorneys and other interested people to make a response. Then, after having received no negatives, the judges of the Northern District and the judges of the Southern District all voted to approve this local rule concerning this particular matter.

We then sent it to the Fifth Circuit Court of Appeals to get the Fifth Circuit Court of Appeals' view on the matter,

and the Fifth Circuit Court of Appeals approved it.

We have in effect a local rule dealing with plea agreements, which is different from our rule involving the sealing of documents. We also have a rule regarding motions for sentence reductions, based on cooperation with the government. I will start with the one on plea agreements.

Basically, it mirrors the North Dakota approach. [17] All plea agreements shall be submitted, with original signatures, in paper format to the court, and then shall be sanitized by the drafter of any references to cooperation. After a plea has been accepted in open court, plea agreements shall be scanned and electronically filed as public, unsealed documents. All plea agreements shall be accompanied by a sealed document entitled "Plea Supplement." The plea supplement will also contain the government's sentencing recommendation. The plea supplement will be electronically filed under seal. All cases will be docketed identically, with reference to the sealed plea supplement, regardless of whether a cooperation agreement exists. The district judge may order the entire plea agreement to be sealed for a specified period of time if the court finds an exception.

So we have two documents submitted. One is the plea agreement; the other is the plea supplement. They are both accepted by the court. One is to be sealed; the other is for public review.

The document-style plea agreement is read into the record. Nothing is read into the record concerning the [contents of the] plea agreement, other than the fact that there is one and that the parties have signed it and that it will be filed under seal.

The matter concerning reductions based on cooperation: Government motions filed pursuant to Federal Rule of Criminal Procedure 35 [18] or Section 5K1.1 of the United States Sentencing Guidelines [19] or 18 U.S.C. Section 3553(e) [20] shall be filed under seal without prior leave of court. The government must provide notice to counsel for the defendant that such motion has been filed and provide defense counsel with a copy of the motion. Defense counsel may not copy or distribute the motion, nor may they reveal the contents of the motion to anyone other than their client, without prior leave of court. Said motions will remain under seal indefinitely, unless and until a court enters an order directing that they be unsealed.

 [*93] In taking this approach, we took into consideration the public's right to know. We are concerned about it. We took into account the safety of prisoners. We are concerned about that, too. Then we took into account what we considered to be an abuse of our PACER system. We found that prisoners were accessing PACER. We found that some penitentiaries allow access to PACER on the computers in the penitentiaries. Therefore, they were pulling this information right out of PACER. So we tried to craft an approach that we thought would at least address the problem.

We also recognized that prisoners identified as snitches face problems in a penitentiary, not only because they have snitched in the past, but because prisoners are afraid they will snitch in the future. A lot of abuses occur in the penitentiary setting. There is the selling of drugs. There is other criminal activity afoot. There are assaults committed by anonymous persons. Prisoners feel that someone who has snitched in the past will snitch in the future, and thus, they pay special attention to snitches. So it is not just because of what they have done or the snitching they have done in the past that concerns the prisoners. It is also their fear of what they [past snitches] might say about what is going on in the penitentiary.

We have heard so many anecdotal stories about what has transpired in various prisons, both in our domain and elsewhere, that we felt we had some obligation there. We felt we had some obligation to protect our PACER from being a part of this wrongdoing. So we crafted the rules that I just described. These are rules that both the Northern District and the Southern District of Mississippi have embraced.

With regard to this matter of whether those of criminal intent or hostility will discover the information, no matter what we do, we do not take that view. We reject that view, just as we reject the view that one should not put locks on houses because a professional crook is going to break in anyway. We tried to make it a little more difficult for that individual to come forward and to hurt us. We tried to put some obstacles there to make them work just a little bit harder.

That is the view that we have taken in the Northern and the Southern Districts of Mississippi. That is the entire state of Mississippi. So we weighed in on this matter mightily. I might add again that our rule was approved by the United States Court of Appeals for the Fifth Circuit.

Thank you.

JUDGE MERRYDAY: Thank you.

From the Eastern District of Pennsylvania, Judge Michael Baylson.

JUDGE BAYLSON: Thank you very much.

The protocol that we adopted about three years ago is in your booklet, along with a short memo that I did with Professor Capra. It describes the formulation of this and how it has been working.

Basically, both the government and defense counsel, when they want to file a plea agreement, file it under the heading, "Plea Document." That is all the docket shows, the electronic docket or the physical docket. The same with a sentencing memorandum. It just shows the term "Sentencing Document." It is not accessible electronically, regardless of whether it is **[*94]** cooperation or not. However, the document is accessible to someone who comes into the Clerk's Office.

People can say that that is an artificial distinction, that it is an illegal distinction. I do not agree with either of those. It works for us. Our Clerk's Office told us that it was exceptionally rare for anyone to come in and ask to see a document filed of record in a criminal case. It just really never happened. But based on Whosarat.com and some other stories, we felt that there was a risk of this happening remotely, electronically. That is why we designed the policy the way we did.

I respectfully take issue with those who think there is a guaranteed right of public access to plea agreements. I am not aware of any ruling of the Supreme Court or any circuit court that has ever held that. In the Third Circuit we have a fairly well-developed body of law that allows for sealing of lots of documents involved in the criminal process - the results of discovery, wiretap evidence, things like that. If a trial starts involving one of those things, there are many instances where representatives of the press have tried to gain access to them. If they petition the trial court to do that, the Third Circuit requires that we allow the press to intervene, to be heard. We have to rule promptly, with facts, defending the preclusion of the material from the public record or allowing access to it. Then there is an expedited appeal if the press wants to appeal. Usually the whole process is done and accomplished in three or four days. In past history, there are lots of instances of that.

So at least in the Third Circuit, I think we are well within our rights in protecting plea agreements from uniform public access.

We have many documented examples in the Philadelphia area of a culture of intimidation and retaliation. We feel as a court that we have some responsibility to take some action that protects our records, our court records, from being available for those purposes. Is there any guarantee? Is it failsafe? Of course not. But we thought it was reasonable, within the public interest, and did not deter people from looking at those court records if they really wanted to, by coming to the court and going to the Clerk's Office and asking to see them. We felt that that served the objectives of public access.

I should also say that I think it would make a lot of sense if the Department of Justice would take a position on these issues that we are exploring here today. I think there are a lot of reasons why courts may have their own local preferences for how they do things. I think some courts feel guided by circuit law in unique ways and that other districts in different circuits may not feel so compelled. But I think nationally and nationwide it would be advantageous for the Department of Justice to develop some guidelines or rules for various U.S. Attorney's Offices to follow in this instance. I would respectfully recommend that the Privacy Subcommittee make such a recommendation to the Attorney General.

I want to add just a couple of other things, and then I will stop.

[*95] The 5K1.1 motion [21] - and in the sentencing guidelines the word "motion" is used - was, under the pre-Booker [22] regime, a necessary motion for a judge to depart downward from the guidelines. Post-Booker, I do not think 5K1.1 has the same significance, and I do not think a motion ought to be required. I think some thought should be given by the Sentencing Commission to eliminating the concept of a motion in order for a judge to apply 5K1.1. We all know that we have to make a Guidelines calculation before we apply the statutory factors and impose a sentence. But 5K1.1 no longer has that gateway significance that it had before.

Also I think there is a lot to be said for the practice in the Southern District of New York, and the Eastern and Northern Districts, for not filing these documents at all. We considered that in our court, but it did not carry the votes. But I think it has a lot of merit to it.

My own view also is that we should have some more development of substantive law in this area. I am sure these issues will come up, and we will get some more circuit law. Maybe the Supreme Court will take a case that involves some of them. I think the amendment of the Rules should await further substantive legal holdings.

Thanks.

JUDGE MERRYDAY: Thank you.

Let me clarify, if I may. You said that you do not agree that a qualified right of access attaches. Is that a statement that is applicable to a plea agreement in the public docket?

JUDGE BAYLSON: If the plea agreement is filed publicly - that is, if it is available in public - then obviously there is a right of public access to it.

JUDGE MERRYDAY: Your view is that that problem is made by the filing of it.

JUDGE BAYLSON: Yes, it is made by the filing of it. Furthermore, even though we have this protocol in our district, the government still files a lot of plea agreements under seal when there is a cooperation provision and they think the case is very sensitive. They recognize that that is, to some, a signal that the defendant may be cooperating, but nonetheless they go ahead and do it anyway, because they feel the protection of the terms of the agreement is more important than somebody making an inference out of the fact that it was filed under seal.

JUDGE MERRYDAY: Do you think that the event of sentencing affects whether the qualified right of access has attached? In other words, if it is not filed but a sentencing occurs in which a concession is made based upon a term in that plea agreement -

JUDGE BAYLSON: The uniform practice in our district is that where there is a sentencing of a defendant who has cooperated, colloquy on that takes place in sidebar, and the sidebar conference is sealed. If and when the sentencing transcript is uploaded - we have digital audio - the sidebar is not [*96] available publicly. If the transcript is to be prepared by a stenographer, then the sidebar is not available to the public.

JUDGE MERRYDAY: Satisfying the qualified right of access?

JUDGE BAYLSON: That is our feeling, yes.

JUDGE MERRYDAY: Thank you.

From the District of Connecticut, where my mother was born, Judge Stefan Underhill.

JUDGE UNDERHILL: Thank you.

WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP
4242101.1

Let me just give a little bit of background about how Connecticut came to undertake a very comprehensive revision of its local rules on these issues two or three years ago.

In 2005, two things happened that kind of shook up the District of Connecticut. The first was a very highly publicized criticism of the state court system in Connecticut for so-called secret files. It became known and widely reported in the press that the state court system basically would not acknowledge the existence of some several hundred files, principally the divorce files of politically connected folks in Connecticut. This was front-page news. The concern in the district was, are we doing the same thing? Are we hiding files in some way? Are we not letting the public know that we have cases pending?

The second thing that happened in 2005 was that the Second Circuit decided the case of United States v. Alcantara, [23] which made clear that plea proceedings, which, in our view, included cooperation colloquy, had to be conducted in open court unless the stiff requirements for court closure could be satisfied. [24]

So with those two concerns in mind, we undertook a comprehensive review of what we were doing. Frankly, there was quite a tension between the desire, both by the U.S. Attorney's Office and the court, frankly, to protect cooperators as much as possible against what we saw as very strict and clear guidelines from the Second Circuit Court of Appeals. I will say that with Judge Raggi sitting here. We always follow what the Second Circuit says to the "T."

I will disagree, at least in the Second Circuit, with the concept that a plea agreement or cooperation agreement is not a judicial document. As we read the Second Circuit cases, every document used by parties moving for or opposing adjudication by the court, other than a hearing or trial transcript, is a judicial document that is subject to the qualified First Amendment right of access. Now, the trick, I think, is that the right of access is a qualified right of access, and it can be overcome in circumstances that are sufficiently extraordinary.

If you look at a case like United States v. Doe, [25] in which the Second Circuit set forth four steps for closing a court, [26] that is essentially what our [*97] rule requires with respect to cooperation colloquies. The process in our district, in essence, is that the U.S. Attorney's Office or the defense counsel makes clear to chambers that there is a cooperator involved, that the plea agreement includes a separate document. In the District of Connecticut there are two letters. One is the plea letter; one is the cooperation letter.

When we are informed that there is a cooperation agreement involved, we begin the proceeding in camera. We give the U.S. Attorney's Office a chance to make a request that the proceeding be closed. We usually get an affidavit setting forth facts that we can rely upon to make the particularized findings of fact that are required for court closure. We then make a determination, based upon what we have been told by affidavit, whether to close that proceeding or not. Typically in a cooperation scenario, a closure motion is granted. The transcript of that proceeding - and that is usually undertaken prior to going into court for the plea colloquy - the transcript of that proceeding is sealed. If the correct findings are made, the docketing of that cooperation colloquy is also not shown on the docket sheet, until some later date, typically sometime after sentencing.

At that point, we go into court. We do the plea colloquy. The plea agreement makes no mention of cooperation. We do not mention cooperation. We do not include it as something that is inquired of on the record. Rather, it is a fairly discreet inquiry: Does the written plea agreement contain your entire agreement with the government? Has anybody made any other promises to you that are not put down in writing in your agreement with the government?

The agreement with the government, of course, includes both the plea and the cooperation agreement, which incorporate each other by reference. So the defendant can truthfully say, "No. My entire agreement is put down in writing," with no mention on the record of any cooperation agreement.

We think this works pretty well. I asked our U.S. Attorney just a moment ago whether she was aware of any complaints about it. The only complaint she has, which I would share a little bit, is that our judges have not been uniform in the way that they have followed the rule. Some of them who have been here longer than the rule are not going to be told how to do things, and they are going to do them their own way. So there is not uniformity.

But the rule, I think, is quite comprehensive. In my view, it tracks quite well a number of Second Circuit decisions that we wanted to make sure counsel were aware of and followed. We thought that that kind of enforcement would be increased if we put it expressly into the rule. Frankly, it also helps the judge do the right thing.

We did consider, after this rule came into effect, what I know as the South Dakota rule. Maybe North Dakota has the same rule - but the Dakota rule. We declined to adopt it, principally because of the concern that folks who had not cooperated would be deemed to have been cooperators and would be potentially subject to retaliation.

In sum, we like to think that our rule, although relatively strict - because the Second Circuit rules are relatively strict - strikes a pretty good balance **[*98]** between recognizing the substantial, although qualified, right of First Amendment access and balancing that right against the right of the individuals who are cooperating and the right not to be put at risk as a result of that cooperation.

JUDGE MERRYDAY: Thank you, Judge Underhill.

We do have a couple minutes for some questions.

JUDGE DAVID COAR (U.S. District Court for the Northern District of Illinois): If there is an 11(c) agreement, [27] an agreed-upon sentence, is that not covered in the plea colloquy?

JUDGE UNDERHILL: That would be in the plea agreement letter.

JUDGE COAR: But it would not be discussed in the colloquy?

JUDGE UNDERHILL: It would be. But I do not think there is a concern - at least in our district, those are relatively rare. Nora Dannehy can correct me if I am wrong, but my sense is that they are not really used as a substitute for a 5K1.1 motion. If I get an 11(c)(1)(C) agreement, it is going to be the concern that I am going to go too low or whatever. So they are going to try to say, "Here we go, so do not go below this." It is not really used with cooperators, to any great extent, as far as I am aware.

JUDGE COAR: In our district, we get fairly complicated 11(c)(1)(C) agreements, where there are variations - if this, then that. We may go through three or four levels.

JUDGE UNDERHILL: We have not seen that.

JUDGE RAGGI: I do have one question for the panel as a whole. As each of you have spoken about the reasons you have adopted your particular practices, I do not hear anyone saying that you really need any help from the Rules Committee. Am I right in that? No one is floundering or needs our help.
JUDGE PRESKA: Indeed, we must be cognizant of what Judge Underhill said about the rules having been made after people got here. Sometimes they are less likely to listen.

JUDGE MERRYDAY: Again, on behalf of Judge Raggi and the Privacy Subcommittee, thank you all for participating.

**Legal Topics:**
For related research and practice materials, see the following legal topics:
Computer & Internet Law > Privacy & Security > General Overview
Criminal Law & Procedure > Preliminary Proceedings > Entry of Pleas > General Overview
Criminal Law & Procedure > Sentencing > Plea Agreements

**FOOTNOTES:**
n1. United States District Court Chief Judge, Eastern District of New York.
n2. United States District Court Chief Judge, Southern District of New York.
n3. United States District Court Judge, Southern District of Florida.

fn4. United States District Court Chief Judge, Southern District of Mississippi.

fn5. United States District Court Judge, Eastern District of Pennsylvania.

fn6. United States District Court Judge, District of Connecticut.

fn7. U.S. Sentencing Guidelines Manual § 5K1.1 (2009).

fn8. 396 F.3d 189 (2d Cir. 2005).

fn9. See id. at 199-200.

fn10. Who's a Rat - Largest Online Database of Informants and Agents, http://www.whosarat.com (last visited Sept. 23, 2010).

fn11. Adam Liptak, Web Sites Expose Informants, and Justice Dept. Raises Flag, N.Y. Times, May 22, 2007, at A1.

fn12. See Alcantara, 396 F.3d at 200 n.8 (citing In re The Herald Co., 734 F.2d 93, 102-03 n.7 (2d Cir. 1984)).

fn13. United States v. Gotti, 171 F.R.D. 19 (E.D.N.Y. 1997).

fn14. S.D.N.Y. R. 39.1.

fn15. See supra note 4.

fn16. N.D. Miss. & S.D. Miss. L.U. Civ. R., available
at http://www.msnd.uscourts.gov/FINAL%20CIVIL%20RULES%20w%20amendm ent%20.pdf.

fn17. D. N.D., Plea Agreements & Plea Agreement Supplements (2007), available
at http://www.ndd.uscourts.gov/pdf/Plea_Agreements.pdf.

fn18. Fed. R. Crim. P. 35.

fn19. U.S. Sentencing Guidelines Manual § 5K1.1 (2009).

fn20. 18 U.S.C. § 3553(e) (2006).

fn21. U.S. Sentencing Guidelines Manual § 5K1.1 (2009).

fn22. United States v. Booker, 543 U.S. 220 (2005).

fn23. 396 F.3d 189 (2d Cir. 2005).

fn24. Id.

fn25. 63 F.3d 121 (2d Cir. 1995).

fn26. See id. at 128.

fn27. Fed. R. Crim. P. 11(c).

| | |
|---|---|
| Service: | **Get by LEXSEE®** |
| Citation: | **79 Fordham L. Rev. 85** |
| View: | Full |
| Date/Time: | Saturday, November 27, 2010 - 2:30 AM EST |

## Addendum #2

In 2009 Mr. Bernstein filed an action against Bayrock Group LLC in New York State Supreme Court. After protracted effort, Mr. Sater was deposed. Observe what happened:[1]

A.  I was convicted of assault one.

Q.  Were you ever convicted of any other crimes?

A.  On the advice of counsel, I am not going to answer that question as I don't have to incriminate myself nor does this business litigation have anything to do or bearing on whether I am convicted of any crimes or not. On the advice of counsel, I won't answer past what I have already answered.

Q.  You already answered you were convicted of assault?

A.  Yes.

Q.  If you have actually been convicted, the fact that you have been convicted cannot constitute any testimony against your own interests and goes to your credibility depending upon what the nature of conviction was and if it goes to a conviction related to something related to any sort of fraud, et cetera, it is relevant to your credibility as a witness in this case. ...

[¶]... Are you refusing to answer the question --

A.  On the advice of counsel.

Q.  Is that your direction to him?

A.  He is not my counsel on this particular matter. My counsel is Leslie Caldwell from Morgan Lewis....

Q.  Did she know you would be asked this question?

A.  Yes.

Q.  Did she advise you not to answer this question?

A.  Yes.

Q.  The grounds being again?

A.  Not to incriminate myself and -- on this issue and that I don't have to answer since my convictions have -- or lack thereof have nothing to do what I am going to be questioned about here.

Now consider this, your honor: Either (i) counsel committed an obstruction of justice by advising him that he did not have to truthfully answer "yes" in respect to his RICO conviction. After all, how could he be subjected to further criminal penalties for admitting that he had already been convicted? It was a *fait accompli*, No?

Alternatively: (ii) counsel was being a good advocate, protecting the client from incriminating himself. But the only way his admitting to being a convicted RICO racketeer could subject him to further criminal penalties (warranting his taking the Fifth) would be if his concealment of his RICO conviction is itself a crime. It is alleged, and demonstrated, in the SDNY complaint in *Kriss v. Bayrock* that his concealment of his conviction allows him to continue to commit further crimes. Mr. Oberlander will demonstrate that it is to continue his crimes that he illegally conceals his RICO conviction.

---

[1] For the record, Mr. Oberlander did not prepare these questions, did not give them, and wasn't even in the room when all these questions and answers occurred and we are simply quoting from the reporter's transcript.